JAN 1 0 2018

.D.C.
WP

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------------------------

MARC FISHMAN

             Plaintiff,

    v.

Office of Court Administration New York State Courts

             Defendants

# 18 CV 282

CASE NO. Pending

----------------------------------------------------------------------------------------

COMPLAINT

----------------------------------------------------------------------------------------

Plaintiff, MARC FISHMAN, Plaintiff *pro se* herein, brings this Complaint against the Office of Court Administration New York Courts,:

## PARTIES

1.    I am the Plaintiff in this matter and am "Qualified Disabled " under the ADA and ADAAA with Invisible Disabilities including Severe Obstructive Sleep Apnea, Traumatic Brian Injury, Post Concussion Syndrome, Occipital Neuralgia, and TMJ caused by two car accidents in 2013. I am a Qualified ADA Disabled father in a never ending 45 month

State proceeding in New York State Family Court that is administered by Chief Judge Kathy Davidson, Judge Michelle I. Schauer and Court Attorney Michelle D'Ambrosio and overseen by Office of NY Courts Administration. The Family courts operation and ADA accessibility matters are overseen by the Office of Court Administration and its ADA Administrator Dan Weisz. All Defendants who make up the Office of Court Administration have discriminated against me in Violation of Title Two of the ADA by failing to reasonable accommodate my "Qualified ADA Disabilities" in court and court proceedings/programs. All defendants have discriminated against me by retaliating against me with deliberate intent and indifference for my "Qualified ADA Disabilities. " All Defendants discriminated multiple times with over 20 instances of intentional disability discrimination. Because my disabilities are "invisible disabilities" in that I do not carry a cane or have a wheelchair, the New York State Court willfully discriminates compared to other disabled who are immobile/wheelchair bound and receive immediate disability accommodations from the court. All defendants including Judge Schauer denied my minor son, Jonah Fishman an ADA Advocate for his "Qualified ADA disabilities" to punish me as retaliation for making ADA accommodations of the court and of complaining about the court's discrimination. Seeking redress of the disability discrimination under title

2

two of the ADA and amended ADAAA, Section 504 of the 1973 Rehabilitation Act and repeated violation of the New York Human Rights Laws.

2.    I seek a Federal Stay of all New York State Family court proceedings and orders until this matter is heard and the State and Defendants comply with all "reasonable accommodations" requests for ADA handicap accommodations in this petition.

3.    Defendants have failed to Reasonably Accommodate my "Qualified ADA Disabilities" of Severe Obstructive Sleep Apnea, Traumatic Brian Injury, Occipital Neuralgia, and TMJ apnea in the court room and court services by denying me a note taker in court, denying me permission to tape or video record court proceedings, denying large print court orders, denying testimony of my neuropsychologist, social worker and psychologist and forensic psychologist to my qualified disabilities in court, denying my son Jonah Fishman, a qualified disabled boy with Langerhan Hystiositosis X (an expedited Social Security Disability) an ADA Liaison for his interests in State Court which affects the major bodily function of concentration and physical muscle/body control and denying access to my children for home visits in "court supervised visitation programs" post Inspire neurostimulator Sleep Apnea implant surgery. I have two neurostimulator implants in my

chest/head and neck for my qualified ADA disabilities.  I have a Medtronic Neurostimulator for Occipital Neuralgia pain in my left chest since March 2014 and An Inspire Brand tongue/hypoglossal neurostimulator in my right chest/neck and underneath my tongue  since December 2016 to minimize my sleep apnea.  My Qualified Traumatic Brain injury and Severe Obstructive Sleep Apnea affects the major bodily function of  short-term memory and sleep so a note taker is needed in court to help remember by taking notes (particularly when there is no stenographer and it takes months to order digital transcripts from the Family court and produce transcripts of family court proceedings.) A tape or video recorder could allow me immediate access to proceedings and assist my slight memory impairment from Sleep apnea and TBI/Post Concussion Syndrome.  Large print court orders are needed as a reasonable accommodation for my disability because my qualified disability of Occipital Neuralgia creates burning eyes, and hours long debilitating headaches from reading tiny microscopic size print contained in standard NY State court forms like orders of protection that are in very tiny/small print to fit on small court forms. My Sleep Apnea disability sometimes makes me tired and an accommodation for morning only court sessions were requested for me to be maximum alert in court so I can concentrate and have ample time for cognition classes in the afternoon

for my post concussion syndrome. My TMJ disability affects eating and sleeping and shortened court proceedings are necessary to tolerate the pain and decreased sleep of the ADA qualified disabilities.

4.    Defendants have discriminated against me and retaliated against me for my "Qualified ADA disabilities" by failing to conduct a State family court hearing timely and delaying/canceling/rescheduling 4 fair hearings for multiple years because of the side and behavioral effects of my disabilities and retaliatory actions of the court. Fair hearing trials or fair hearings based on "unfounded" child abuse charges levied in June 2014 were willfully, purposely, deliberately and intentional delayed and postponed from original hearing dates in April 2015, November 2015 and April 2016 by defendants as retaliation for my qualified disabilities and qualified disability side effects. Non-disabled fathers or mothers in family court do not have their hearings intentionally postponed repeatedly by defendants for similar charges/offenses. Defendants were deliberately indifferent and purposely delayed these hearings to punish and retaliate by keeping kids away from their father more time than non-disabled father endure in the same family courts in similar proceedings. Defendants have belittled, made fun of and punished me for my post concussion syndrome and difficulty remembering

and registering all court order terms in small tiny print orders of protection forms because of my "invisible disabilities."

5.    Defendants are retaliating against me against regulation 42 USC code 12203 for being disabled by denying me the reasonable accommodations listed in this complaint.  Defendants have been retaliating against me by requiring me to attend hundreds of visits/therapy sessions with evaluators,    doctors,    therapists,    psychologists,    social    workers, neuropsychologists, psychiatrists, parent coordinators, social workers and other professionals not covered by health insurance  that other non-disabled parties in other family court are not required to see or attend in similar family court hearings. Defendants could have utilized medical providers that accept health insurance or no-fault insurance as payment, but instead defendants deliberately selected and ordered me to see specialists , doctors, evaluators or social workers THAT DO NOT ACCEPT MY INSURANCE AS RETALIATION FOR MY QUALIFIED ADA DISABILITIES. Defendants repeatedly punished me by having me pay much much more for evaluations with particular high cost psychologists and other medical court ordered providers than those who cost less covered by insurance. Defendants further discriminated and retaliated against me by failing to allow therapists that specialize in my unique disabilities from testifying or given evidence at

Fair hearings or court proceedings. Other non-disabled parents in Family court are permitted to have their medical or therapeutic experts or treating doctors/therapists testify, but these defendants denied me because I am disabled with "invisible disabilities" as retaliation for making numerous ada accommodation requests, complained about defendants to supervisors and regulatory agencies and acted to deliberately treat me differently.

6.    Defendants including Judge Michelle I. Schauer further retaliated against me for my "Qualified ADA disabilities" by confining and incarcerating me for sending gifts to my kids for the major holiday of Passover 2016, Memorial Day 2016, Independence day July 2016 and my twins birthday in July 2016. in alleged violation of a Temporary Order of Protection. (TOP.) The TOP order provided gifts could be sent on major holidays and birthdays. Defendant Judge Schauer stated that "Passover, Memorial Day and July 4 are not major holidays" and that I allegedly violated a TOP order. All three are major holidays per the Federal, State Government and Official Jewish Calendar. All three of these holidays are considered legal major holidays by other judges in family court without disabled litigants participating. Defendants knew these were major holidays and that I did not violate the order, but defendants deliberately jailed me, by stating they told me at the hearing that there were no major holidays between

April and July 2016. Defendants including Judge Schauer and Michelle D'ambrosio expected me to remember words stated at a hearing without a note taker, stenographer or tape/video recording in small print and handwritten New York State forms and New York State form orders. With my slight memory impairment, I did not remember the Judge's exact words spoken at the conference and just tried to follow the written court order that allowed for gifts to be sent on Major holidays. With knowing and acknowledging the disability, the jailing by the State of New York and its Judges was deliberately indifferent to my disabilities and extremely biased and retaliatory. Another non-disabled parent would not have been jailed for this alleged offense. I was jailed because I am disabled with these particular "invisible disabilities" that disturbed defendant Judge Michelle I. Schauer who felt I was intentional mocking her or not following complicated court instructions. Defendants further retaliated against me, by choosing the most expensive cost for court transcripts as their disability accommodation to my memory impairment instead of free or low cost note takers or video/tape recorders that could immediately take notes and report of what is said in court. Official Court Transcript requests were deliberately delayed by Judge Schauer and Michelle Dambrosio for months, who interfered with court staff to purposely delay digital recordings from being sent out of Yonkers family

court by the court clerks to my transcriber, as retaliation to my ada complaints, complaint to NY Office of Judicial Conduct and Judge Davidson, supervising Judge. Other non-disabled litigants do not need a court order from a Judge for transcripts, but Judge Schauer required Lee, the court clerk in Yonkers to get court permission to send out the recordings for transcripts in my case. This willful, disparate and intentional discrimination was deliberate to my unique disabilities. The court intentionally wanted to delay transcripts for me, because I would use the transcripts to complain to agencies that regulate judges as well as supervisors and administrators for the court. The sooner I could get a transcript, the sooner I could study it and try to follow all the complicated confusing orders and instructions. Defendants including Judge Schauer willfully delayed the State Court transcript producing process as retaliation for my qualified ADA disabilities. Chief Judge Kathy Davidson and Office of Court Administration chief ADA administrator Dan Weisz were repeatedly made aware of Judge Schauer's and Attorney Michelle Dambrosio's disability discrimination in court and court programs and requested to act administratively to grant the ADA accommodations. Judge Davidson and Administrator Weisz failed to act administratively to insure their court proceedings and court programs were free of disability discrimination to accommodate my reasonable invisible

disabilities. Judge Schauer and Court Attorney Dambrosio deliberately interfered with the normal granting of ADA accommodations by the court ADA liaison William Curry who told me "he would not have denied any reasonable accommodation of a tape recorder, note taker or large print court order." Mr. William Curry further informed me he "is instructed to grant all administrative accommodations to the Qualified ADA Disabled to avoid discrimination." William Curry told me these accommodations requests were administrative accommodations and do not interfere with the operation of the Family court. There was no plausible, rational reason defendants could not grant a note taker or tape recorder as these administrative accommodations do not interfere with the courts process or judges wide discretion. A note taker would sit quietly and take notes. In addition there was no legitimate reason to deny large print court orders. The court uses word processors that can print in large 12-point large print instead of the microscopic order of protection small print font size that I get occipital neuralgia headaches from after reading. The court could have easily scheduled morning only conferences like the judge said she would. The court determines its own schedule. But Defendants including Schauer and Dambrosio purposely and willfully scheduled afternoon court sessions in violation of the ada hearing terms on 6/21/17 that provided for morning only

~~discretion.~~ A note taker would sit quietly and take notes. In addition there was no legitimate reason to deny large print court orders. The court uses word processors that can print in large 12-point large print instead of the microscopic order of protection small print font size that I get occipital neuralgia headaches from after reading. The court could have easily scheduled morning only conferences like the judge said she would. The court determines its own schedule. But Defendants including Schauer and Dambrosio purposely and willfully scheduled afternoon court sessions in violation of the ada hearing terms on 6/21/17 that provided for morning only court sessions to accommodate my sleep apnea impairment. Defendants intentionally sought to punish and retaliate against me to stop me from taking an early evening flight in the late afternoon, by making it impossible to get to the flight on time. This denial of an ada accommodation for sleep apnea was deliberate and willful. The Judge and defendants wanted me to be overly tired in court when I had to testify and wanted me to suffer debilitating headaches by purposely scheduling me for afternoon testimony as compared to other courts that allow morning only hearings for those with sleep apnea "Qualified ADA Disabilities.". The judge and co-defendants deliberately wanted me to be uncomfortable because Judge Schauer and Michelle D'ambrosio are so biased in my ex-wife's favor that they wanted

me to be suffering the most physical pain in her court while testifying.  The judge knew my occipital neuralgia, TMJ, post concussion syndrome/tbi and sleep apnea symptoms get worse without rest.  I normally take an afternoon nap.  Without the nap and needing to testify, the judge was deliberately and intentionally interfering with my ADA rights and needed reasonable ada accommodations of morning only court sessions. Whereas  Judge Schauer opined that if I could make a flight, I can endure and 8 hour all day hearing within court after morning court sessions the whole week without an afternoon nap, The fact is, I would have napped before my flight.  But again the defendants wanted to intentionally retaliate for my qualified ADA disabilities. Judge Schauer wanted to emphasize to me that she felt that I am not disabled, was faking my symptoms and in her opinion do not need morning only court sessions. The facts are disabled people are allowed to go on vacation too on a pre-planed trip/vacation too that was scheduled for the upcoming the following Labor Day weekend. To deny morning only court the day before labor day weekend 2017, was deliberate and intentional punishment/retaliation by defendants including Judge Schauer to make it extra hard and more difficult to for me to have meaningful access to the state courts by being able to concentrate while managing multiple disabilities.  All because I could fly late in the afternoon, does not mean I can tolerate sitting

in court the whole day and testifying. These are two distinct acts that require use of separate bodily functions. Instead Judge Schauer and Court Attorney D'ambrosio deliberately interfered with William Curry, ADA liaisons duties and job responsibilities to purposely and intentional oppose reasonable ADA accommodations that would have been granted administratively by Court Administrator William Curry. Judge Davidson refused to act and ignored her ADA administrative responsibilities to make sure her State Family courts are accessible to the "Qualified ADA Disabled" litigants. Official Court Transcripts take too long to prepare by transcribers and take months as compared to note takers whose reports are immediately available in hours or a couple of days. Similarly a video or tape recorder accommodation is immediately available to accommodate my disabilities. On average it took over 3 to 4 months to get a Court transcript produced with all the intentional court delays. The New York State Family court, purposely, with deliberate indifference had me expend over $15,000 for transcripts as compared to a low cost note taker or low cost tape/video recording accommodation which would not have cost even 20 percent of the cost of official court transcripts. Under the ADA rules and regulation, ADA accommodations are to be provided free or no cost to litigants. ADA Qualified Disabled applicants cannot be charged more than the non-disabled for access to handicap

accommodations under Federal ADA Law. Judge Schauer and Court Administrative attorney Michelle D'ambrosio purposely chose the highest cost of disability accommodation as retaliation for my disability request and disability conditions. A note taker would not interfere with the court proceeding and it was discriminatory not to approve one as a reasonable disability accommodation request to my "Qualified ADA Disabilities." Said retaliation was deliberate on behalf of the State Court, its agents, employees and Officers as the court was well aware of my disabilities and had received numerous pages of confidential medical information by my ada advocate and myself attesting to my "Qualified Ada Disabilities." Providing large print court orders would not cost more to the state. The large print orders would only require a couple more pages of printed-paper to accommodate the larger letters. The cost for extra paper and toner is in the pennies not even extra dollars for large print court orders. The ada advocate accommodation request on behalf of my son would not have cost the court anything, as I offered to pay for it and my ada advocate, Donna Drumm's cost for making the ada requests was born by me, not the State court. The cost to the State court of morning only court sessions would be negligible as the court is already open in the mornings. These was no additional cost to hold morning court sessions to accommodate sleep apnea as compared to all

day sessions. In fat the court may even save money by having morning only sessions and the court had to frequently pay overtime for court staff for late afternoon hearings. In denying my requested accommodations for me and my disabled son, the court did not show that the accommodation would interfere with the normal court procedures or "alter the nature of the court ."

7.    New York State's ADA accommodation process of allowing inexperienced Judges and Court Attorneys like Judge Schauer and Attorney Administrator D'ambrosio in Family court hearings to usurp the Experienced Court ADA Liaisons and prevent liaisons like William Curry from granting of ADA accommodations  interferes with the Federal Broad non-discrimination mandate under ADA.   Under   USDOJ implementing regulation id $ 12134; 28 C.F.RE pt 35 and 28 C.F.R $ 35.130(b)(1)(iii) the USDOJ ADA regulation prohibits a public entity from providing services to individuals with disabilities that are "not as effective in affording an equal opportunity to obtain the same result...as that provided to others." Consistent with the statute, the regulation both prohibits outright discrimination and requires a public entity to "make reasonable modifications in policies, practices, or procedures when...necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making modifications would fundamentally alter the nature

of the service, program, or activity." This is specified in 28 C.F.R $ 35.130(b) (7). This regulation is entitled to "controlling weight" so long as it is not "arbitrary, capricious or manifestly contrary to the statute," as specified in Chevron USA , Inc. v. Natural Res. Def. Council, Inc 467 U.S. 837, 844(1984.) The Supreme Court of the United States has credited USDOJ's interpretation of Title II as implemented by this regulation as concluded in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597-98(1999.) New York State and Office of Court of Court Administration allowance for inexperienced Family Court Judges to override ADA decisions of experienced liaisons is contrary to the mandate of the ADA and ADAAA. Other states have central ada administration judges that dispense in hours or days rulings of providing ada accommodations in a quick manor to insure the disabled have meaningful access. New York State's  ADA reasonable accommodation process of allowing/permitting judges in individual cases to take away the accommodation process from experienced ADA court liaisons violates the Congressional spirit , mandate and intention of the ADA law to provide swift and immediate accommodations to the handicap.  The ADA provision for reasonable accommodations extends to the visibly and invisible disabled as long as the disability is qualified and affects a major bodily function like sleep, memory, eating, walking, standing or other

qualified handicap impairment.   New York State Office of Court Administration is guilty of violating the spirit and regular handicap administration process of the ADA because their ADA accommodations website listed court procedures interfere with Federal Mandate for immediate accommodations.   There is no legitimate excuse of New York State that Reasonable ADA accommodations of a note taker be allowed in court from a  December 2016 accommodation request should still not be provided a year later in December 2017 or January 2018. New York State Court administration's ada accommodations procedures fails to allow swift appeals/review of denial of ADA accommodations by State Judges in State court.   Indeed trying to appeal an ADA accommodation in the busiest appeals court in the country in the second department covering long Island, Westchester, Brooklyn, Queens, Rockland, Putnam, Dutchess and Orange County is  an impossible endeavor.   Even the Appellate court chief clerk Aprillanne Agostino stated that the ADA accommodations is an "administrative function that the appellate division could not help me out with."  The appellate division second department recommended I contact Office of Court administration and the Commission on judicial conduct agency for ada access administration issues in the court room/for court services.  The Office of Court Administration and office of judicial conduct

told me I needed to file an appeal with the appellate division second department. The second department appellate division stated I could not appeal denial of ada accommodations without a final order in family court article 6 or 8 cases like mine. So here I am in a vicious cycle of court administration politics, technicalities and interference with my right for swift granting of ada accommodations for my unique handicaps. This hierarchy obstructs ada administration and violates the ADA and Section 504 of the Rehab act of 1973. This violates section 504 of the 1973 rehab act because the State of New York and the family court accept federal funds and therefore must observe and follow anti-discrimination laws of the ada and federal government. By New York state failing to grant morning only court sessions for my sleep apnea, note taker for my tbi/post concussion syndrome, large print court orders for Occipital Neuralgia and an ADA advocate for my disabled son Jonah Fishman with Langerhan Cell Hystiocytosis x, the State court is in violation of federal anti discrimination laws(section 504 of the 1973 Rehabilitation Act,) the ADA, the ADAAA and the New York Human Rights Act/state anti-discrimination laws.

8.    Defendants retaliated by jailing me by violating their own State Court TOP order that permitted gift giving to my wonderful four kids. Gifts that were in large part necessities: clothes, education computers etc for kids

who need and want the gifts. Defendants do not jail non-disabled fathers in similar court proceedings for sending gifts to their kids, when court orders allow gifts on major holidays. This retaliatory punishment was unique/deliberate against me as a disabled litigant in New York State Family court.   Judge Schauer and her co-defendants intentionally jailed me as "punishment/retaliation" for requesting that Schauer recuse herself and complaints about Judges discrimination to multiple supervisory parties including Westchester County Office of Human Rights, US DOJ Disability Rights Section and NY State Commission on Judicial Conduct. Other non-disabled fathers and mothers are not jailed by The State for sending gifts to their kids.  This State retaliation was direct, deliberate and personal as Judge Schauer/Co-defendants felt they needed to "jolt me" (see June 27, 2017 transcript for Judge's quote) in retaliation for sending gifts to my kids for major holidays.  Schauer and Co-defendants feel that physical punishment of me being confined to a hospital Jail room cell without my special handicap pillows and without my handicap equipment was appropriate punishment. Given that I have electric stimulation from neurostimulator implants sending electric pulsation up my rights and left neck in my body, the intention of the State Corporal punishment was deliberate and real.  By sending me to County Jail without pillows in the hospital wing, I suffered several electric

jolts up both sides of my necks and a severe neck sprain. Judge Schauer and Co-Defendants were deliberate and intentional as they could have chosen probation or lesser form of punishment like other non-disabled litigants who receive.    But Defendants including Judge Schauer's and Michelle Dambrosio's personal cold direct disdain and feelings that they was personally spited, insulted and belittled by my post concussion syndrome/tbi/sleep apnea memory lapse/Occipital Neuralgia Headaches of not remembering the court's statement "that there are no major holidays between April and May 2016" necessitated their jailing retaliation of me for my qualified disabled tbi memory impairment.  Indeed in former attorney general Loretta Lynch's US Department of Justice 2010 bulletin on interpretation of the 2009 ADAAA act, the interpretation lists "traumatic brain injury/TBI " a Qualified ADA Disability under the amended ADA ACT that former President George Bush signed into Law. Judge Schauer and Co-defendants deliberately knew I was disabled and acted deliberately indifferent with personal intent to "confine" /jail me was punishment/retaliation for "Qualified ADA Disability" side effects. State Court Defendants knew that I could not get bail during confinement for an alleged Family Court offense and that I would have to serve real jail time for

trying to abide by complicated court orders in small print and sometimes-illegible handwritten notes in side margins of family court state order forms.

9.      Defendants further retaliated against me by denying and delaying my appeal rights because they have failed to issue a final order—now in January 2018--- for December 2016 accommodation requests and June 2017 ADA Denial of accommodations that I can appeal in New York Courts.   New York Family Court and Office of Court administration discriminates against the qualified disabled because non-final New York State family court proceedings under article 6 and 8 of the family court act ARE  NOT  APPELLABLE  WITHOUT   PERMISSION  OF  THE APPELALATE DIVISION.  APPEALLATE Division denied permission to appeal denial of ADA accommodations twice stating these were not "final orders." The Appellate Division 2nd Department Supreme State Court was deliberately discriminatory against me and my invisible ada qualified disabilities as other lesser judicial offenses are given permission to appeal, but my ADA needs and reasonable accommodation requests were denied permission to appeal deliberately by the Appellate division of New York State under archaic laws that interfere with the federal ADA mandate to provide  swift  accommodations  and  "reasonable  accommodations"  be provided promptly "without undue effort of the disabled.". This provision of

Federal ADA Law is reinforced in the Federal Supreme court case of Tennessee versus Lane and Prakal versus Indiana. In both cases, the state was held liable for violations of ADA and Section 504 of the Rehabilitation Act of 1973 for title two ada and federal anti-discrimination laws. In both cases the plaintiff was due these reasonable accommodations and the plaintiff was allowed to pierce State immunity to pursue compensatory damages for intentional, deliberate and direct violation of Federal Anti-discrimination laws and the ADA. This extended the length of the disability discrimination, as the Appellate division had a responsibility to stop the Family Court disability discrimination, but failed to do so. Others disabled litigants in other courts not in New York family Court article 6 and or 8 proceedings are permitted to appeal as of right, where I am discriminated against for my disabilities against appealing in New York State. Other litigants when and if they are jailed or denied ADA Accommodations receive final orders in New York State. Defendants including Judge Schauer willfully, deliberately and purposely delay my appeal rights as retaliation for my disabilities and disability side effects by denying issuing a final order after a December 2016 disability accommodation request, January 25, 2017 non-final order and June 21, 2017 ADA Accommodations hearing and making me as a disabled litigant pay for transcripts of court proceedings for

the court to issue orders. Other non-disabled litigants in front of other judges do not have to pay for transcripts on their own for the benefit of the court. The court deliberately ordered me to provide the transcripts at my sole cost and expense instead of the court generating its own orders, as retaliation for my qualified ada disabilities. Had the court allowed Note takers that were free or little cost to me, it would have been less costly by thousands of dollars compared to the cost of ordering transcripts. Tried my hardest to remember court orders and what is said in court for 45 months of endless 20 plus court appearances. With severe Obstructive sleep apnea, TBI and Post Concussion Syndrome and Occipital Neuralgia it is harder to remember. Defendants including Judge Schauer exploited that disabilities by jailing me for memory disability side effects of post concussion syndrome/TBI and refusing to allow my neuropsychologist treating physicians to testify about my disabilities as mitigating factors at sentencing hearings before jailing me. Other non-disabled fathers that commit family offenses are allowed doctors to testify about their medical condition as mitigating circumstances. Defendants including Judge Schauer denied me the ability to have doctors testify presentencing like other non-disabled fathers do. This retaliation is prohibited under title two of the ADA, Section 504 of the 1973 Rehabilitation Act and New York Human Rights Act and related Laws.

Defendants including Judge Schauer also  retaliated against me by failing to allow me to file or prosecute family offense petitions against my x-wife, Jennifer Solomon when she missed or was late to over 30 court ordered visits. Other non-disabled fathers are allowed to file and have fair hearings heard for their former spouses violating court orders, but Defendants denied me the same rights and privileges as the non-disabled parents in other similar proceedings.

10.    Under regulation 28 CFR $35.130(b)(7), discrimination is prohibited and a public entity such as the Family court is required to "make reasonable  modifications  in  policies,  practices  or  procedures when…necessary to avoid discrimination on the basis of disability."  By denying me the administrative ADA accommodations that would have been granted by the Yonkers ADA Family Court liaison William Curry and the Office of Court Administration under Dan Weitz (see attached 8/14/17 letter from office of court administration exhibit "A") detailing that Judge Schauer takes the administrative responsibilities away from an ADA liaison, the judge is the sole person in the court responsible for administering required ada  accommodations,)    Defendants  including  Judge  Schauer  have discriminated against me and violated Federal ADA law, Section 504 of the

rehabilitation act of 1973 and NY Human Rights Laws in a never ending Family Court action that is 45 months old with no end.

11.    Defendant Judge Schauer ignored the court ordered report of Licensed Social Worker Lorna Hakim Baker (Exhibit "B")_attached that stated I am a great dad and loving father.  Lorna stated that my x –wife "is a very dangerous women.(see top of page 7 of exhibit "B".") Lorna Hakim Baker further commented on the  page 6 of exhibit "B" of her Social worker report that she told Jennifer Solomon, " until you love your  children more than you hates your ex-husband, the children's emotional well being will be at stake."  Defendants including Judge Schauer continued their disability discrimination of me by refusing to allow Lorna Hakim Baker testify at the fair hearing or allow her report  exhibit "B" into evidence.  Non-disabled fathers are allowed to submit court ordered reports into evidence in other Family court proceedings.  This is further example of  Defendant Judge Schauer's  disability bias and willful deliberate discrimination against me.

12.    Defendants including Judge Schauer are attempting to retaliate against me for submitting numerous ada accommodation requests to her directly and punish me for those disabilities by denying me the reasonable accommodations needed for me to be an equal participant in the her court room.  Judge Schauer further retaliated against me and needs to be removed

from this proceeding by failing to issue a final appealable order in 45 months that could be appealed (under article 6 and 8 of the family court act, interim appeals are not allowed as of right.) Since Judge Schauer has willfully and purposely failed to issue a final order in 45 months, and the appellate division 2nd department has refused my permission request for interim appeal, am stuck with Judge Schauer in a viscous cycle of disability discrimination. This is the case, because any other father in front of Judge Schauer in Family Court for unfounded abuse charges levied in June 2014, would have had a trial within 9 months. Defendants including Judge Schauer have refused to dismiss charges and clear my name—even after 45 months, because Defendant Judge Schauer enjoys retaliating against me and punishing me for my qualified ADA disabilities. Any other non-disabled father would have had a full and fair hearing within 9 months. Schauer has purposely delayed mine for 45 months , by constantly belittling me and making fun of my disabilities. Schauer stated" I cannot be discriminating against you because you do not look disabled. You do not have a cane or need a wheel chair. So sir, I cannot discriminate against you, because you are                    not                    disabled,                    "
(see transcript 11/2/15 Exhibit "C" ) .In this article 6 and 8 proceedings the appellate division has denied requests for permission for interim appeal of

ada orders (see exhibit "D".) By using my disabilities against me, Judge Schauer and Co-defendants have limited the hearing and failed to allow medical witnesses to testify as to my condition and ability to successfully parent my four children with my disabilities. The underlying matter concerns alleged violations of certain Temporary Orders of Protection between me, my ex-wife, Defendant Jennifer Solomon (hereafter, the "Mother") and our four minor children.

13.    The presiding judge, the Hon. Michelle I. Schauer, has made it very clear that she will not schedule another hearing or allow more ada accommodations to be heard (again in violation of ADA procedures of the office of court administration.) I attempted to obtain a stay in State Appellate court, but there is no right to an interim appeal in family court without a final order in this article 6/8 proceeding under the Family Court Act (see exhibit "D", appellate court decision.) There can be no final objective, fair and unbiased order on Custody and Visitation because Defendants including Judge Schauer are discriminating against me, failing to accommodate my qualified disabilities in family court and retaliating against me for side effects of my qualified disabilities(A copy of the ADA January 25, 2017 Order (the order on appeal herein) is attached hereto as Exhibit "E". Judge Schauer has repeatedly refused to recuse, even though her bias and

discriminatory comments about her disdain and prejudice against accommodating my qualified ADA disabilities prohibit her from rendering an unbiased decision.

14.    As will be shown in more detail below, the ADA order, to the extent it denied me certain modest but critically important accommodations pursuant to my physical disabilities – disabilities not denied by Family Court – it violated my rights under the ADA; Moreover, the ADA order and ada hearing transcript threatens me with irreparable harm, because Judge Schauer is so biased and discriminatory that she will terminate my joint custody based on Physical Disability , further causing my kids and I harm if the cases are not stayed and consolidated and moved into Supreme Court., first pending the resolution of this show cause. Thus, I respectfully submit that I am entitled to a stay of enforcement of the ADA Order under Federal ADA and Section 504 of the 1973 Rehabilitation Act.

## FACTS

15.    My multiple and serious disabilities are set forth in the formal request for accommodations under the ADA submitted on my behalf by Ms. Donna Drumm (exhibit "F") whom I retained as my ADA Advocate, on December 15, 2016. (A copy of this request for accommodations – hereafter

referred to as the "ADA Request" – is attached hereto as Exhibit "F") (See Exhibit "Ḥ," p. 2.)

16.    In brief summary, my diagnosed physical disabilities include severe obstructive sleep apnea syndrome, occipital neuralgia and traumatic brain injury, TMJ/TMD and post concussion syndrome. Medical documentation establishes that these disabilities have a serious, deleterious impact on major life activities. My obstructive sleep apnea disrupts breathing and sleeping. My occipital neuralgia causes intense pain and increased sensitivity to light.    Post Concussion Syndrome, Severe Obstructive Sleep Apnea and Traumatic Brain Injury have resulted in short term memory loss and need for cognitive therapy averaging over 15 hours per week this year.  My TMJ/TMD affects eating and sleeping and causes severe chronic pain. My driver's license was revoked by New York's Department of Motor Vehicles (from May 2014 until  January 2016) due to these multiple conditions.

17.    In addition, due to surgery I underwent in December 2016 to insert a second neurostimulator implant – part of a medical approach to allow my body to breath at night---with the debilitating sleep apnea condition associated with TMJ/TMD, occipital neuralgia, neck protrusion and herniated disks that resulted from two separate automobile accidents – I

continue to experience a heightened degree of disability post hernia surgery in May 2016 and post Inspire Neurostimulator Implant in December 2016 with multiple skin infections, allergic reactions and chronic pain. (Exhibit "F," p. 2.)

18.    The underlying proceeding, commenced by Mother in June 2014, is based on Mother's allegation that I violated certain terms of applicable court orders regarding custody and visitation, as well as Temporary Orders of Protection (TOPs). After a fact-finding proceeding, the trial court found, on September 2, 2016, that I had violated various orders even though my memory impairment ADA Qualified Disabilities of TBI and Post Concussion Syndrome prevent me from knowingly violating any court orders in this matter, and scheduled a dispositional hearing for December 2016. Mother seeks, among other things, my incarceration, as her counsel has clearly informed the trial court. (Attached hereto as Exhibit "G" is an excerpt of the transcript of proceedings from July 27, 2017 – counsel's request that I be incarcerated is found on page 21 of Exhibit "G".) Mother also seeks a modification of the existing custody/visitation order that will further impinge on my ability to see my children. As it is, I am not permitted any unsupervised visits and my visits with my four children have been limited to less than 24 hours in the 2016 year. The ADA Order denied

requests for reasonable accommodations that are critical to my ability to see my children, participate in court programs and access the court. Specifically, the Family court refused to allow me to have a note-taker/tape recorder present to personally record the proceedings. Since my disability affects my short-term memory (side effect of Post Concussion Syndrome/TBI,) the denial of these requests seriously compromises my ability to participate in my defense.

19.    In addition, the Family Trial court, on grounds of standing, refused even to consider that portion of my ADA Request that seeks to address the disabilities of my minor son Jonah. (Exhibit "F," pp. 3, 4.) this willful failure of defendants to allow me to request accommodations for my disabled son was retaliation for my disabilities.  Other non-disabled fathers can request ada accommodations and have them granted in other courts without biased and discriminating Judge Schauer and intimidating/discriminating Michelle D'ambrosio court attorney administrator.

20.    Finally, the Family trial court simply ignored two crucial requests for reasonable accommodations under ADA. First, the trial court ignored my request for the production of the medical records of the court-appointed social worker, Mary Crowe, from 2014, 2015 and 2016 to his

treating psychologist, Dr. Michelle Maidenberg. As indicated in my the ADA Request, this information was critical in that it would assist in my therapy with Dr. Maidenberg. The ADA Order does not even mention this request.

21. Similarly, the ADA Request asks the Family court to accommodate me by allowing the substitution of a recent report by Dr. Gluck, from April 2016, for a new forensic report to be prepared by a Dr. Herman. This request, too, was simply ignored in the ADA Order. The accommodations request also asked for home-supervised visits because my doctors opined that I could not travel to court supervision programs (under doctors orders post implant surgery) outside the home due to likelihood of re-injury. Defendants including Judge Schauer denied home visits for months in retaliation for my disabilities and numerous ada accommodation requests.

22. It is clear that the ADA Order, as it stands, threatens immediate and irreparable harm. If not stayed, the Family court's rulings will: 1) terminate joint custody in place since November 2010 because a biased discriminating Judge Schauer sees no harm to her repeated disability discrimination with my qualified disabilities; 2) limit visits between me and my minor children, the effects of which cannot readily be undone (which

were under one day worth of visitation in the entire 2016 year and less than a week's visitation time in all of 2017; and 3) may expose my minor son to harm while his needs, due to his disability, are not being addressed by lack of ada advocacy for his major disability.

23.    The defendants also violated my rights and my disabled sons rights under the Federal IDEA act by prohibiting me access to school events for the disabled. Despite numerous requests for Judge Schauer to lift the TOP order because it violates and restricts my access to the school, Schauer has retaliated and deliberately excluded me from school IDEA participation. Am zero threat to the school and have no history of violence, yet Judge Schauer has restricted me access to the school since December 2015 in retaliation for me attending book fairs and other events other parents are invited to. Under the Federal Idea Act parents have a right for disability education by the school in school programs to learn to assist their qualified disabled children in school. As my sons Jonah and Skye Fishman are disabled with IEPs protected under the IDEA act Schauer and defendants denied me participation by denying me access to the school. Seek court assistance to lift access to my children's school in this federal IDEA case. Not to remove unreasonable state restrictions in an order of protection would

violate the provisions of the IDEA protecting disabled parents and children's rights.

## **TEMPORARY RESTRAINING ORDER**

24.    My initial request of this Federal Court is for an immediate, temporary restraining order suspending all Family court proceedings in this matter –, pending resolution of this lawsuit in Federal Court.

25.    Due to the absence of stenographers and delays in obtaining transcripts in Family Court, the Family Court cannot reasonably accommodate my memory impairment disabilities(required under ADA, NY State Human Rights Laws and Westchester County Anti-discrimination laws) like Supreme Court can. New York Supreme Court has stenographers that can easily and quickly produce transcripts of proceedings to help assist my memory with my acquired disabilities. New York Family court transcripts take up to 4 months and are not readily available to help me remember court directions and instructions without the assistance of a note taker, denied by the Family Court. The Family Court, due to the limitations in the Family Court Act. The Mothers allegations that my multiple disabilities "make my crazy or unsafe" to care for my children are blatantly false and unsubstantiated by the thousands of pages of certified medical records and reports submitted in these Family court cases. All my medical

doctors and therapists feel my physical disabilities are no danger to my four children.

26.    Now it is January 2018 and Judge Schauer just extended the so-called temporary order of protection to the end of January 2018 without ANY PROVISION FOR VISITATION OR COMMUNICATION OF ANY KIND WITH MY FOUR CHILDREN. Due to the State Court's willful disability discrimination, failure to accommodate impairments and retaliation for Qualified ADA Disabilities, the State Family Court Judge Schauer has gone nowhere in the case except to punish me for my qualified ADA Disabilities by amongst other actions, restricting my kids access to their father. Have not had any contact with my kids in over two months since the first week of November, because Judge Schauer will only agree to a supervisor that cost $700 to $800 a visit and I cannot afford it. Under the ADA, court state visitation programs are not allowed to charge more for the disabled at home, then those who can travel to visitation offices. All State title two court programs including government-supervised visitation programs (that accept federal funds per section 504 of the 1973 rehabilitation act) must provide equal services without additional expenses for the disability accommodation of home visits. Additional expenses to the ADA qualified disabled are prohibited in title two of the ADA State

government and/or State court supervised visitation program services. Defendants including Judge Schauer deliberately retaliate against me by ordering me to expend huge costs of home visitation providers by only allowing providers like CFS family services that are located outside my borough of residence in downtown Manhattan who charge hundreds of dollars of travel time. Judge Schauer could have used local supervisors in the Bronx, but failed to do so as retaliation for my numerous disabilities and accommodation requests. And continuous desire to punish me for my disability behavioral side effects. Indeed the court appointed Social Worker Mary Crowe after spending over 75 hours with me and the our children over the course of a year, stated in her court ordered reports stated that "I should be allowed unsupervised visits with my four children." The Federal Court is the only court that can issue a stay, since the Supreme Court, New York and appellate division  second department and administrative officials in the OCA have thus far refused to stop Defendants including Judge Schauer from their repeated disability discrimination. The court ordered Psychologist, Dr. Verno stated in 2014, "There is no evidence that Mr. Fishman has ever been violent with any of his children."

27.    Worse, my relationship with my children may be irreparably damaged. My visits with them are already restricted; The continued

restrictions of any contact with my children will be dire for two special needs children and the family as a whole for children's limited access to their father. Had less than one days visits with the children in 2016 and less than one week with my four kids in 2017. There has been zero visitation or contact with my four children in 2018.

28.     It is therefore clear that I face irreparable harm in the absence of a temporary restraining order suspending the Family court's proceedings until this Federal Court can, at least, hear and rule upon this lawsuit.

29.     Accordingly, I first seek from this Federal Court a temporary restraining order staying all proceedings in the State Family court until this show cause may be heard and resolved. In Federal Court.

30.     I have not approached opposing counsel to discuss this request to Federal Court. My reason is simple: counsel's prior conduct, including taking a very harsh adversarial position against me (seeking my incarceration, for one thing) and even denying that I have a disability that needs to be accommodated, leaves it beyond any doubt that agreement between us on this issue is not a realistic possibility. The same, unfortunately, is true of the Attorney for the Children in this matter.

# IRREPARABLE HARM AND BALANCE OF EQUITIES

31.    A plaintiff is entitled to a stay pending transfer of the case to Federal Court. when the equities favor such relief. Indeed, "the granting of stays pending appeal in such cases is, for the most part, a matter of discretion" of the Court. *Grisi v. Shainswit*, 119 A.D.2d 418, 421, 507 N.Y.S.2d 155, 158 (1st Dept., 1986). I respectfully submit that, given the facts of this case, the equities clearly favor the granting of a stay.

32.    Indeed, my position in seeking a stay is particularly strong, because this case specifically meets the standard set by New York law and Federal Law for the granting of any preliminary injunction, for which the moving party must show "(1) the likelihood of ultimate success on the merits; (2) irreparable injury to him absent granting of the preliminary injunction; and (3) that a balancing of equities favors his position." *Niagara Recycling, Inc. v. Town of Niagara*, 83 A.D.2d 316, 324, 443 N.Y.S.2d 939, 945 (4th Dept., 1981). All because the State appeals court will not stay a Family court proceeding due to the technicalities of an article 6 family court state case being unappealable under NY State Law without final order (and a discriminating Family Court Judge refusing to issue timely final orders,) does not absolve the Federal Court of its obligations and responsibilities to

enforce ADA and force the State Court to provide needed ada reasonable accommodations to the qualified ADA disabled and handicapped.

33.    As shown above, the ADA Order, ADA hearing and the release of confidential medical treating information threatens irreparable harm to me and to my relationship with my children. In addition, one of my requests – denied by the trial court – seeks help for one of my children, whose serious medical needs are not currently being addressed. (Exhibit "F." ) Every day that needed services are denied, this child may suffer irreparable harm. Such irreparable harm can only be prevented by a stay pending resolution of this appeal.

34.    Irreparable harm is always a powerful argument in favor of a stay pending appeal. *See Cavanagh v. Hutcheson*, 232 A.D. 470, 252 N.Y.S. 113, 114 (1st Dept., 1931); *Wilkinson v. Sukiennik*, 120 A.D.2d 989, 502 N.Y.S.2d 837, 838 (4th Dept., 1986). Indeed, even the "possible detrimental effect of the judgment below" on the appellant can justify a stay. *See Serth v. New York State Dept. of Transportation*, 77 A.D.2d 957, 958, 430 N.Y.S.2d 721, 722 (3rd Dept., 1980).

35.    This is particularly true where, as here, the threatened harm is more than monetary. *See Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 292, 783 N.Y.S.2d 758, 767 (Sup. Ct., N.Y. Co., 2004). In this

case, I face an irreversible incarceration and both the children and I face damage to our relationship.

36.    In addition, I face yet another sort of irreparable harm. This show cause and lawsuit asserts a violation of my rights under a federal civil rights statute (the ADA). The violation of civil rights, under New York law, is itself a species of harm, and it is irreparable by nature, thus justifying a stay pending appeal in order to prevent such harm. *See Time Square Books, Inc. v. City of Rochester*, 223 A.D.2d 270, 278, 645 N.Y.S.2d 951, 958 (4th Dept., 1996), *leave to appeal denied*, 647 N.Y.S.2d 650. My case therefore presents the possibility of irreparable harm as a matter of law, thus giving this Federal Court a compelling reason to order such a preliminary stay as a matter of law my ADA disability rights can be accommodated under Federal ADA Law. Defendants including Judge Schauer and Michelle D'ambrosio cannot be allowed to continue their proceedings as there is no end in sight after over 45 months of family court proceedings and no full and fair hearing on all unfounded child abuse charges and mental instability allegations from June 2014. If Judge Michelle I. Schauer, in Family Court cannot reasonably accommodate my "Qualified ADA Disabilities" fairly and adequately under ADA, then she cannot be an independent and impartial Judge in this matter. A Judge who blatantly, willfully, deliberately and purposefully denies

reasonable ADA Handicap accommodations for a disabled Father in Family court, cannot be impartial in administering Justice in the Father's Family Court Case. A Family Court Judge who willfully and frequently discriminates by failing to reasonable accommodate disabilities of a litigant before her is under ADA is violating Section 100.3 of the New York Judicial Codes of Conduct. Under Section 100.3, of the codes of conduct , "a Judge must administer Justice impartially and free of Discrimination." Judge Schauer's Failure to tissue a final order dismissing unfounded child abuse charges from June 2014 for almost  years now and skipping them for newer charges assessed by mother is discriminatory.  This discriminatory action speaks loudly of the extreme bias of Judge Schauer in favor of my x-wife. Judge Schauer has ignored repeatedly rule 100.3 and has pending complaints against her with The New York commission on Judicial conduct and the

Us Department of Justice for disability discrimination. As a Supreme court judge and Federal Court Judge are  required to administer justice under NY judicial codes 100.3 and Federal Law when the acts of a discriminating Family Court judge are made aware to the court, it is imperative that the Federal court act to right the wrongs.

## LIKELIHOOD TO PREVAIL IN FEDERAL COURT

37.     As shown above, my likelihood to prevail on the merits of the instant show cause is another factor militating in favor of a stay. *Niagara Recycling, Inc. v. Town of Niagara, supra*, 83 A.D.2d at 324. In this case, there are several reasons why, as a matter of law, I am likely to prevail – and thus why it would be injurious both to me and to the interest of justice if this Court were not to grant a Federal stay under while it considers the lawsuit. Clearly, it would serve no one's interest for this case to proceed in the Family Court  only to have the proceedings scrapped, and resumed all over again, as a consequence of this Family Court's  denial of ADA Accommodations. The most salient reasons I am likely to prevail are set forth below.

38.     *Family Court Ignored My Standing To Seek Relief for a Minor Child.* To begin with, I will have a strong case on appeal because the trial court misrepresented the law on standing in rejecting my request for accommodations on behalf of my disabled minor son. As shown above, Family Court rejected my request for accommodations for my son, who is disabled (Exhibit "F," p. 5) solely due to its claim that my ADA Advocate and I lack "standing to demand such relief." See 1/25/17 ADA Order Exhibit

"E." In this respect, Family Court clearly and completely misrepresented the law.

39.    A parent whose parental rights have not been terminated has standing to seek relief on behalf of one of his minor children. "Parents generally have standing to assert the claims of their minor children." *Altman v. Bedford Cent. School Dist.*, 245 F.3d 49, 70 (2nd Cir., 2001), *cert. denied Dibari v. Bedford Cent. School Dist.*, 534 U.S. 827, 122 S. Ct. 68, 151 L. Ed. 2d 34, *citing Engel v. Vitale*, 370 U.S. 421, 423, 82 S. Ct. 1261, 8 L. Ed. 2d 601 (1962) *and Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 841 n. 44, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977); *accord, Rivers v. McLeod*, 252 F.2d 99, 102 (2nd Cir., 2001). Under New York law, that a parent currently does not have custody of the child in question does not diminish his standing to assert any legal claim on the child's behalf, so long as his parental rights have not been terminated. *See Sykia Monique G. v. Little Flower Children's Services*, 208 A.D.2d 534, 535, 616 N.Y.S.2d 806, 807 (2nd Dept., 1994).

40.    Indeed, this point has been specifically upheld in a case involving the ADA. In *M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 175 (D. Conn., 2008), a federal district court upheld a mother's right to pursue a claim under the ADA on behalf of her minor child. *See 554 F. Supp.2d at*

194-95. The trial court did not cite any case law indicating a contrary result; indeed, it cited no authority whatsoever. It follows that, as a matter of law, I have standing to seek accommodations under the ADA for my minor child.

41.     Moreover, my ADA Advocate (who actually submitted the ADA Request) likewise has such standing. An entity or individual may seek relief under the ADA on behalf of another, because the language of the ADA, "[b]y its plain meaning," indicates that the claimant "need not be an individual with a disability, but may be anyone injured by a covered entity's discrimination against an individual on the basis of that individual's disability." *Innovative Health Systems, Inc. v. City of White Plains*, 931 F. Supp. 222, 236 (S.D.N.Y., 1996), *aff'd in part*, 117 F.3d 37 (2nd Cir., 1997). A state court is clearly a "covered entity" under the ADA. Accordingly, the family court clearly erred in denying my ADA Request, as it relates to my minor child, as a matter of law. Thus I will likely prevail on this issue.

42.     *Family Court Violated ADA Procedures.* The ADA Order does not describe even the slightest effort, on the part of the trial court, to negotiate an alternative or compromise solution to the accommodations it denied. At the ADA Hearing, Judge Schauer was antagonistic to my ADA Advocate and prevented her from filing new ADA Accommodation requests, violating state court ADA office procedure. In this respect, too, the

Family court violated applicable law. The ADA requires attempts to "negotiate" requests for accommodations before simply disposing of them. *See Phillips v. City of New York*, 66 A.D.3d 170, 884 N.Y.S.2d 369 (N.Y. App. Div., 2009). Thus, without even considering the trial court's rationale for denying the accommodations I requested, this Court should reverse the ADA Order because it failed to comply with the legal procedures required under the ADA, which require the entity to which the request is directed to engage in an "interactive process" with the party requesting accommodations. *Wright v. New York State Dept. of Corrections*, 831 F.3d 64, 79-80 (2nd Cir., 2016). This the Family court clearly failed to do. T is shown over and over again that defendants failed to negotiate or compromise on ADA accommodations requests.

43.    What is more, by insisting that my request for accommodations in my visits with my children must be addressed within the adversarial process of the underlying litigation, the trial court violated a principle of the ADA that requires ADA accommodations to be treated as rights to be administratively granted rather than claims to be litigated between adversaries. *King v. Indiana Supreme Court*, 2015 U.S. Dist. LEXIS 58388 (S.D. Ind. May 5, 2015). This, too, represents a violation of the procedural

norms of the ADA as a matter of law, and supports my likelihood of success on the merits of the lawsuit with Federal Court.

44.    The same procedural violations mar the Family court's denial, *sub silentio*, of my requests for the production of needed reports to my treating therapist and for the substitution of forensic reports. Here, too, the family court completely failed to engage in any "interactive process" as required by law; indeed, the family court did not even mention these requests. Here, too, is an error of law that makes me likely to prevail in this matter in Federal Court.

45.    *Family Court Misapplied Applicable Law Relating to ADA.* Another legal error committed by the Family court was its insistence that I, rather than the court, bore the burden of establishing a reasonable accommodation request. The law is different. "If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant, who must articulate a legitimate nondiscriminatory reason for its challenged actions." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 n. 3 (2nd Cir., 2004). The Family court itself does not deny that I established a *prima facie* case for the accommodations I am seeking; yet the Family court judge did not meet its burden of showing a "legitimate nondiscriminatory reason" for its denial. Here, too, reversal is the likely outcome of this appeal.

46.    *The family Court Violated My Substantive Rights under the ADA.* Finally, I am likely to prevail on the merits of this Lawsuit filed in Federal Court because the family court wrongly denied my requests for reasonable ADA accommodations as a matter of substantive law. Precisely the sort of scheduling changes I requested as a result of my disability – and which the trial court denied – are in fact comprehended under the ADA. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3rd 2010) ("we hold that the ADA contemplates that employers may need to make reasonable shift changes in order to accommodate a disabled employee's disability-related difficulties"); *McMillan v. City of New York*, 711 F.3d 120, 127-28 (2nd Cir., 2013). The same principle applies to the reasonableness of the scheduling changes I requested, as a temporary ADA accommodation for my disabilities, in my visitation with my children and in requesting morning only court sessions with the court(due to sleep apnea disability.) Thus, the trial court's denial of these requests violated my civil rights.

47.    What is more, as noted above, my request in this case implicates my civil rights – specifically, my right to see my children frequently like other non-disabled fathers due and send gifts, make calls, and text my children...all like other non-disabled fathers due. There is currently no visitation at all. If my joint custody is terminated because the Family

Court is allowed to continue its disability discrimination, it will further delay the four kids access to me. Under the ADA, I may not be denied that rights of non-disabled fathers as a result of my disability. Yet that is precisely the result of the Family court's denial of my requests. Where, as here, legally mandated civil rights are at stake, the law indicates that the ADA Qualified Disabled father will prevail in Federal Court unless the infringement of rights is minimal and justified. *See People v. Adams*, 53 N.Y.2d 241, 249, 440 N.Y.S.2d 902, 905, 423 N.E.2d 379, 382 (1981). Since accommodations such as allowing me a note-taker or large print court orders in court could easily have been granted without undermining the Family court process, the interference with my rights under the ADA was anything but minimal; accordingly, I am likely to achieve a reversal of these rulings on hearing this case in Federal Court or eventual appeal in State Court when and if a Final order is ever issued in State Family Court in this article 6 /8 proceeding.

48.    All of these facts strongly support a Federal stay of the ADA Order dated January 25th 2017,  a stay in the ADA instructions at the June 21, 2017 ADA hearing  and a stay preventing Judge Schauer and/or New York State Family Court from conducting any matters or issuing any custody or orders pending resolution of this Federal Court Case. *See Da*

*Silva v. Musso*, 76 N.Y.2d 436, 443 n. 4 (1990) ("court considering the stay application may consider the merits of the appeal").

49.    In sum, the January 25th 2017 ADA Order, ADA Hearing June 21 and court hearing June 27, July 31 and August 18, 2017, August 29th, August 30th, September 1 and September 12 violated both procedural and substantive requirements of the Federal ADA, and wrongly denied my standing to seek accommodations for my minor son, Jonah Fishman. All of these rulings are erroneous as a matter of law, and in the absence of a stay pending this Federal Court Application, both my four young children and I will be exposed to possible irreparable harm.  Have tried for stay in State Supreme court and appellate court without success, and the Federal court is the overseer of the ADA and must act to insure the ADA is followed at all times.

## JURISDICTION AND VENUE

50.    The Court has subject matter jurisdiction over Plaintiff's claims brought under the American with Disabilities Act, Section 504 of the 1973 Rehabilitation Act. The New York Human Rights Act, pursuant to 28 USC $$ 1331 and 1343.  The Court has supplemental jurisdiction over Plaintiff's claims brought under the New York Human Rights Act under 28 U.S.C $ 1367.

~~claims brought under the New York Human Rights Act under 28 U.S.C §~~

~~1367.~~

*ar.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Marc Fishman prays that this court grant the following relief:

A. I respectfully pray the Federal Court to order an interim stay of all New York State Family Court Proceedings and Orders, pursuant to Federal ADA Law and the need for all state courts to provide needed reasonable ada accommodations. Pray for an order directing the Office of court Administration to schedule morning only appearances due to my tiredness from sleep apnea. Pray for an order for Large 12 point print or large court orders only from state court due to my Occipital Neuralgia. Pray for an order that I may bring a note taker into court for my TBI/Post concussion memory impairment. Pray for an Order for the state court to provide all my medical records of social worker reports held in court to me per Hippa and ADA. Pray for an Order that all Ada requests are to be administered by the court ada liaison, not the sitting judge as is customary practice . These requests do not override the state in the Rooker act. Per case law specified in the Supreme Court decision of Tennessee v. Lane, the states are required

PRAYER FOR RELIEF

WHEREFORE,  Plaintiff Marc Fishman prays that this court grant the
following relief:

A. I respectfully pray the Federal Court to order an interim stay of all
New York State Family Court Proceedings and Orders, pursuant to Federal
ADA Law and the need for all state courts to provide needed reasonable ada
accommodations specified in the Supreme Court decision of Tennessee v.
Lane.

B. Grant plaintiff's request for declaratory relief, finding that
Defendants actions violated Title Two of the American With Disabilities
Act("ADA"), 42 U.S.C $ 12101 et seq; Section 504 of the Rehabilitation Act
29 U.S.C. $794 et seq., and The New York Human Rights Act.

C. Request Compensatory Damages from Defendants for violations
of title two of the ADA, specifically retaliation and failure to accommodate
reasonable accommodation requests and, Violation of section 504 of the
Rehabilitation Act and Violations of The Human Rights Act of New York
State.

D. Enter a judgment for Plaintiff requiring the New York State
Family  Court  and  Office  of  Court  Administration  to  provide  all

accommodations requests in the December 2016  and June 21, 2017 ADA requests.

    E.   Enjoin defendants from retaliating against Marc Fishman and Jonah Fishman.

    F.   Appoint counsel to prosecute this Federal Lawsuit.

    G.   Grant such other relief as it deems just and equitable.

Dated: Submitted:    New York, New York
                     January 10, 2018

                     _____
                     MARC FISHMAN
                     Plaintiff *pro se*
                     3200 Netherland Ave Apt G
                     Bronx, NY 10463
                     914-837-3209

# EXHIBIT "A"

**NEW YORK STATE**
Unified Court System

OFFICE OF COURT ADMINISTRATION

RONALD P. YOUNKINS, ESQ.
EXECUTIVE DIRECTOR

BARRY R. CLARKE, ESQ.
CHIEF OF OPERATIONS

DANIEL M. WEITZ, ESQ.
DIRECTOR, DIVISION OF PROFESSIONAL AND COURT SERVICES

August 14, 2017

Marc H. Fishman
3200 Netherland Avenue Unit G
Bronx, New York 10463

Dear Mr. Fishman:

This is in response to your most recent inquiries. As I mentioned to you in our previous contacts, The OCA practice and policy, which is available on the UCS website www.nycourts.gov states that "if you have a pending case before a judge or judicial officer and your request for ADA accommodation(s) will require a modification of or otherwise affect the court's practices or procedures, the request should be made to the judge or judicial officer." As stated in the FAQ's, if in a pending proceeding a judge or judicial officer denies an accommodation request (usually either in a written order or as stated on the record), "it is a judicial determination and not an administrative one, and may be subject to judicial, rather than administrative, review." OCA is not authorized to overrule a judicial decision. This is true for appellate matters as well.

Sincerely,

Dan Weitz

25 BEAVER STREET, SUITE 809, NEW YORK, NEW YORK 10004   PHONE: (212) 428-2760

54



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
**NINTH JUDICIAL DISTRICT**
DARONCO - WESTCHESTER COUNTY COURTHOUSE
111 DR. MARTIN LUTHER KING, JR., BOULEVARD
WHITE PLAINS, NEW YORK 10601
(914) 824-5100
FAX:  (914) 995-4111

**HON. LAWRENCE K. MARKS**
Chief Administrative Judge

**HON. MICHAEL V. COCCOMA**
Deputy Chief Administrative Judge
Courts Outside New York City

**HON. ALAN D.SCHEINKMAN**
District Administrative Judge
Ninth Judicial District

**NANCY M. MANGOLD**
District Executive

September 26, 2016

Marc H. Fishman
3200 Netherland Avenue Unit G
Bronx, New York 10463

Dear Mr Fishman:

In response to your inquiry, I have reviewed the paperwork that you faxed to me. The OCA practice and policy, which is available on the UCS website **www.nycourts.gov** - states that "if you have a pending case before a judge or judicial officer and your request for ADA accommodation(s) will require a modification of or otherwise affect the court's practices or procedures, the request should be made to the judge or judicial officer." As stated in the FAQ's, if in a pending proceeding a judge or judicial officer denies an accommodation request (usually either in a written order or as stated on the record), "it is a judicial determination and not an administrative one, and may be subject to judicial, rather than administrative, review." Neither the Administrative Judge's office nor OCA are authorized to overrule a judicial decision. Thus, my office cannot in the first instance entertain your accommodation request, nor can it review or overturn an accommodation request that may be denied by the judge.

It is unclear from what you have provided exactly what, if any, medical documentation was presented to Judge Schauer to assist in her consideration of your request for an accommodation under the ADA. It is always advisable to provide the court with as much relevant documentation as possible to support the request and assist in the determination. If the medical documentation has been presented, then your attorney may inquire with the court if a decision on the ADA issue is forthcoming, or if the court still requires further demonstration of your disability and that the accommodations you are seeking are reasonable.

Sincerely,

NANCY M. MANGOLD
Director, OCA Division of Professional and Court Services
and District Executive, Ninth Judicial District

NMM/fq

55

# EXHIBIT "B"

Riverdale Therapy & Counseling Services
4705 Henry Hudson Parkway
Suite 9N
Bronx, New York 10471
lhblcsw@aol.com
(917)270-9595

Dear Marc,

You and I met once to talk about whether I was willing to observe you and your children in a setting where I could view the dynamics of your family. In addition, I asked whether or not I could engage in play therapy and talk therapy with Aiden and Skye individually and together. Another request was granted when I asked to speak to Jonah and Johanna for a time that I could not specify exactly.

The goal was to observe their interaction with their father and determine if they were threatened or made to feel uncomfortable while spending time with their father without a supervisor. I agreed to do this in an appropriate setting and one where the children would feel most comfortable and more like themselves. I specifically stated that the supervisor could not be present during this time and suggested she take herself out for coffee until she received notice that it was time to pick the children and you up.

At first, I was going to have the family meet at my office. I clearly told you that the supervisor could wait in the lobby which is comfortable to read, sit, and has a doorman who is welcoming and accommodating. The observation and assessing was going to take place in my office suite. After you left, I revisited the purpose of meeting with your children and decided it would be in the best interests of your children to meet with me at your apartment. Familiarity breeds comfort and I wanted Johanna, Jennifer, Skye and Aiden to be as comfortable as possible. There was one stipulation, and that was that I could speak to the children and observe the family dynamic without the supervisor present. Supervisors' presence tend to inhibit children's true feelings and they tend to say what won't get them into trouble rather than freely speak about their feelings.

Upon walking into you apartment I was greeted by a friendly Israeli man whose name is Ephraim. He said that he has worked with you for many years and was there when each of your children were born and attended all their religious celebrations. You were seated and playing battleship with two or three of the children and there was a lot positive energy in that room. All four children said hello very politely. The game must have ended and everyone seated at the dining room table scattered off to a different place and I was left alone with Johanna who was well poised, warm and agreed to sit with me in an open room to the left of the dining room. It was assumed on my part that the supervisor/ nanny had gone out for coffee as I had requested. She was not in my sight during the conversations I had with Jonah and Johanna; and nor did I see her when I first walked in and saw you and your sons playing battleship. The only non-family member I saw and spoke to was Ephraim. I believe, before you left the dining room to join the boys, I asked you if I could sit with Johanna in the open room to the left of the dining area.

I told Johanna I was asked to observe the dynamics of her family and I explained what the word "dynamics" meant. I told Johanna that I was also there to assess ( and I explained the word "assess") whether it was necessary for her siblings and her to be supervised while spending time with their Dad. I made it clear to Johanna that I was spending time with her family that particular day to help her and her siblings figure out what felt good to them in regard to visiting their father. I said that since she was the one who did not leave the room I would begin by talking to her first. I wanted to engage with Johanna with the hope of understanding what she would like to see happen in the near future in regard to having a supervisor during the time she visited her father.

I said to Johanna "before we get started with the more serious issues of concern, I would like you to tell me a little bit about who you are." She proudly related to me that she did extremely well in school. She told me she was studying the Aztec Indians and had to do a project where she had to write a story using a journal entry format and she went into a little detail about the project that the teacher assigned to each student on the Aztec Indians. It seemed a little complicated for an eleven year old, but she felt comfortable with the assignment and said it was easy for her to do it.  She said she is a very good student. She went on to tell me that she won the election and is now the President of her class.  After stating that she is now the president of her class, she paused and picked up the poster used in her campaign. Johanna showed me the poster that she felt helped to get her elected. She credited her good friend and said that it was her friend who did a lot of the art work and went on to point out the specific parts that were her own additions. Apparently, Johanna did win this election and she felt very good about having been elected to be class president by her peers.

I asked Johanna about boys and if she got along with them. She claimed she doesn't really interact with them so much and when they say mean things she is not bothered by their remarks. Her words were: "when the boys say mean things it doesn't hurt my feelings and I just walk away and ignore them."  Johanna is displaying remarkable ego strength for an eleven year old girl.

We went on to discuss the letter she wrote to Mr. Mc Gueg on November 16, 2013. I showed her the letter and asked her whether she wrote this letter. She said she wrote it awhile ago so I had her read the letter to me. After reading the letter out loud, Johanna said that Mr. Mc Gueg was supposed to help and be the legal guardian but he was too busy and never came to see my brothers and me. I asked Johanna if anything changed since she wrote that letter. She said things used to be different because they used to have sleep overs with their Dad but they don't trust my Dad even though he has the best intentions".  What she is seeking is still the same. She wants the court to make sure that she and her siblings agree first on the visitation in regard to place and time. She clearly stated "please note we do want the overnights with the parent we are with that particular day." "We do not want to go back and forth driving each day to another parent." "That would be too hard to do each night." "But we do wish for you guys to find something for our parent to agree on. "And the decision that they agree on please make sure us kids agree first". Her last line was: "I want the best for my family, and I am counting on you guys to help us with that". After reading this letter I really wanted to help these children. This letter

apparently fell on deaf ears and that, in my professional opinion, is a tragedy.

Johanna said "even though I live with my mom during the week I don't spend much time with her." "We get up at 6:00 A.M. and I brush my hair, brush my teeth, and eat breakfast. "After that I get all my things together and put them into the book-bag and we are dropped off at The Learning Tree at 7:30 A.M.,where there are a lot of little kids, and Mrs. Tornett takes us to the bus stop, which is in front of our house that is only a couple of blocks away." Johanna reported that they are dropped off after school at 3:00 P.M. at The Learning Tree and their mother picks them up between 5:00 P.M.- 5:30 P.M.

Once they arrive home, Johanna explained that her mother begins to make dinner. They eat dinner when it is ready and she finishes up her homework if she didn't finish doing it at the "The Learning Tree". Johanna reports that some nights she has a small amount of homework but other nights she can have two and a half hours of work. Johanna says "I am expected to finish the homework myself while mom helps Skye, Aiden, and Jonah because they need help and she is a teacher". Johanna admits that she still needs attention but the boys need a lot more attention. Johanna says "I try to do as much by myself as I can so that I don't interrupt mom and the time she spends with my brothers."

Johanna said that she doesn't get to spend any time with her mom during the school week because she is always helping her siblings with their work. She said that her mother knows she can get her work done by herself and expects her to complete her homework and be ready for bed by 8:30 P.M..

I said "it sounds like you spend a lot of time yourself trying to get your homework done" and Johanna admitted that she does what is expected because she can. "It sounds like you always have to be perfect, is that hard for you", I asked . Johanna admitted that sometimes it really is hard for her, but it is better to make her mother happy because she doesn't want her mother to be mad or angry at her. It sounded like she doesn't like disappointing either parent. It is obvious that she is eager to get approval from both parents and does whatever she can to help each parent with her siblings. This is Johanna's way to insure that neither parent will feel upset.

Johanna makes it clear that even though Jonah and she are one year apart, they get along very well. She also speaks her mind about how difficult the twins can get and that they are very competitive with one another and like ganging up on Jonah whose feelings get hurt easily because he is sensitive. Johanna's words were: "the twins set off Jonah and often make him cry; but now he is fighting back and he is being physically aggressive." "Each parent loses their patience at times when the twins get everyone worked up". "My Dad does have a temper when the twins get everyone worked up but he isn't mean." "Dad will blame whoever caused the problem but he would never hurt us". She made it a point to say that she feels safe with her Dad and I asked her whether she would feel safe with her Dad if Karen wasn't there. Johanna states:

"Karen is like a second mother to me, but she doesn't have to be with us when we are spending time with our Dad." Johanna states "I feel safe either way, even if Karen was gone I would feel safe spending more time with my Dad."

Johanna then says "there is one more thing I want to tell you: "Dad thinks I get to spend much more time with my mom because I live with her, but I don't spend much time with her because she is always helping my brothers and I am alone." "I feel like a mother many times because I help so much with my brothers so that there is more peace in our home." I asked her if she missed feeling like a kid who could say exactly what she wants even if it wasn't what her parents wanted to hear and she said that she did feel that way some of the time. I also asked Johanna if she ever gets to play with her friends and she says that she only sees her friends when she is in New Rochelle.

Johanna opened up and began to talking about the fighting that has gone on between her parents and she wishes they could get along but knows that they can't. We discussed tempers and I told her a story that happened many years ago but I never forgot it: "My mother and I were on line in the supermarket and there were four women saying 'all men have tempers' and each one of the ladies admitted that their husbands have a temper except for the fifth lady who said that her husband didn't have any temper at all." "The other women said she wasn't telling the truth and she said there was a reason that her husband didn't have a temper and it was because she knew what not to say that could possibly and even more probably arouse his temper." Johanna understood the story very well and said that kind of thing is what goes on and her parents fight a lot and she wishes it wasn't that way. I asked her if she happened to know which twin was afraid to be with her Dad alone and she said she didn't think either one had a problem and that she never heard anything about that. I told Johanna that I wanted to speak to Jonah next, and she got Jonah to come to the same open room. Johanna left the room after Jonah came in.

Jonah was happy to talk to me and quite friendly. He was warm and talkative and told me he won an award in the summer as best camper, I can't remember the exact name of the award but he said it a couple of times and seemed very proud that he won an award. I explained why I was visiting him in his home and he said that he loved spending time with his Dad. Jonah stated " I only see my Dad on Wednesday and Sunday and I wish I could see him more." Jonah continued speaking: "what used to happen doesn't happen anymore, Dad would have us from Saturday morning and then we went back on Sunday night". Jonah then changed the subject and told me that he went to Kindergarten for two years and liked it both times.

Jonah changed the subject again and told me that he had grandparents who lived in Florida and grandparents who lived in California. Jonah loves spending time with his grandparents. He also said he had a grandfather who lived on long Island. Jonah said a second time that he would like to see his Dad more often. I asked him if he feels more comfortable having Karen present during the time he sees his father. Jonah said: "it feels good with Karen or when Karen is gone; both ways are okay." Jonah changed the subject again and stated: "I hate the fighting and it makes me feel sad when I hear the fighting". "I don't trust them together." Jonah changes the subject again

and I just let him speak since he really feels like chatting. Jonah goes on to say "I think it's fine to be with daddy alone and I feel 100% safe, but if my parents talk they will fight". He says something about wishing that (his parents) they could get along but I don't have the exact words he used.

I asked Jonah how he would feel if he slept over his Dad's house without Karen. Jonah replied: " I feel Daddy can do it alone and get it all done." " Daddy can do the days without Karen and I think it would be good if Karen stayed over for the first night to test it". Jonah continues: "Daddy can do things without Karen." "Daddy doesn't yell at me and I know I can stay with Daddy all alone  because I am the most flexible".  Jonah went on to talk about the young kids that are at The Learning Tree" ,and then I thanked him for speaking to me and asked him to lead me to his twin brothers, Skye and Aiden.

Jonah led me to a room where you, Marc Fishman, were on the bed with your two boys playing or maybe watching something. I didn't take note of what you were all doing because Karen started questioning me with a very nasty and condescending attitude. I introduced myself to Karen and said you must be the nanny. She said "I am not their nanny, I am their aunt."  I replied: "Yes, but you also drive them to and from the visits and stay during the visits which is more like what a nanny would do." Karen snapped "I am not their nanny, I am only their aunt". She did not say that she was their supervisor. I explained who I was and why I was there and she asked me whether anyone knew I was coming because nobody told her that I was coming. "Do you have permission to be here", Karen asked.  I said that I was asked to come and looked up at you, Marc, and then it was down hill. Karen began calling someone and was sighing and the twins both did not want to talk to me. Karen then announced in a terse voice "we are leaving in fifteen minutes." Even though you, Marc, tried to coax the twins to go into the other room with me, the damage was done. Karen's body language was dripping with disgust and I knew it would not be a good idea to try and encourage them to come into the other room. Karen clearly sabotaged the real reason I came, which was to watch you interact with the twins, Skye and Aiden.

According to the letter from Christopher Weddle I was supposed to observe your parenting style with Skye and Aiden because "one of the twins expressed some unease at visiting alone."  As I understood it , you had the right to find an independent professional that could give an unbiased and objective parental assessment by spending time with you and the twins.   It was supposed to be my job to determine whether or not your parenting is perfectly acceptable or determine that there are some skills that you might improve with the benefit of some professional guidance.

Unfortunately Karen made it terribly uncomfortable and I spent virtually no time with Skye, Aiden, and you. I said that I would want to meet with the twins and you in my office when you returned from your business trip. We were about to schedule a few more home or office visits with just the twins and you, but the next day I was bombarded with calls from Kathleen Hanon and when I didn't respond she began sending me e-mails.

After hanging up I was very happy that I resigned from the assessment because this is a very dangerous woman who was angry because I wouldn't let her tell me information I wasn't supposed to hear. As far as your children go, I believe it is important that children think they come from good stock. Having a parent that can not see their children without being in a supervised setting is giving those children the message, in this case, that their father is a bad person or may even lead them to believe that you are a criminal. Unfortunately your children are picking up the emotional tab for their parents turbulent relationship. Divorce is not pleasant but children become victims when their parents do not have a good relationship during and after the divorce. It isn't the divorce that hurts the children so much, but it is the way they treat each other through out their children's lives. Many children fear celebrations and don't look forward to them because they want both parents there to celebrate their event; but because they know a fight may erupt suddenly, they don't really want both of them there at the same time because it causes them a lot of anxiety.

Either parent that talks negatively about the other, should fear losing their child some time in the future. Parents need to build up the other parent and avoid negative talk to protect the development of their children's self-esteem. Self-esteem can go way down when children think they don't come from good people. They say to themselves "how good can I be if I come from those kind of people?"

In closing, I wish you and your children the very best. They seem like lovely little people who need the grown ups in their life to protect them. They need emotional nourishment in order to develop high self esteem. Knowing their parents have their back would really help them to flourish.

Enclosed is a check reimbursing you for monies paid to me thus far. I do not wish to be paid for the home visit or this letter. I will hold on to the small portion I charged for the phone consultation and first meeting we had together. I was unable to complete the parental assessment that the court required or was asking for, therefore, I do not feel entitled to the $300.00 you gave me. I will issue you a check for $200.00 and keep $100.00 for the long phone consult and first visit with you individually. The home visit and this letter is on me. Once again I am sorry that I could not complete the requested "parental assessment".

Sincerely,

Lorna Hayim-Baker from Riverdale Therapy & Counseling Services

-7-

62

# EXHIBIT "C"

FAMILY COURT OF THE STATE OF NEW YORK    DOCKET NO. F-10154-14/14F

NEW ROCHELLE                             FILE NO. 131794

------------------------------------------

MARC FISHMAN

            Petitioner,

        -against-



JENNIFER SOLOMON,

            Respondent.

------------------------------------------

          November 2, 2015, 2:30 P.M.
          Conference

HELD AT:   420 North Avenue, 3rd Floor
           New Rochelle, New York 10801


BEFORE:    HONORABLE MICHELLE I. SCHAUER, PT 6

APPEARANCES
                      VIRGINIA FOULKROD & NICOLE FEIT
                      Attorneys for Respondent JENNIFER
                      SOLOMON

                      KATHLEEN HANNON
                      Attorney for Child AIDAN FISHMAN
PRESENT:              Marc Fishman
                      Jennifer Solomon
                      Nicole Feit
                      Virginia Foulkrod
                      Kathleen Hannon


TRANSCRIBER:          ALAN KACHALSKY


                 **AL'S TRANSCRIPTION SERVICES**
            **800 Westchester Avenue, Suite S-608**
          **Rye Brook, New York 10573 (914) 220-5324**

64

clothes and that he spends $1,600 a month on his
driver.  It seems that he has sufficient income to
at least pay for SVE, and his claims that he has no
money seem to be untrue.

MR. FISHMAN:  Your Honor, if I may, I have an
implant.  It's not covered by insurance, for
sifroneuralgia (phonetic).  Okay, and my implant is
not covered by insurance, nor is the therapy that
I've been doing for all the courts, my --

THE COURT:  I also - can I just say something
to you, sir?  Because I'm  offended, really,
frankly, about your throwing around this language
that you are being discriminated against because
you're disabled.  You come to court, you appear to
be perfectly fine, and I'm not saying you're not
disabled, but I don't understand this philosophy
that everyone is against you because you're
disabled.  It's not apparent that you have any
disability, frankly.  So, I would have no basis to
be discriminating against you because your you're
disabled.  I don't see any problem with you -- Well,
you're pulling something out of your briefcase --

MR. FISHMAN:  This is the battery I take to
charge once a week, your Honor.

THE COURT:  I understand that, but what I'm
saying is --

MR. FISHMAN:  Four hours.  Four or five hour.

THE COURT:  I understand that, but what I'm
saying, you're saying I'm discriminating against you
because you're disabled, and what I'm saying is that
as you sit here right now, there is no apparent
disability.  You're not in a wheelchair, you didn't
come in with a cane, you don't have crutches, you
don't have a brace on you.  there's no physical

65

indication that you have any disability.

So again, I'm offended that you say that. You have no basis to say it, and it's not true. Now you've pulled something out of your briefcase that's. You have this video in your, briefcase. I have not seen it before. And even were I to have seen it before, it certainly would not be the basis for me treating you differently than any other litigant who walks through this door. So we're going to come up with a plan today, to help move this case forward. And what I would like to see is (inaudible) schedule, supervised visits. You want to go to the Y, I'll send you back to the Y. I know it's expensive, but if that's what you want, we're going to have all four kids at the Y, together. And there we go --

MR. FISHMAN: Well why can't I --

THE COURT: You can manage them in a loving appropriate way.

MR. FISHMAN: I can't get to the Y. There's no public transportation at night. They won't pick up a cab there.

THE COURT: So what do you suggest, sir?

MR. FISHMAN: I suggest that you -- --

THE COURT: I need a professional --

MR. FISHMAN: I suggest that you dismiss Miss Hannon's petition, with all the lies here. Now she's not representing the interest of all the kids.

THE COURT: Well, I think --

MR. FISHMAN: And just check the minutes, your honor.

THE COURT: Well, I think, what I suggest --.

MS. SOLOMON: Of where I was asked to get an independent, independent therapist. Which I did in

February and then my visitation taken away. Check the results of Mary Crow's report. It recommended unsupervised visits. And also see, how in the case of H Children and Gary D.B. Rabuzzi (phonetic), when the Law Guardian, okay, says one child says one thing and the other child don't say it, that that's a conflict, and she should be relieved, replaced. Because of her unethical behavior. It's not the first time she was chastised. She was she in front of Judge Nicolai, okay, in court.

THE COURT: Judge Nicolai?

MR. FISHMAN: Yeah. In the Supreme Court matter. She was originally assigned in the Supreme Court matter, your Honor, okay. Not the first time here.

MS. HANNON: You're talking about a --

THE COURT: All right. Well, the the way I propose that we move forward in this case is for me to give you the supervised visits by a professional supervisor. I don't want someone to be hired, someone your you're paying for, or someone that Miss Solomon's is paying for. I want an independent supervisor.

MR. FISHMAN: Your Honor, we have all these reports. We have over 20 reports from supervisors. Over 20 reports from supervisors. Over 20 reports in a year and a half, your Honor. Over thirty, $40,000 spent. Okay, and unless the other side is saying, they don't understand why I have over 3,000 a month in medical bills. SVE WANTED $1,500 up front, and 1500 to see the kids.

THE COURT: Did your driver bring you here today?

MR. FISHMAN: He did.

67

# EXHIBIT "D"

# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

M228831
E/sl

REINALDO E. RIVERA, J.P.
LEONARD B. AUSTIN
ROBERT J. MILLER
BETSY BARROS, JJ.

_____

2017-01990                                        DECISION & ORDER ON MOTION

In the Matter of Jennifer Solomon, respondent,
v Marc Fishman, appellant.

(Docket No. O-7850-14)

_____

Motion by the appellant to stay enforcement of an order of the Family Court, Westchester County, dated January 25, 2017, pending hearing and determination of an appeal therefrom.

Upon the papers filed in support of the motion and the papers filed in opposition thereto, it is

ORDERED that on the Court's own motion, the appeal is dismissed, without costs or disbursements, as no appeal lies as of right from a nondispositional order in a proceeding pursuant to Family Court Act article 8 (*see* Family Ct Act § 1112), and leave to appeal has not been granted; and it is further,

ORDERED that the motion is denied as academic.

RIVERA, J.P., AUSTIN, MILLER and BARROS, JJ., concur.

ENTER:

Aprilanne Agostino
Clerk of the Court

April 4, 2017

# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

M234932
E/sl

REINALDO E. RIVERA, J.P.
LEONARD B. AUSTIN
HECTOR D. LASALLE
VALERIE BRATHWAITE NELSON, JJ.

2017-05010

DECISION & ORDER ON MOTION

In the Matter of Jennifer Solomon, petitioner,
v Marc Fishman, respondent.

(Docket Nos. V-8186-14/16M&N, V-8187-14/16M&N,
V-8188-14/16M&N, V-8189-14/16M&N)

        Motion by Marc Fishman for leave to appeal to this Court from an order of the Family Court, Westchester County, dated March 31, 2017, for poor person relief, and for the assignment of counsel.

        Upon the papers filed in support of the motion and the papers filed in opposition thereto, it is

        ORDERED that the branch of the motion which is for leave to appeal is denied; and it is further,

        ORDERED that the motion is otherwise denied as academic.

RIVERA, J.P., AUSTIN, LASALLE and BRATHWAITE NELSON, JJ., concur.

ENTER:

*Aprilanne Agostino*

Aprilanne Agostino
Clerk of the Court

July 26, 2017

MATTER OF SOLOMON v FISHMAN

70



**Appellate Division**
**Supreme Court of the State of New York**
**Second Judicial Department**
**45 Monroe Place**
**Brooklyn, N.Y. 11201**
**(718) 875-1300**

MEL E. HARRIS
KAREN HOCHBERG TOMMER
MARIA T. FASULO
DEPUTY CLERKS

DARRELL M. JOSEPH
KENNETH BAND
ASSOCIATE DEPUTY CLERKS

RANDALL T. ENG
PRESIDING JUSTICE

APRILANNE AGOSTINO
CLERK OF THE COURT

July 26, 2017

Marc Fishman
3200 Netherland Avenue Apt G
Bronx, New York 10463

Re:    *Matter of Solomon v Fishman*
       App Div Docket No. 2017-05010

Dear Mr. Fishman:

In response to your letter dated July 21, 2017, enclosed please find this Court's Decision & Order on Motion dated today's date and issued in connection with the above-referenced matter.

This Court cannot assist you with the remainder of the issues raised in your letter. However, you may wish to consult the website of the New York State Commission on Judicial Conduct at http://www.scjc.state.ny.us/ for further information as to your allegations of misconduct on the part of a Family Court Judge, and the website of the Office of Court Administration at http://www.nycourts.gov/accessibility/index.shtml for further information regarding alleged violations of the Americans with Disabilities Act.

71

Finally, as you are represented by counsel, this Court cannot respond to any future inquiries received directly from you in regard to this matter.

Very truly yours,

Aprilanne Agostino
Clerk of the Court

cc:     Ian P. Spier, Esq.

Legal Services of the Hudson Valley

Kathleen Hannon, Esq.

# EXHIBIT "E"

23

NOTICE OF ENTRY

PLEASE TAKE NOTICE that the within
is a true copy of an order entered in
the office of the Clerk of the Family
Court of the State of New York in the
County of Westchester.

Date: ..... 1/25/17 .....

~~Anne M. Marks~~

Chief Clerk of the Court

Order
Distributed    ☒ P    ☐ P-ATY
☐ DSS/SCU     ☐ R    ☐ R-ATY
☐ OTHER ...........    ☐ C-ATY
                        ☐ N

At a Term of the Family Court of the
State of New York, held in and for
the County of Westchester, at 131
Warburton Avenue, Yonkers, New York
10701 on January 25, 2017

PRESENT: HON. MICHELLE I. SCHAUER

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-----------------------------------------------------------------x
In the Matter of  Proceedings under Article 6 and
Article 8 of the Family Court Act

JENNIFER SOLOMON,

                                    Petitioner,

                                                                    DECISION AND ORDER
                                                                    UPON APPLICATION
                                                                    FOR ADA
                                                                    ACCOMMODATIONS

                                                                    Docket Nos.:
                                                                    O-7850-14 et al

MARC FISHMAN,                                                        File No.   131794
                                    Respondent.
-----------------------------------------------------------------x

        The parties in this proceeding are the parents of four children.  The parties were
divorced in August 2012.  In June 2014, Ms. Solomon filed a family offense petition on
behalf of herself and the children, as well as a petition to modify an order of visitation
between the father and the children.  Those petitions are currently pending before this
Court, as well as eighteen other petitions including the mother's petitions alleging
violations of the Temporary Order of Protection and petitions filed by both parents
seeking modification, enforcement, or alleging violations, of a custody order.[1]
        On June 28, 2016, this Court commenced a fact-finding proceeding on Ms.
Solomon's petitions alleging that Mr. Fishman violated, on numerous occasions, the
temporary orders of protection which had been in effect continuously since June 11,

_____

        [1]In October 2012, the parties began post-judgment modification proceedings in Family Court. That
initial wave of Family Court matters concluded in July 2013, and the petitions currently pending before this
Court are a fraction of the petitions that have been filed in this Court since then, many of which have been
previously disposed.  In addition, Mr. Fishman also had related matters pending before a Supreme Court
Judge and a Support Magistrate, and both parties currently have petitions pending before a Support
Magistrate.

2014.[2]  The fact-finding continued for several days, concluding on September 2, 2016. On that date, this Court found that Mr. Fishman had violated the temporary orders of protection in several respects.  The matter was adjourned for a dispositional hearing. Due to Mr. Fishman's representation that he was having hernia surgery in October and required six to seven weeks recovery time, this Court granted his request to schedule the disposition for a date after his recovery.  Accordingly, the dispositional hearing was scheduled for December 22, 2016.

On December 13, 2016, the Deputy Chief Clerk of this Court received an email from Donna Drumm stating that she had been retained by Mr. Fishman to be his ADA (Americans with Disabilities Act) Advocate and attaching a "Confidential Document - For Americans with Disabilities Act (ADA) Accommodation purposes only" that indicated that no one besides the clerk of the court had been sent a copy of the document, including Mr. Fishman's assigned counsel.[3]  Ms. Drumm also sent a few follow up ex parte e-mails to this Court's Court Attorney, requesting various ADA accommodations. The disabilities are stated to be largely the result of two automobile accidents suffered by Mr. Fishman - one in June 2013 and one in November 2013.

Although this Court did not issue a formal Order, this Court granted Ms. Drumm's request for a 90 day adjournment of court proceedings scheduled for December 22, 2016.[4]  Ms. Drumm also requested that she be permitted to be present with Mr. Fishman during his court appearances at his expense, as his "Americans with Disability Advocate."  In support of the request, she asserted that Mr. Fishman needed the assistance of such an advocate to "'cue' him when he begins engaging in tangential speech to slow down or take a break.  This will assist the judge, court reporter[5] and attorneys to understand what Mr. Fishman is saying when his speech becomes garbled. The ADA Advocate will also work with Mr. Fishman's therapist's suggested strategies for coping with impulsivity and tangential speech in the courtroom."  This Court granted her request to be present, although it should be noted that in Mr. Fishman's approximately 14 appearances before this Court between January 2015 and September 2016, neither this Court nor the other attorneys have ever raised a problem of not understanding Mr. Fishman.

The matter is again before this Court based upon another e-mail request made

---

[2]Although a Temporary Order of Protection has continuously been in effect throughout these proceedings, the terms and conditions have been modified on several occasions so as to accommodate various access plans for Mr. Fishman and the children.

[3]Mr. Fishman has had numerous changes in counsel throughout these proceedings.  He had three separate retained attorneys in the past and in the interests of justice was also assigned four separate attorneys all of whom requested to be relieved or were discharged by Mr. Fishman.  His current attorney is his fifth assigned counsel in these proceedings.

[4]The matters were adjourned, after coordinating amenable dates with all counsel, to March 14, 2017 at 9:00.

[5]Family Court does not use court reporters.  Proceedings are recorded by the use of digital voice recorders.

75

by Ms. Drumm on January 11, 2017, to this Court's Court Attorney renewing requests for accommodations, and the Court issues this Order formally addressing the accommodation requests.  Although some information about Mr. Fishman's asserted disabilities were disclosed to all counsel through his assigned attorney in connection with that attorney's request for an adjournment of the dispositional hearing, this Court is keeping the medical information confidential at this juncture.[6]

As an accommodation to Mr. Fishman's asserted disabilities, this Court permits (and has permitted at prior proceedings), Mr. Fishman to wear sunglasses, as he deems necessary, in the courtroom.  Mr. Fishman's requests to hire a note taker and use a tape recorder during court proceedings is denied.  Instead, Mr. Fishman may continue to order transcripts at his expense, as he has done for almost every court proceeding, other than in camera interviews between the Court and the children.  To the extent that Ms. Drumm is requesting certain "accommodations" on behalf of one of the subject children, that relief is denied, as she has no standing to demand such relief.[7]  Ms. Drumm's remaining requests deal with specific visitation issues and are denied as they do not concern court programs, services or activities.  They involve a judicial determination of legal rights based upon the facts of the case and will not be determined by an ex parte request made in the guise of an accommodation but, rather, as the case proceeds in court with all parties.  At such time Mr. Fishman's physical condition will be given due weight.

Accordingly, it is hereby

ORDERED, that the branch of Donna Drumm's ADA accommodation request for an adjournment of the matters pending before this Court on December 22, 2016, is granted and those matters are adjourned to March 14, 2017 at 9:00 a.m.; and it is further

ORDERED, that the branch of Donna Drumm's ADA accommodation request that she be permitted to be present with Marc Fishman, at his expense, as his ADA Advocate during court appearances at times when the parties are present in the courtroom is granted; and it is further

ORDERED, that the branch of Donna Drumm's ADA accommodation request that Marc Fishman be permitted to wear sunglasses during proceedings at his discretion is granted; and it is further

---

[6]This Court recognizes that some of Mr. Fishman's claimed disabilities may have an impact on his ability to parent the subject children and to that extent, may become relevant during subsequent custody and visitation proceedings.

[7]This Court questions the actions of Ms. Drumm, who although representing to be an ADA Advocate, is also an attorney, in requesting relief and making unsupported and conclusory allegations about a child who is represented by his own attorney and who is in the sole legal and physical custody of Ms. Solomon.  This Court has no reason to believe that Ms. Drumm has ever even met the child.

ORDERED, that the branch of Donna Drumm's ADA accommodation request that Marc Fishman be permitted to have a note taker present and to personally record the proceedings is denied; and it is further

ORDERED, that the branch of Donna Drumm's ADA accommodation request that seeks an <u>ex parte</u> order of visitation is denied; and it is further

ORDERED, that the branch of Ms. Drumm's ADA accommodation request seeking accommodations on behalf of one of the subject children is denied.

This constitutes the Decision and Order of this Court.

Dated: January 25, 2017
      Yonkers, New York

                              Hon. Michelle I. Schauer
                              Judge of the Family Court

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

# EXHIBIT "F"

CONFIDENTIAL DOCUMENT – FOR AMERICANS WITH DISABILITIES ACT (ADA)
ACCOMMODATION PURPOSES ONLY

request for ADA accommodation(s) will require a modification of or otherwise affect the court's practices or procedures, the request should be made to the judge or judicial officer."

In the second attachment of this email, we are submitting medical documents. Included in the attachment is a letter from Mr. Fishman's current psychologist, Dr. Maidenberg regarding his traumatic brain injury impairments. Although not written for this purpose, it includes strong advocacy language which we do not wish to present to Judge Schaeur that would appear to be unfair to the other party. I respectfully suggest the ADA Liaison or Judge Schaeur's Court Attorney review the medical documents to satisfy the 'record of such an impairment' prong for ascertaining Mr. Fishman as a qualified individual with disabilities.

This reasonable request is arranged in the following manner, as per the ADA and its Amendments. A description of the nature of disability or impairment. A description how the disability affects a major life activity or major bodily function and the type of accommodation(s) requested. Part V includes additional requests. Records of impairments are being sent separately to preserve their confidentiality.

Mr. Fishman's diagnosed physical disabilities are:

> Severe obstructive sleep apnea syndrome
> Occipital neuralgia
> Traumatic brain injury, (TBI)
> Temporomandibular joint disorder (TMD) / Temporomandibular joint (TMJ) syndrome

Mr. Fishman's severe obstructive sleep apnea disability affects major life activities of breathing and sleeping. Occipital neuralgia and traumatic brain injury affect the major bodily functions of the brain and neurological functioning. TMD/TMJ affects eating and sleeping. Mr. Fishman also suffers from tinnitus or ringing in the left ear which causes hearing problems if his neurostimulator is off.

Occipital neuralgia

Mr. Fishman suffers from Occipital neuralgia which causes intense pain that feels like a sharp, jabbing, electric shock in the back of the head and neck. Other symptoms include aching, burning, and throbbing pain that typically starts at the base of the head and goes to the scalp. Also, Mr. Fishman suffers from sensitivity to light. Mr. Fishman's driving license was revoked by the NY DMV until Jan. 2016 due to this condition.

Part I Requested Accommodations due to Mr. Fishman's Surgery Scheduled for Dec. 19, 2016

CONFIDENTIAL DOCUMENT – FOR AMERICANS WITH DISABILITIES ACT (ADA)
ACCOMMODATION PURPOSES ONLY

*90-day adjournment of Dec. 22nd sentencing hearing due to medically necessary surgery scheduled for Dec. 19, 2016*

The Dec. 19th surgery is the implantation of a second inspire neurostimulator to improve Mr. Fishman's obstructive sleep apnea so he can get adequate sleep and be less at risk for heart attack or stroke. The neurostimulator locations are the right lung, right chest and underneath the tongue/neck.

As Dr. Chernobilsky describes in his Dec. 5, 2016 letter (attached in the medical documents packet), "Obstructive sleep apnea syndrome is characterized by repetitive upper airway collapse during sleep, causing hypoxemia and sleep fragmentation. This leads to daytime sleepiness, and increased risk of cardiovascular incidents (heart attack and stroke) and occupational accidents, along with the worsening of several co-morbidities such as cardiac arrhythmias, diabetes, hypertension and daytime functions... In my medical judgment, upper airway stimulation offers my patient the best clinical option available given his medical condition."

Dr. Chernobilsky recommended that any court appearance or trial be delayed 90 days Post-operatively. Mr. Fishman does not anticipate he will be well enough to attend the hearing four days after surgery. The 90-day recuperation period was calculated based on i) Mr. Fishman's previous experience with implant surgery. ii) Recovery of the use of his right arm. iii) Recovery of the three wounds in the implant areas (right lung, right chest and underneath the tongue/neck).

Mr. Fishman's attorney is also seeking an adjournment this week in a letter to Judge Schaeur.

Judge Schaeur has ordered supervised visits at the "Y" between Mr. Fishman and his four children on Saturdays. Mr. Fishman anticipates he will be unable to drive or sit in a car or enjoy a visit with his children outside of his home due to pain after surgery during his 90-day recuperation. His doctor has advised him not to exert himself in such a way that would aggravate the wounds from the three surgical incisions which would induce more pain and prolong his recuperation period.

## Part II Requested Accommodations to Visitation Schedule During 90-day Recuperation Period

Children visit Mr. Fishman at his home three times a week, Tuesdays, Wednesdays and Saturdays with Mr. Fishman's aunt, Joyce Fishman who is a retired special education principal with extensive early childhood experience, to supervise.

Transportation – Three sons picked up at the end of the school day from school Tuesdays and returned to New Rochelle by 8 pm. Joanna picked up from school Wednesdays and returned

*80*

CONFIDENTIAL DOCUMENT – FOR AMERICANS WITH DISABILITIES ACT (ADA)
ACCOMMODATION PURPOSES ONLY

by 8 pm to New Rochelle. On Saturdays, Jennifer transports all four children to Mr. Fishman's home by 10 am. The children will be returned to New Rochelle by 7 pm with half hour leeway for driving.

For family continuity and accommodating the disabled two children, visitation must be regular and frequent. Mr. Fishman has seen his children less than 24 hours in last 12 months.

Traumatic Brain Injury (TBI)

Mr. Fishman suffers from Traumatic Brain Injury (TBI) due to two separate motor vehicle accidents. The TBI affects Mr. Fishman's communication. Diagnosed as tangential speech, his speech pattern became faster after the accidents. This appears to an outsider as mumbled or jumbled; he interrupts people to 'get his words out.' TBI created impulsivity, burning eye pain, headaches and loss of short term memory. He is undergoing cognitive and behavior therapy to teach himself how to slow down and control his speech and impulsivity and not to let it control him.

Part III Accommodation Requests for Non Apparent Disabilities (TBI)

Mr. Fishman's communication at times presents itself in the courtroom as disrespectful and disruptive. *We request an Americans with Disability Advocate* to accompany Mr. Fishman during his court appearances (at his expense) to 'cue' him when he begins engaging in tangential speech to slow down or take a break. This will assist the judge, court reporter and attorneys to understand what Mr. Fishman is saying when his speech becomes garbled. The ADA Advocate will also work with Mr. Fishman's therapist's suggested strategies for coping with impulsivity and tangential speech in the courtroom.

To accommodate short term memory, *we request a note taker* (to be provided by Mr. Fishman) and *a tape recorder* to be used and provided by Mr. Fishman.

To support the integrity of complying with court orders and following court instructions, the accommodations we are seeking are: *Tape record verbal instructions, Orders or instructions from the court are typed (some are cut off in faxes) and mailed to Mr. Fishman with explicit parameters – including times, places, dates, footage, etc.; A remedy if the orders are not clear for Mr. Fishman to utilize prior to taking action – e.g. calling his attorney, seeking clarification from the court.*

To accommodate headaches and burning eye pain, when Mr. Fishman is experiencing either of these maladies, *he may use sunglasses.*

Mr. Fishman also experiences involuntary head turning and twitches due to TBI. We note this for the court's knowledge as this may appear to be inappropriate behavior in the courtroom.

4

CONFIDENTIAL DOCUMENT – FOR AMERICANS WITH DISABILITIES ACT (ADA)
ACCOMMODATION PURPOSES ONLY

**Part IV Request for Attorney for the Disabled Child Knowledgeable in Americans with Disabilities Advocacy**

Langerhan Hystiocytosis X

Mr. Fishman and Ms. Solomon's minor son, Jonah has Langerhan Hystiocytosis X (LCH).  In LCH, too many Langerhans cells are produced and build up in parts of the body where they can damage organs or form tumors.   This is a rare disease most closely associated with cancer..  LCH affects his normal cell growth, a major bodily function.  Jonah qualifies as a person with a disability under the ADA.  It is our understanding Judge Schaeur has an Order in place for one attorney to represent the interests of all four children.  According to Mr. Fishman's attorney, he has recently brought up a request to the court that Ms. Hannon be removed and the possibility exists that four attorneys will be appointed, one for each child.

*Mr. Fishman requests Jonah be assigned an attorney who has experience working with disabled children and is knowledgeable in Americans with Disabilities Advocacy as an accommodation for his son's disability.*

**Part V Additional Requests**

Reports

The court to provide all reports from the court-appointed social worker, Mary Crowe, which Mr. Fishman does not have for 2014, 2015 and 2016 to his treating psychologist, Dr. Michelle Maldenberg.

The court to provide all reports prepared by the visitation provider, the YWCA, that Mr. Fishman does not have for 2014, 2015 and 2016 to his treating psychologist, Dr. Michelle Maidenberg.  The reports will assist Mr. Fishman with his mental therapy treatment.

Forensic evaluation

The court to accept Dr. Gluck's forensic psychological report completed in April 2016 and faxed to the court from Dr.Gluck in lieu of a new report prepared by Dr. Herman.

Under the ADA Amendments, the question of whether an individual meets the definition of disability under this part should not demand extensive analysis. 29 C.F.R. §16301.4  Mr. Fishman believes undergoing another forensic evaluation within eight months of the completed Gluck report is demanding extensive analysis contrary to the ADA.

Kindly contact Ms. Donna Drumm with questions or responses to these requests.
DDrumm@DrummAdvocacy.com

5

82

CONFIDENTIAL DOCUMENT – FOR AMERICANS WITH DISABILITIES ACT (ADA)
ACCOMMODATION PURPOSES ONLY

Ph: 914 222 0529

Respectfully Submitted,

_12/15/16_ (Date)

Mark Fishman

_12/15/16_ (Date)

Donna Drumm, Esq.

ADA Advocate

6

83

# EXHIBIT "G"

84

FAMILY COURT OF THE STATE OF NEW YORK    DOCKET NO.

NEW ROCHELLE

V-10056-14/14A B
V-10058-14/14A B

------------------------------------------ ET. AL.

JENNIFER SOLOMON,                  **FILE NO. 131794**

          Petitioner,

       -against-


MARC FISHMAN,

          Respondent.

------------------------------------------

          June 27, 2017, 10:30 A.M.
          Hearing

HELD AT:   130 Warburton Avenue
          Yonkers, New York 10701

BEFORE:   HON. MICHELLE I. SCHAEUR, PT. 17

APPEARANCES:           VIRGINIA SUZANNE FOULKROD
                     Attorneys for Petitioner JENNIFER
                     SOLOMON

                     IAN PHILIP SPIER
                     Attorney for Respondent MARC
                     FISHMAN

                     KATHLEEN MURTAGH HANNON

PRESENT:                    Nicole Eugenie Feit
                     Ian Philip Spier, Esq.
                     Marc Fishman
                     Jennifer Solomon
                     Virginia Suzanne Foulkrod, Esq.
                     Kathleen Murtagh Hannon, Esq.


TRANSCRIBER:           ALAN KACHALSKY


**AL'S TRANSCRIPTION SERVICES**
**800 Westchester Avenue, Suite S-608**
**Rye Brook, New York 10573 (914) 220-5324**

85

1      COURT CLERK:  On the record.  This is case numbers 274 on

2   the calendar.  In the Matter of the Fishman Solomon, counsel,

3   appearances.

4      MS. FEIT:  Good morning your Honor, Nichole Feit, staff

5   attorney with Legal Services of the Hudson Valley, on behalf

6   of Petitioner, Jennifer solomon.

7      MS. FOULKROD:  Virginia Foulkrod, also Legal Services of

8   the Hudson Valley, on behalf of Miss solomon.

9      MR. SPIER:   Ian Spier.  I represent Marc Fishman.  Good

10  morning, Judge.

11      MS. SOLOMON:  Donna Drum, Americans with Disabilities

12  advocate, for Marc Fishman.

13      MS. CASALLE:  Loretta Cassale, assisting Ian Spier, Good

14  Morning.

15      MS. HANNON:  Kathleen Hannon, attorney for the children,

16  Joanna, Jonah, Aiden and Skye.  Good morning, Your Honor.

17      COURT CLERK:  All parties, raise your right hands,

18  please.  (inaudible).

19      MS. SOLOMON:  Yes.

20      MR. FISHMAN:  Yes.

21      COURT CLERK:  And (inaudible) relationship with

22  (inaudible).

23      MS. SOLOMON:  My name is Jennifer Solomon.  I am mother

24  to the Joanna, Jonah, Aiden and Skye.

25      COURT CLERK:  Sir?

86

1       MR. FISHMAN:  Marc Fishman, father.

2       COURT CLERK:  (inaudible).

3       UNKNOWN:  (inaudible),  legal intern with Legal Services

4   of the Hudson Valley.

5       COURT CLERK:  You may all be seated.

6       THE COURT:  Good morning.  This court --

7       MR. SPIER:  (inaudible) but this part with regard to the

8   intern, I have no objection to the intern being in here, but I

9   would just ask that if Mr. Fishman has, during (inaudible)

10  proceedings in his case (inaudible), had someone that he

11  wanted to have observe, sit quietly in the back, not disturb

12  anybody, that there wouldn't be any objection to that.  Not

13  only --

14      THE COURT:  This is an open courtroom.

15      MR. SPIER:  That's what I have advised him.

16      THE COURT:  This court, having completed a fact-finding

17  hearing, and having found that respondent father, Marc Fishman

18  violated temporary Orders of Protections issued by this Court,

19  in favor of Petitioner mother, Jennifer Solomon, we're here

20  today to proceed to disposition.

21      Today's proceeding will conclude all current family

22  offense petitions of violation petitions and violation

23  petitions currently pending before the court.  Before we

24  get to that, I would like to discuss how the pending 'V'

25  Petitions will be handled.  So, first I'll ask you,

1    Mr. Spier, because there was an issue as to whether or not
2    you would be making an application to be relieved, if that
3    is your intention to do, with respect to the custody and
4    visitation petitions that are pending.
5        MR. SPIER:  Yes ma'am, it is my intention.
6        THE COURT:  Do you want to say anything?
7        MR. SPIER:  In -- there have been, I believe, two written
8    applications.  I think one was done by Mr. Fishman -- not by
9    Mr. Fishman, (inaudible) submitted both, but one was his
10   affidavit.  The other was my affidavit.  We have different
11   philosophies as to the nature of Family Court, and the nature
12   of litigation.  And I don't think I'm the attorney for him.
13   It is (inaudible) -- we disagree on the approach to the case,
14   and, as I said, he's not really satisfied with the work I've
15   done in the past.
16       I don't think it's fair to him, to have me represent
17   him.  I don't think it's fair to me to represent him.
18   And, I would just say, for all the reasons set forth in
19   prior applications, I would ask to be relieved at the end
20   of the Family Offense Proceeding.
21       THE COURT:  Is it your desire, Mr. Fishman for me to
22   remove Mr. Spier from representing you, at the conclusion of
23   the Family Offense Proceedings?
24       MR. FISHMAN:  No.  I'd want it at the end of the case.
25   Whenever the entire --

1    THE COURT:  Did you not understand what I said?  We're

2    here to conclude the Family Offense Proceedings.  Then we will

3    be proceeding at some later date, with the custody and

4    visitation petitions.

5        So Mr. Spier is asking to be relieved at the

6    conclusion of the Family Offense Petitions.  So I don't

7    understand what you say you want him to be relieved at the

8    end.  At the end of what?

9        MR. FISHMAN:  Well pardon me, your Honor, I'm not fully

10    understanding this.  And I explained to Mr. Spier that there

11    was petitions that I put in on violation, back in July of '14.

12    We haven't had a full hearing on that.  I'd want counsel to

13    defend that.

14        We also have the original petition in front of Judge

15    Klein, June 11th.  What I need a disposition of

16    (inaudible) insurance matters where claims were denied or

17    held up, pending the final dispositions in the court

18    (inaudible).  I don't know how I can have a final

19    disposition (inaudible) when those initial petitions in

20    front of Judge Klein were an offense --

21    THE COURT:  I think you're referring to violation

22    petitions that are violation of orders of custody and

23    visitation.

24        MR. FISHMAN:  I'm not sure it was a custody and

25    visitation, your Honor.  But I'm not an attorney.  I know

1    filed a violation petitions in July of '14, or May of --

2        THE COURT:  Okay.  You can not file a Violation Petition

3    with respect to a Family Offense Petition, because you don't

4    have an Order of Protection on your behalf.  Do you understand

5    what I'm saying?

6        MR. FISHMAN:  I don't,  your Honor.  I was represented by

7    counsel and the counsel filed that paper, and I'm not sure I

8    have the correct title --

9        THE COURT:  Okay --

10        MR. FISHMAN:  And I've had 11 surgeries --

11        THE COURT:  You have Violation Petitions pending with

12    respect to visitation orders.  Not with respect to Family

13    Offense Petitions.

14        MR. FISHMAN:  What's the difference?  I'm not sure I

15    understand.  I believe it started as a violation of visitation

16    and custody.  That's what I believe.  Again it's three years

17    ago with a different Judge.  And I've had 11 surgeries and I

18    don't have all the legal papers in front of me.  But I was

19    always told that there'd be a full and fair hearing, and

20    there'd be a hearing on that original petition, which is the

21    one that defended custody and also took away no-fault

22    insurance benefits, because I didn't have custody.

23        THE COURT:  Okay --

24        MR. FISHMAN:  And then I --

25        THE COURT:  Mr. Fishman, focus.  Focus.

90

1    Focus.  This court has nothing to do with your

2    insurance benefits, or any litigation concerning

3    your automobile accidents.  So limit your comments

4    to the matters pending before this Court.  So again,

5    there are two sets of Petitions.  There are the

6    Family Offense Petitions, which are the petitions

7    than resulted in a number of Orders of Protection

8    issued against you, on behalf of Miss Solomon  and

9    the children.

10        In addition, she filed petitions alleging that you

11        violated those Orders of Protection.  We're here today

12        because I did not find you did violate those orders of

13        protection.  Those are one set of issues.

14        The second set of issues relates to your request to

15        have visits with your children.  And that goes back to

16        Judge Klein's original Order suspending your visits with

17        the children.

18        Those are the petitions that are pending.  Those are

19        Petitions that you filed, alleging that Miss Solomon has

20        denied you access to the children.  Those petitions will

21        continue.

22        So my question is whether you are asking for

23        Mr. Spier to be relieved from representing you with

24        respect to the custody and visitation issues.

25        MR. FISHMAN:  No.  I'm not.

1      THE COURT: You would like him to continue to represent

2  you.

3      MR. FISHMAN: Yes.

4      THE COURT: Okay. I am going to deny your application,

5  Mr. Spier. So, as we move forward, Mr. Fishman is in contempt

6  of this Court's order endtered April 8th, 2016, that he, Miss

7  Solomon, and the children all submit to a forensic evaluation

8  by Dr. Steven Herman. That order you will recall, was issued

9  at Mr. Fishman's insistence, and upon the following facts: On

10 May 5th, 2014, Judge Marks so ordered a Modification Agreement

11 regarding custody and access. That Order required that

12 Mr. Fishman complete an evaluation by Dr. Robert Verno. Dr.

13 Verno's report, dated August 3rd, 2014 is very unfavorable as

14 to Mr. Fishman's mental health and parenting ability.

15      Upon Mr. Fishman's objections to Dr. Verno's

16 conclusions, this court suggested an updated forensic

17 report from Dr. Verno. Mr. Fishman, however insisted upon

18 a new evaluator, and demanded that Miss Solomon be

19 investigated for alienating the children.

20      Because this Court had no indication that

21 Miss Solomon was engagng in behavior that was alienating

22 children from Mr. Fishman, this court explained to Mr.

23 Fishman that he would be ordered to pay for all of the

24 evaluations, subject to reallocation if indeed the

25 evaluator found merit to his claim of alienation. To

9

1  date, Mr. Fishman has refused to pay for, or participate

2  in the evaluation.

3       At this point, I'm going to use Dr. Verno's forensic

4  report and take a negative inference against you,

5  Mr. Fishman if you do not comply with the my Order dated

6  April 8th, 2016.

7       We're going to pick a date for the fact finding on

8  the pending 'V' Petitions.  If I don't have a completed

9  evaluation from Dr. Herman, as I said, I'll use Dr.

10 Verno's report, and we will proceed with that.

11      So we're going to pick a date for trial of the 'V'

12 Petitions.  Those are all of your petitions alleging that

13 Miss Solomon violated Custody and Visitation Orders, as

14 well as her Petitions seeking a modification of an Order

15 of Custody.

16      August 7th I have available.

17      MS. HANNON:  Your Honor, I'm unavailable on August 7th

18 and I'm not available again until the week of the 21st, in

19 August.

20      THE COURT:  August 21st?

21      MS. FOULKROD:  I'm off from  (inaudible) 22nd

22 (inaudible?).

23      THE COURT:  Well, I think we're going to need a number of

24 days.  And Mr. Fishman has requested that we only use

25 mornings.  I can do the morning of the 22nd, and the morning

93

1   of the 23rd.

2        MR. SPIER:  Morning of 22nd is no good.  Twenty-third is

3   fine.

4        THE COURT:  23rd?

5        MR. SPIER:  Are you available the 23rd?

6        THE COURT:  What is your intent, Mr. Fishman, with

7   respect to having the forensic evaluation by Dr. Herman?

8        MR. FISHMAN:  I intend on having it, your Honor.

9   (inaudible) some judgments against my insurance company that

10  they have to pay on, I'm intending on having it.

11       THE COURT:  You understand that if you don't have it by

12  the time of trial, I'm taking a negative inference.  Do you

13  understand that?

14       MR. FISHMAN:  I do.

15       THE COURT:  Do you understand what it means when I say a

16  negative inference?

17       MR. FISHMAN:  I do. it's going to be at 9:30?

18       THE COURT:  Yes.

19       MS. HANNON:  (inaudible) the next day?

20       MR. BIRMAN:  August 23rd was our second date?

21       THE COURT:  One second.  Mr. Fishman, did you have an

22  opportunity to observe your calendar, and notice when

23  August 23rd is?

24       MR. FISHMAN:  (inaudible)

25       THE COURT:  Okay.  Well, you have your ADA advocate

1    sitting next to you, and one of the  your things was, you

2    needed to look at a calendar.  Did you bring one now?

3         MS. DRUM:  No, I did not.

4         THE COURT:  You said you need to have access to a

5    calendar, did you not?

6         MS. DRUM:  Yes I did, your Honor.

7         THE COURT:  Okay.  So why didn't you bring one?

8         MS. DRUM:  I (inaudible).

9         THE COURT:  Okay.  Your request was that the Court

10   calendar, which is affixed to my courtroom wall, was too far

11   away for Mr. Fishman to see.  You requested as an

12   accommodation, that my Court Officers remove the calendar from

13   the wall, and bring it close enough for Mr. Fishman to

14   observe.  I denied the application and said he was free to

15   bring in his own calendar so that he could look at the dates.

16        MS. FEIT:  I apologize, your Honor.  I was just told

17   (inaudible).

18        THE COURT:  Does someone have a calendar for Mr. Fishman

19   to look at?

20        So Wednesday, it's morning only, to accommodate your

21   request.

22        Okay, we're all set?  We understand when August 23rd

23   is, and you're good with that day, Mr. Fishman?

24        MR. FISHMAN:  August 29th?

25        MS. FEIT:  It's fine with me.

1          THE COURT:  9:30?

2          MR. SPIER:  Fine.  August 29th is a Tuesday.  We will

3    (inaudible) calendar.  Yes, Judge.

4          THE COURT:  You see it, Mr. Fishman?  You're

5    acknowledging.  It's a Tuesday morning.

6          THE COURT:  Do you think we need to pick another day?

7    Anyone?

8          MR. SPIER:  I have a request, with his administrative

9    request.  Either working with counsel, or the Court and

10   counsel, if I could get a list of the open Petitions.  I have

11   approximately four or five boxes, bigger than the one Miss

12   Feit --

13         THE COURT:  We can Do an Attorney's Conference, and

14   narrow things down, so that everybody's aware of the Petitions

15   and the issues that will be tried.

16         MR. SPIER:  Right.  That would be really helpful.

17         THE COURT:  We can pick that date.  All right, so this

18   attorney's only.  August 16th, August 17th, August 18th.  Any

19   of those days.

20         MS. HANNON:  (inaudible).

21         MR. SPIER:  Could it be earlier, so that if we're going

22   to start the trial on the 23rd, I would need to be focusing on

23   the Petitions --

24         THE COURT:  Okay.

25         MR. SPIER:  -- and --

1    THE COURT:  I have August 11th, in the afternoon,
2  August 10th, in the morning.
3    MS. HANNON:  I'm not available, but if you --
4    MS. FEIT:  Your Honor, I'm off from the 7th to the 21st
5  (inaudible).
6    MR. SPIER:  I'll be happy to tell you what Petitions are
7  -- .
8    MS. FEIT:  All right.
9    THE COURT:  Can we do the first week of August, like July
10  31st, any day that week?
11    MS. HANNON:  Your Honor, I think (inaudible).
12    THE COURT:  Okay.  Anybody --
13    MR. SPIER:  (inaudible)
14    THE COURT:  July 31st?
15    MR. SPIER:  Okay.
16    THE COURT:  You want to do late morning?
17    MR. SPIER:  Yes.
18    THE COURT:  Like 11:30?  That's attorneys only, you
19  understand?  Miss Solomon, Mr. Fishman, you will not be here.
20    Okay, are we ready to move on?  Anything else with
21  respect to the pending 'V' Petitions?
22    MS. HANNON:  No.
23    THE COURT:  All right.  So we're moving on to the Family
24  Offense Petitions.
25    By way of background, on June  11th, 2014, Petitioner

mother, Jennifer Solomon, filed a Family Offense Petition against respondent father, Marc Fishman, seeking an Order of Protection on behalf of herself and the parties' 4 children.  Joanna was 10 years old at the time, Jonah was 8 years old, at the time, and Aiden and Skye, the twins were 5 years old at the time.

Miss Solomon alleged that Mr. Fishman was physically and verbally abusive to the twins.  She expressed her concern that the father was unstable and spiraling out of control, and asserted that he had failed to complete a Court-ordered psychological evaluation that was ordered in the context of the parties divorce proceeding.  That was the Dr. Verno evaluation.

She also filed, on that date, a Petition seeking modification of the Visitation Order issued by Supreme Court.

Judge Klein issued a Temporary Order of Protection against Mr. Fishman on behalf of Miss Solomon and temporarily suspended visits between the father and the four children.

Upon Judge Klein's retirement in December 2014, the matters were assigned to this Court.  In the two and a half years the matters have been pending before this Court, approximately 20 additional Petitions have been filed by both parents.  The essence of the allegations

1    made by Miss Solomon is that Mr. Fishman continuous to

2    engage in harassing, threatening, intimidating,

3    manipulative and controlling behavior, that puts herself

4    and the subject children in danger.

5         For his part, Mr. Fishman continues to assert that

6    Miss Solomon is denying him access to the children.

7         This Court has issued numerous Court Orders,

8    including Orders allowing him unsupervised access to the

9    older children, in an attempt to restore him to a more

10   traditional non-custodial access schedule.

11        Suffice to say, and the Court record will reflect,

12   that the increasingly restrictive Temporary Orders of

13   Protections and Visitation Orders came about as a result

14   of Mr. Fishman's pattern of self destructive, impulsive,

15   inappropriate and contemptuous behavior.

16        Due to Miss Solomon's allegations that Mr. Fishman

17   was blatantly ly and continuously ignoring Court Orders of

18   Visitation, and violating Temporary Orders of Protection,

19   this Court proceeded to a fact-finding hearing on her

20   Petitions alleging Mr. Fisherman's violations of Temporary

21   Orders of Protection issued against him on behalf of

22   herself and the parties four children.

23        Four Petitions are Docket Number 07850-14,

24   Supplements 14A, filed September 11th 2014, supplement

25   15D, filed December 17, 2015, supplement 16H, filed

1    April 6th, 2016, and Supplemental 16J, filed June 17th

2    2016.

3         The fact-finding hearing was held on June 28th

4    July 7th, July 11th, September 1st and September 2nd 2016.

5         At the conclusion of the hearing, this Court found

6    that Miss Solomon established beyond a reasonable doubt, that

7    Mr. Fishman repeatedly violated the Orders of Protection.

8         Miss Solomon's testimony was largely unrebutted by

9    Mr. Fishman, whose main defense was that he believed that

10   his actions did not in fact constitute violations.

11        This court found that Miss Solomon testified credibly

12   and consistently, and that Mr. Fishman was not a credible

13   witness.  Mr. Fishman's memory was good and strong

14   regarding everything negative relating to Miss Solomon,

15   including conversations that went years back.

16        Yet his memory failed as to key facts having to do

17   with his culpable behavior.  For instance, Mr. Fishman

18   testified on September 2nd, 2016, that he did not recall

19   what was said at a hearing only one month before.

20        Although there were many violations, including

21   evidence that Mr. Fishman sent hundred of text messages to

22   Joanna and a virtual mountain of gifts to the children,

23   all in violations of Temporary Orders of Protection, this

24   Court limited it's findings to 3 specific incidents that

25   were admitted by Mr. Fishman, that were in violation of an

April 6th, 2016 Temporary Order of Protection that was in effect until July 11th 2016.

The April 6, 2016 Temporary Order of Protection was on behalf of Miss Solomon and the children and provided in relevant part that Mr. Fishman have no communication with Miss Solomon, and that he stay away from her place of employment.

In addition, the Temporary Order of Protection provided that Mr. Fishman have no communication with the children, except as provided by Court Order.

The interim order of visitation issued on April 6, 2016, provided for supervised visitation for Mr. Fishman and limited his gift giving to the children, to the children's birthday or major holidays. This court specifically advised Mr. Fishman, in Court, on the record That there were no major holidays between April 6, 2016, and the next scheduled court date, which was July 11th, 2016, and that he was not to send any gifts his children during that time period.

However, Mr. Fishman acknowledged that he sent gifts for Passover, Memorial Day and July 4th.

As a defense to these violations, Mr. Fishman testified at the Violation Proceeding, that he had not been paying attention in Court. But the Court record reflects otherwise.

Significantly, and as evidence of Mr. Fishman's

attempt to manipulate the Court's directive, Mr. Fishman's Passover gifts to the children contained cards. The card to Jonah, Aiden and Skye, which was marked into evidence stated, and I quote "Happy Passover. Passover is a major Jewish holiday."

Similarly, in his card to Joanna, that was also marked into evidence, he stated quote "So happy to send you the gifts on this major holiday of Passover."

Mr. Fishman also admitted sending the children gifts for Memorial Day, and July 4th. These were actually three separate violations, which this Court erroneously counted as one violation, previously. These violation were established beyond a reasonable doubt.

Mr. Fishman also violated the April 6, 2016 Temporary Order of Protection, which prohibited him from having any communication with Miss Solomon,. By causing flowers to be sent to her on May 6th, 2016, for Mother's Day.

Miss Solomon testified that she received purple flowers inside a purple glass container. An attached card said Happy Mother's Day, from Aiden, Skye, Jonah, Joanna and Bella. Enjoy the flowers.

Miss Solomon testified that she thought it was from Mr. Fishman, because he always included the pets in his cards, that Bella is her dog, and that she asked her family members, and they denied sending the flowers.

1    She testified that her children do not have the

2    capability of ordering flowers online, and paying with a

3    credit card.  Mr. Fishman admitted that he sent the

4    flowers.  And he's asserted defenses, that he did it in

5    prior years, years in which there were no Orders of

6    Protection, and that he did so at the request of his son.

7    And the Court did not find him to be credible in that

8    respect, or without merit.

9        There's a case, Matter of a Craig O against Barbara

10    O, 118 A.D.3rd, 1068, 3rd Dept., 2014 which supports the

11    conclusion that sending the flowers was in violation of

12    the Order of Protection.

13        This violation is also established beyond a

14    reasonable doubt.

15        Another violation established beyond a reasonable

16    doubt was Mr. Fishman's presence at Miss Solomon's place

17    of employment, in violation of the April 6, 2016 Temporary

18    Order of Protection, specifically requiring that he stay

19    away from Miss Solomon's place of employment.

20        This Court found Miss Solomon to be credible in her

21    testimony that Mr. Fishman was present on the grounds of

22    her place of employment, Chatsworth School, on June 11th,

23    2016.

24        Miss Solomon testified that while the parties

25    children were on FaceTime with Mr. Fishman, she watched as

1  he walked to the school where a carnival was taking place.
2  Mr. Fishman asked each child if they were going to the
3  carnival, which was at the blacktop area of the school, at
4  the rear, inside the fence.

5      Mr. Fishman admitted being at Chatsworth School,
6  Miss Solomon's place of employment, but asserted that he
7  could be there, in violation of the Order of Protection,
8  because he was an individual with disabilities, and that
9  it was a PTA fair, to which the public was invited.

10     Mr. Fishman's disingenuous attempt to explain his
11  presence at Miss Solomon's place of employment, by
12  labeling as a park, to which as a disabled person he was
13  entitled to be present, is a horrifying and scary insight
14  into Mr. Fishman's inability to reason, understand, and
15  obey Court Orders.

16     Miss Solomon testified that Mr. Fishman's behavior as
17  to all of the above violations, as well as many, many more
18  alleged violations, intimidated and alarmed her.  She
19  testified that she was frightened by Mr. Fishman's lack of
20  respect for a Court of Law, and that his behavior in that
21  respect, made her feel unsafe.

22     Having found that Miss Solomon established beyond a
23  reasonable doubt Mr. Fishman's numerous violations of this
24  Court's Orders of Protection, we are proceeding to
25  disposition.

1    At the conclusions of the fact-finding hearing,

2    Miss Solomon asked that Mr. Fishman be incarcerated for

3    his contemptuous behavior.  Is there anything else you

4    wish to say today, Miss Feit?

5    MS. FEIT:  Yes, Your Honor.  If I may, just very short,

6    make one last statement.

7    I'd just like to say that, again, the reason we ask

8    for Mr. Fishman's incarceration, is that it's not only

9    necessary to insure compliance of the Orders, as the Court

10   has pointed out today, but to insure the safety of

11   Miss Solomon and her children, has been clear throughout

12   the trial, Mr. Fishman does not see anything wrong with

13   his conduct and blames everyone else.

14   It is clear that he will violate over and over again,

15   unless this Court provides Mr. Fishman with some serious

16   consequence.  And I will just very ly briefly state,

17   another Judge has said this before me.  But I found it

18   very on point and poignant.  It's from the Supreme Court

19   in Nassau County, with respect to a civil contempt

20   proceeding.  And I paraphrase it, it's right on point.

21   Here, the plaintiff has shown no necessity for his

22   unilateral and aggressive violations of Defendant's

23   established rights.  Here the plaintiff -- being

24   Mr. Fishman -- permitting such a contemnor to avoid civil

25   contempt remedies, by allowing technical attacks upon the

1    Judgment, can only encourage self-help from a disrespect

2    for the law, and violate basic privacy expectations, which

3    go to the very heart of the Judgment.  This applies here.

4        Mr. Fishman, through his own testimony, and actions,

5    has shown absolutely zero accountability.  He's never

6    acknowledged wrongdoing, and will continue to violate over

7    and over, unless he is faced with a serious consequence of

8    jail time.  If this court enters a Permanent Order of

9    Protection, I submit that it will have no teeth, unless

10   Mr. Fishman knows and expects that he can incarcerated for

11   his actions.  That's all I have to to say, your Honor.

12       THE COURT:  Mr. Spier?

13       MR. SPIER:  Judge, I have expected some, since the matter

14   was set down for dispositional hearing, to have the ability to

15   call witnesses.  Mr. Fishman, and the doctor who performed the

16   neuropsychological eval of him.

17       The court found, and I am not disputing, that Mr.

18   Fishman sent flowers and gifts, not necessarily all the

19   gifts, but sent gifts, and was in the school yard.

20       This was at a time when he had at least for two of

21   the violations, or two of the items, had just completed a

22   operation having to do with a hernia.  And that it appears

23   that the treatment created many additional problems, which

24   he could to.

25       Particularly, he had an allergic reaction to the

1    mesh.  And Doctor Cole could testify that this type of

2    reaction, in addition to the pain, the failure to heal,

3    the other, that Mr. Fishman suffered from pain from

4    various parts of his body.  We've had discussions on his

5    (inaudible) the implant he had, because of neurological

6    pain.  And that these interfere with the ability to

7    register events.

8        There's a difference between memory and registering

9    events, so that they become part of memory.  So that it

10   is, and gain, I'm not the expert.  Doctor Cole, who is

11   planning to be here tomorrow at 9:30, a professor at

12   Columbia in Neuropsych.  And he would testify that you can

13   hear something, or see something.  You can acknowledge it.

14   But if it doesn't register, you won't remember it.  And, I

15   guess part of Mr. Fishman's problem -- it's my expectation

16   that we be allowed to go forward with the witness.

17       Mr. Fishman can talk about his health, after the

18   operation.  And Dr. Cole could explain the relevance to

19   his ability to bring to -- and Dr. Cole corrected me --

20   it's not memory, it's registering the events or the

21   Courts' Orders.

22       As I said, he can, he can sit here and say, 'yes, I

23   hear what the Court says.  Yes, I understand it.'  But if,

24   because of his various conditions, he doesn't register

25   that, it will not last as a memory.

1    Dr. Cole explained to me that when he tested

2    Mr. Fishman, -- I don't want to testify for him.  And that

3    that's to his -- I know I'm headed down that road.  And I

4    don't want to, but I want the doctor to come in and

5    testify.

6    I asked Mr. Fishman the question 'is there anything

7    I'm going to hear today about the last ten months that I

8    don't want to hear?'  And he said, basically, no.  He has

9    not spoken to Miss Solomon, he has not communicated with

10   her except through counsel.  He has not gone to her house.

11   He has not gone to the neighborhood.  When there was a

12   point in time, we were discussing how we were going to

13   transport the children, so as to arrange for 4 hours

14   instead of two hours, and there was an issue because the

15   family, the twins were a little active in the car, and

16   whether Mr. Fishman accompany them back to the house.  And

17   he said 'only if they change the order.'  I cannot go to

18   the house with the Order as it stands now.'.

19   So, it would appear that comprehension has started to

20   sink in, that he's aware.  And, as I said, he has not gone

21   near Miss Solomon, he has not spoken to her, he has not

22   sent her anything.  And I think that shows a understanding

23   of where he's headed.  I advised him that the Court is

24   planning to issue a Permanent Order of Protection, and

25   that the Court will hold that Permanent Order of

1    Protection, my words, on a short leash.  So that should

2    there be a violation, and the Court gives the example of

3    should he go to Miss Solomon's house, that there would be

4    a hearing.  And should that be found to be true, the Court

5    would have no hesitation in putting him in jail.

6        I think he's, he is, he understands that whatever

7    remedies he has, lies in the Court, either this Court or

8    an appellate Court, or Federal Court.  And he's aware of

9    those rights and he is intent on exercising them, to the

10   extent that he can.

11       But he has not taken any help self help with regard

12   to Miss Solomon.  He hasn't gone to the children's school.

13   He's been very -- in his communications with me, he's been

14   very -- he always asks me, can he pick something up at the

15   school, he wants some report IEP report.  And he

16   understands, again, that he cannot go to the school.  And

17   we've had discussions as to whether he can go to the Board

18   of Education.  And he has essentially said 'no, I think

19   it's best if I don't.  I don't want to take any chances.'.

20       I think he understands.  We don't have Dr. Herman's

21   report.  And we all heard him say that he, his plan is to

22   have a rport and hopefully, preferably by August 23rd, I

23   think it was, whatever the first day the Court listed for

24   trial, which August 23rd.

25       But I think the court is aware that there are -- that

1    Mr. Fishman is Mr. Fishman.  And that he is not changing

2    his basic personality, his behavior can be changed.  And,

3    as I said, his behavior over the past nine months, ten

4    months, whatever it is, from September, has not been

5    violative of an Order of Protection.

6        The Court has many choices.  The Court can, there are

7    are two sections, which I put in my letter.  I can't pull

8    them up.  But there are two sections dealing with Family

9    Offenses that relate to actions the Court can take.  Both

10   when it issues on Order of Protection, and a Violation.

11   And there are several options available to the Court.  And

12   the option that presents the most problem is the question

13   of incarceration.

14       As I believe I put in the letter, he is scheduled --

15   I don't know if I put that in the letter -- but he has

16   advised me, he is scheduled for an operation to remove the

17   mesh, in July, and that his various implants require

18   monitoring.  And it is his understanding that the

19   Westchester Medical Center is not one of the hospitals

20   that has dealings with the Inspire Company.  So that they

21   don't do the monitoring and technically is necessary for

22   the use of that device.  And he would need, as he -- we

23   had happen in Court during testimony, in the Family

24   Offense Petitions, the violations, where he needed to go

25   to the men's room to adjust the pain level or the response

1    of his device, because the pain was increasing.

2        It creates medical issues, which, having dealt with

3    the jail for some 25 years, I know they don't want to have

4    to deal with.  And Mr. Fishman, who has been undergoing

5    treatment for his cognitive issues, and other issues,

6    doesn't want to have to deal with that in prison.

7        So that we would ask that the Court not consider a

8    sentence of incarceration.  The Court could issue a

9    sentence and suspend it, subject to Mr. Fishman behaving,

10   following all the Court's Orders, or following the Orders

11   of Protection.

12       And, as I said there are other options.  There's

13   probation, which I'm not in favor of, but -- he has done

14   his thing and has, as I said, he has had no contact with

15   Miss Solomon and has either had me or, as his own counsel

16   in the appellate court, written to Miss Solomon's

17   attorney.  And sometimes there would be a request for

18   Miss Solomon to do something.  But it was never sent o her

19   to her.  It was always given to his attorneys, who could

20   decide what to do with it at that point.

21       I do want to put on the record, that Miss Solomon

22   voluntarily wrote to counsel, who sent that to me for

23   transmittal to Mr. Fishman, which is a letter which

24   essentially went over in more detail, the things that the

25   attorney for the children put on the record earlier, about

*114*

1    how well the children were doing, and the various things

2    they were doing.

3         I also think -- the Court has seen numerous reports

4    which predate my representation of Mr. Fishman.  But the

5    reports have a number of things in common, which is, they

6    all note Mr. Fishman's love and adoration of his children.

7    And his --

8         THE COURT:  All right.  I'm going to stop you at this

9    point, from continuing in that vein.  It's not relevant.  I've

10   let you go on, really with comments that are not legally

11   relevant at this point.  Except, do you want to address the

12   issue of Dr. Cole.  You did you did submit a copy of a

13   neuropsychological evaluation, which all counsel has received.

14   Do you have a position, Miss Feit, as to my admitting that

15   into evidence with respect to to this dispositional

16   proceeding?

17        MS. FEIT:  Your honor, I have no objection to the court

18   entering into evidence on the record, Dr. Cole's report that

19   was dated December 29th, 2016.  I do object to him being

20   brought in as a witness to testify about that report.

21        THE COURT:  Okay.  Thank you --

22        MS. FEIT:  I have no objection to the report itself, your

23   Honor.

24        THE COURT:  Miss Hannon, your position with respect to

25   the neuropsychological evaluation being admitted into

112

evidence?

MS. HANNON:  Your Honor, I have no objection.

THE COURT:  Okay, so we're going to mark Dr. Cole's neuropsychological evaluation into evidence.  And I'm declining your application to have him be here to testify.

Miss Hannon, anyting you want to say --

MS. HANNON:  Your Honor --

THE COURT:  At this point?

MS. HANNON:  -- (inaudible) children.  I am going to take a specific position (inaudible) that the father be incarcerated per se.  But I (inaudible) remind the Court, and ask the Court to be very, very mindful that these four children deserve and need a parent in their father, who respects the law, respects the rules, and respects Court Orders, or they will, they never have peace in their lives.  There will always be chaos.  And he has specificaly, has not respected school rules (inaudible) or the Orders of the Court.

THE COURT:  Thank you.

It is significant to this Court, that throughout the extended court proceedings before this Court, Miss Solomon has previously refrained from asking for Mr. Fishman to be incarcerated.  In that respect, she has shown extraordinary control throughout these proceedings, despite Mr. Fishman's repeated violations of Court Orders.

This court is frustrated by Mr. Fishman's continued

1    refusal to comply with Court Orders, and finds that

2    Mr. Fishman's continuous and contemptuous behavior, reveal

3    the actions of a man whose behavior is intensely,

4    controlling and manipulative.

5        Mr. Fishman has demonstrated  a dangerous lack of

6    self-control, and insight into the negative impact his

7    actions have had, both on himself, and his family.

8        He has shown himself to be adept at manipulating

9    facts, and trying to control the court process to the

10   detriment of both himself and his children.  The record

11   belies his claim that he did not register the terms of the

12   Order of Protection.

13       Nothing more needs to be said than to refer to

14   Mr. Fishman's Passover cards, in which he refers to

15   Passover as a quote 'Major Holiday,' in order to

16   circumvent the specific terms of this Court Order

17   preventing him from sending gifts to to his children,

18   expect for major holidays.  And in violation of the

19   Courts' Order, after being advised that there were no

20   major holidays between that date and the next court date.

21       It is also significant that this neuropsychological

22   evaluation, which is lengthy.  It's extensive, it contains

23   results of various tests.  It seems to me that this

24   evaluation was obviously an extended process.  The

25   evaluation took place on December 29th, 2016.

1          The fact-finding in this case ended on September 2

2     2016.   The disposition was scheduled to occur on

3     December 22nd, 2016.   That date had been repeatedly

4     adjourned at the request of Mr. Fishman and his

5     disabilities advocate.   Her asserted that he was was too

6     ill to appear in court, as he needed to heal from hernia

7     surgery, he was undergoing.

8          I find this to be just another example of

9     Mr. Fishman's attempt to manipulate and control the Court

10    process.

11         At virtually every court appearance, Mr. Fishman

12    could not restrain himself from being interrupt -- from

13    interrupting the Court and counsel, arguing with the

14    Court, despite being admonished on many, many occasions,

15    not to do so, by both the Court and his attorney.

16         While this Court has no desire to incarcerate

17    Mr. Fishman, it appears that incarceration is the only

18    remaining remedy that may jolt him into the reality that

19    Court Orders must be followed.

20         I'm going to first issue an Order of Protection, a

21    two year Order of Protection on behalf of Miss Solomon,

22    that will run until June 27th 2019.   That Order of

23    Protection requires you, Mr. Fishman, to stay away from

24    Miss Solomon, to stay away from her home, to stay away

25    from her place of employment at Chatsworth School,

1      including the school grounds of Chatsworth School.

2           You are to have no communication with her by any

3      means, including through third parties.  You are not to

4      harass, assault, threaten, intimidate, or commit any

5      criminal offense against her.  I'm dismissing the

6      underlying Family Offense Petition.  The issue as to an

7      Order of Protection regarding the children, will continue

8      with respect to the Custody and Visitation Petitions

9      pending before the Court.  And I will be continuing the

10     Temporary Order of Protection on behalf of the children

11     under the 'V' dockets, not under the 'O' docket, that you,

12     Mr. Fishman stay away from your children, except as

13     provided by Court Order of Visitation.  That you stay away

14     from your children's home and school.  That you have no

15     communication with the children, including by sending

16     gifts except as provided by Court Order, and that you not

17     harass, assault, threaten, intimidate or commit any

18     criminal offense against them.

19          The law authorizes this Court to incarcerate

20     Mr. Fishman for up to six months, for each of his five

21     willful violations of the Orders of Protection.

22          Today this Court sentences Mr. Fishman to three weeks

23     incarceration for each violation, each sentence to run

24     concurrently.

25          Thank you.  That concludes today's proceedings.

```
 1            MR. SPIER:  I just want to make a request.

 2       Mr. Fishman needs certain medical devices to take

 3   with him.  We expected this to --

 4            THE COURT:  That true.  That's for him to deal with

 5   Corrections.  That's not my issue.  Thank you

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE

I, Alan Kachalsky, certify that the foregoing
transcript of proceedings in the YONKERS FAMILY
COURT, of Matter of Fishman and Solomon, Docketno.
131794 was prepared using the required transcription
equipment and is a true and accurate record of the
proceedings.


Signature _Alan K____

**Al's Transcription Services**
**800 Westchester Avenue, Suite S-608**
**Rye Brook, New York 10573**
**Tel: (914) 220-5324**
**E-mail: catchsky@earthlink.net**

# EXHIBIT "H"

FAMILY COURT OF THE STATE OF NEW YORK

YONKERS

DOCKET NO.
V-10056 through 59-14/14A B
Et. al.

------------------------------------------

JENNIFER SOLOMON,

**FILE NO. 131794**

                Petitioner,

          -against-

MARC FISHMAN,

               Respondent.

------------------------------------------

           June 21, 2017, 12:30 P.M.
           Hearing
HELD AT:  130 Warburton Avenue
           Yonkers, New York 10701
BEFORE:   HON. MICHELLE I. SCHAEUR, PT. 17 JORDAN

APPEARANCES:         DONNA DRUMM, ESQ.
                     Attorney for MARC FISHMAN

PRESENT:           Unknown

TRANSCRIBER:        ALAN KACHALSKY

               **AL'S TRANSCRIPTION SERVICES**
        **800 Westchester Avenue, Suite S-608**
      **Rye Brook, New York 10573 (914) 220-5324**

1          THE COURT:  We're on the record.  Just state your -- This

2     is the matter of Fishman, file 131794.  Appearance, please.

3          MS. DRUM:  Donna Drum, 800 Westchester Avenue, Rye Brook,

4     New York, appearing as ADA advocate for Mr. Fishman.

5          THE COURT:  Thank you.

6          MS. DRUM:  Thank you, Judge.

7          THE COURT:  So I'm calling you Miss Drum, because I have

8     received the latest in what appears to be a continuous

9     onslaught of multiple requests for disability accommodations

10    made either by, or on behalf of, Marc Fishman, with respect to

11    this file.

12         Now, I can go through the chronology, and I probably

13    will, you know, but put it on the record.  With this

14    particular call is precipitated by a document that was

15    received by Mr. Curry, who is the ADA Liason in the Family

16    Court here in Yonkers.  And it contains tables and what

17    looks like three separate dated documents.  Although the

18    one document that I have is numbered page -- four pages,

19    and they're all page 2 of 4, 3 of 4, 4 of 4.

20         But it contains documents dated March 15th,

21    April 12th, and June 13th, all of which I fnd hard to

22    understand, but seem to be requesting various disability

23    accommodations.

24         The request for accommodations began no later than

25    December 13th, which was by an E-mail from you to

1   Mr. Curry, stating that you had been retained by
2   Mr. Fishman as his ADA advocate, and requesting various
3   accommodations.  YOU sent some follow-up e-mails to my
4   Court Attorney, requesting accommodations.
5       And finally, when you sent an E-mail dated
6   January 11th, in response to that, I issued an Order dated
7   January 25th, 2017, formally adressing the accommodation
8   request.  I understand that Mr. Fishman sought to appeal
9   that Order.  His appeal was denied or dismissed.  And yet,
10  I continue to receive non-stop requests, either from you
11  or from Mr. Fishman for a variety of accommodations.  I'm
12  just not sure under what authority I continue to get these
13  continuous correspondence.
14      He had allegedly, a disability caused by an
15  automobile accident, which he allegedly suffered in June
16  of 2013, in November of 2013.  As far as I can see,
17  there's no new disabilities, only new ideas as to how this
18  Court can accommodate whatever disabilities he says he
19  has.
20      And frankly, some of these requests are ridiculous.
21  And I will not be issuing a Court Order.  So this is your
22  opportunity to tell me exactly what it is you're asking
23  for.  And I'm not accepting any further requests after
24  this date, unless there is a new issue with a new
25  disability.

1      MS. DRUM:  All right.  Thank you, your Honor.  I wouldn't

2   characterize my communications as continuous.  The

3   communications I sent were (inaudible) too much in between

4   each other.  The communications you received from Mr. Fishman

5   were also in between.  But I was respectful of giving a period

6   of time for response to the Court.  So I would just like to

7   make that comment on the record.

8      THE COURT:  Okay.  But I issued .

9      MS. DRUM:   -- (inaudible)

10      THE COURT:  I issued -- Miss Drum, I issued an Order in

11   January.  That's it.  I made my decision.

12      MS. DRUM:  Well, there are new requests since then, and

13   we have a right under the ADA to request those accommodations.

14      THE COURT:  Okay.  So --

15      MS. DRUM:  So that's why they were made.

16      THE COURT:  Okay.  So just so I'm clear because --

17      MS. DRUM:  My client --

18      MS. DRUM:  You're the expert on this.

19      MS. DRUM:  Thank you.

20      THE COURT:   -- and I'm not, I'm not trying to be

21   sarcastic.  I'm saying you're the expert on this.

22      You're telling me that under the ADA you have the

23   authority to make continuous multiple accommodation

24   requests, forever?  Endless accommodation requests?

25      MS. DRUM:   --

1    THE COURT:  Or, I mean, -- you're an attorney as well --

2    MS. DRUM:  -- requests are (inaudible), your Honor.

3    What. Mr. Fishman did without my knowledge is what he did.

4    And, yes, I can, if new accommodations are requested by my

5    client, and I believe that they are matched with his

6    disabilities.

7    THE COURT:  All right.  So, what is your understanding of

8    a request that is outstanding?

9    MS. DRUM:  Okay going to page, the bottom of page 1,

10   Court Orders, and then (inaudible) ABLC, and at the top of

11   page 2, Court Orders are to be typed in 12-point font.  And

12   attached or typed Orders are to be the transcribed on a

13   separate sheet of paper, and all Court Orders are to be typed.

14   THE COURT:  Okay.  And why is that a disability

15   accommodation.

16   MS. DRUM:  Because of his offidable neuralgia, it's

17   difficult for him, he gets pain in his head when he reads --

18   THE COURT:  Okay.  And he has an attorney --

19   MS. DRUM:  -- (inaudible) that.

20   THE COURT:  Listen.  He can, as far as his inability to

21   read anything smaller than 12 points, and frankly, I don't

22   think my orders were any smaller than 12, I think most of them

23   are in 12 point.

24   He can do what the rest of us do, which is put on a

25   pair of reading glasses, or use a magnifying glass.  I'm

124

1    not changing the format of the Court Orders.  Everything I

2    do in Court is read him.  He has an attorney present here

3    in Court.  And I'm not changing my format of Court Orders.

4    That's not a reasonable accommodation.  He has access to

5    to people to help him read orders.  He's hired you to help

6    him.  He has an attorney.

7         MS. DRUM:  I'm just writing it down, your Honor.

8         THE COURT:  You can order a transcript.

9         THE COURT:  All right.  Let's move on.

10        MS. DRUM:  Okay.  So that's -- okay.  The scheduling, and

11   and on the bottom of page 2, special warning herein for trial

12   dates for Monday, one half day.

13        THE COURT:  One moment.  I just want to go back to the

14   Orders.  The handwritten Orders are done because we issue them

15   immediately in the courtroom, so that each party can walk out

16   with an Order and an understanding of what needs to be done.

17   I don't accept handwritten Orders when I do a Notice of

18   Settlement.  But they're done so that we could provide

19   immediate relief and an immediate Order to the parties in

20   Court.  And I'm not changing that.  That process, he is free

21   to hire a person to read the handwritten Order, and to type it

22   up in as large a font as he wants, so that he can look at it

23   that way.  And you may do that for him, as his disability

24   advocate.  Moving on.  Scheduling morning hearings, okay.

25        There was no response.  I thought it was pretty

125

1    obvious when I scheduled the next court dates, for

2    mornings only.  Did you need me to spell that out?  And I

3    will also note --

4        MS. DRUM:  I believed, your Honor --

5        THE COURT:  I scheduled the hearings for mornings only.

6    Was that not obvious?

7        MS. DRUM:  (inaudible) communicate it to.

8        THE COURT:  Okay.  It was not communicated to you in the

9    sense that nobody said, 'yes, we will schedule this for

10   mornings only.'  However, we did you give you next court

11   dates, which were in the mornings only.  So, did you seriously

12   need --

13       MS. DRUM:  (inaudible)and not ambiguity about all future

14   dates.

15       THE COURT:  Well, if Mr. Fishman is telling me that he

16   can't function in the AEFPBL afternoon, then yes, I'm happy to

17   schedule things in the morning.  But he needs to understand, I

18   wasn't aware of this, and I issued visitation Orders, allowing

19   him to have visits in the afternoon.  So we're going to have

20   to revisit those visitation Orders, as well.

21       MS. DRUM:  Well, your Honor, having the children over,

22   it's completely different than being in court --

23       THE COURT:  No.

24       MS. DRUM:  Than court.  Those are two different

25   environments --

1    THE COURT:  Okay, well we'll have that -- we will have

2    that discussion in Court, Miss Drum, because frankly, one

3    needs to be paying attention whether they're in court, or

4    whether they're responsible for the care of four children.

5    He's saying he's falling asleep.  I certainly don't want him

6    to endanger the lives of his four children, if he can't stay

7    awake in the afternoon.

8        MS. DRUM:  Your Honor, he's not (inaudible) fall asleep.

9    He says he gets a Lack of sleep.  And when you're in Court,

10   you need to be on and not (inaudible).

11       THE COURT:  Right.  And so, when you're watching 4

12   children, you need to be less alert, is that what you're

13   telling me?

14       MS. DRUM:  Parents don't have sleep all the time when

15   they watch  (inaudible).

16       THE COURT:  Okay, you're fading in and out.  Is this a

17   cell phone?

18       MS. DRUM:  (inaudible).

19       THE COURT:  The connection is not good.  Are you on a

20   cell phone?

21       MS. DRUM:  Yes, Judge.  (inaudible) parked in front

22   (inaudible).

23       THE COURT:  Okay.  Go on.  A note-taker, already denied.

24       MS. DRUM:  What was the last thing that (inaudible) --

25       THE COURT:  The next request, it looks like is a

127

1    note-taker.

2        MS. DRUM:  Yes.

3        THE COURT:  Already denied.

4        MS. DRUM:  Okay, thank you.  Two (inaudible) court

5    Orders, we discussed.  Number 3 has already been discussed, so

6    I'd ask that I request it which is the (inaudible) all four

7    children, less than 24 hours for that 365 days.  I've advised

8    Mr. Fishman that the ADA accomodation request would not

9    (inaudible) seek today (inaudible) is a temporary Orders of

10   protection.  (inaudible) forward to the next page, number 4.

11   That I attend all attorney only conferences.

12       THE COURT:  Okay.

13       MS. DRUM:  Good?

14       THE COURT:  Yes?  Denied.

15       MS. DRUM:  Okay, (inaudible) thank you.  Now a denial of

16   the request is based on, according to the ADA --

17       THE COURT:  I don't --

18       MS. DRUM:  Three factors.  And the first factor is how it

19   affects (inaudible) burden, administrative burden, on the

20   service or practices of the courts?

21       THE COURT:  You're an ADA advocate.  You're not an

22   attorney.  If I have an attorney's conference, the attorneys

23   will participate.  You may certainly be present when

24   Mr. Fishman's attorney conveys to him what was said in a

25   conference.  And you can counsel him however you like as an

128

1    advocate at that point.

2        MS. DRUM:  Thank you, your Honor.  I'm going to move on

3    to number 5, access to his medical records.

4        THE COURT:  I don't even understand what that means.  If

5    they're his medical records, he has access to them.  What is

6    he talking about HIPAA?  He's entitled to his own medical

7    records.

8        MS. DRUM:  So how can he go about requesting those?

9        THE COURT:  He doesn't request them from Court.  He

10   requests them from his medical providers.

11       MS. DRUM:  Well he's requesting medical records that you

12   have, your Honor.

13       THE COURT:  I don't have any medical records that would

14   be things outside of what he could get from his doctors.  So

15   I'm not quite sure I understand what that is.  Do you

16   understand what I'm saying?  I mean, --

17       MS. DRUM:  (inaudible)

18       THE COURT:  What?

19       MS. DRUM:  The Mary Crow records.

20       THE COURT:  Okay.  Well those are not his medical

21   records.

22       MS. DRUM:  Therapeutic social worker, Mary Crow.

23       THE COURT:  Okay.  Well, whatever is in the Court file,

24   his attorney Has an opportunity to review.  They're not his

25   medical records though.  They're Court documents.  They're not

1    his records under HIPAA, because if they were, he could easily

2    get them.  So, that's not a disability accommodation.  Your

3    request is denied.

4        MS. DRUM:  Okay, thank you, your Honor.

5        MS. DRUM:  All right, number 6, what's also being

6    requested is an Order which was denied.  It's a standing of

7    myself making that request.  He's making a new request of the

8    fther, for an ADA advocate to for his son, Jonah.

9        THE COURT:  Okay.  And the child'S mother has sole legal

10   and physical custody at this point.  And, I'm not quite sure

11   how that becomes an accommodation for a disabled person.  So

12   that's denied.

13       MS. DRUM:  (inaudible).

14       THE COURT:  I don't -- wait, Miss Drum, you're an expert

15   on court accommodations.  How are any of these requests Court

16   accommodations?

17       MS. DRUM:  (inaudible)your Honor.

18       THE COURT:  A court accommodation --

19       MS. DRUM:  (inaudible), your Honor.

20       THE COURT:  What?  Well the request to get an advocate

21   for this child, that's not a Court accommodation.  A Court

22   accommodation is somebody's hard-of-hearing.  We have

23   equipment that could make it easier for someone to hear.  He

24   has problems with his eyes, he wants some sunglasses.  Wear

25   your sunglasses.  You can't appear in the afternoon, come in

/ 30

1          the morning.

2              How does asking for records become an accommodation?

3      He's entitled to whatever records he's entitled to,

4      whether or not he's disabled.

5              MS. DRUM:  This  -- well, actually I requested that I be

6      that ADA advocate, and it was accepted.

7              THE COURT:  Correct.

8              MS. DRUM:  And I have requested that I be an ADA advocate

9      as an ADA accommodation, and that is routinely accepted.

10             THE COURT:  Okay.

11             MS. DRUM:  THE difference --

12             THE COURT:  Okay.  And you're going to be in Court,

13     sitting with him, to keep him from getting out of control.  He

14     said he needs some help when he gets out of control in the

15     courtroom.  So you can do that.  I've allowed you to do that.

16     But I'm just not quite sure how this request to get documents

17     is an accommodation.  So those are denied.  Move on.  Number

18     7?

19             MS. DRUM:  It's number 6, your Honor.  It has to do with

20     an ADA advocate for his son.

21             THE COURT:  Okay.  He doesn't have authority to ask for

22     that, at this point.  The mother has sole legal and physical

23     custody.  And, in addition, the child has his own attorney.

24             MS. DRUM:  She is not aware of ADA law at all.

25             THE COURT:  Okay.  I  -- Miss Drum, I denied this

131

1    request.  He's entitled to file an appeal.  Move on.

2         MS. DRUM:  Number 7, a specialized neuropsych reporting

3    to Court, with a special memory to (inaudible)disabilities.

4         THE COURT:  I don't understand how that's an

5    accommodation.  If he wants to get reports or evaluations, let

6    him get reports or evaluations.  You're arguing that because

7    he's disabled, I have to order that?

8         MS. DRUM:  He wants to show that, since there has been a

9    question about his disabilities, that he wants a specialized

10   report to be presented to you.

11        THE COURT:  And he may do that --

12        MS. DRUM:  And (inaudible) procedurally, he would have to

13   ask your permission to do so.

14        THE COURT:  He can do whatever he wants.  Whether or not

15   it will be admitted, and what -- if so, what weight it will

16   have, is a different question.  That's not a request for an

17   appropriate accommodation of a disability.

18        MS. DRUM:  All right.  Again I'm going to state that the

19   burden of the trial would be if the request would

20   fundamentally alter the nature of the service, program or

21   activity, or the Court may deny a request of the accommodation

22   which would create an undue financial or administrative burden

23   on the Courts.  Or that the -- the rules of the OCA were not

24   followed.  So, are you saying that that this is, would

25   fundamentally alter the nature of the service, the program or

132

1    activity, or would create an undue financial or administrative

2    burden on the court?

3         THE COURT:  I'm saying this isn't an accommodation.

4         MS. DRUM:  It has to do with the truth of (inaudible)

5    accommodation, or does --

6         THE COURT:  Listen, I'm giving you answers to your

7    accommodations, on the basis that I'm accepting, I'm accepting

8    your statement that he is a disabled individual, okay?

9         So I don't need to have his neuropsych report.  If he

10    wants to get it, I've already accepted that he's disabled.

11        I have great concerns about his mental health.  I've

12    ordered a forensic evaluation.  He has yet to do that.

13        That's outside the scope of this request, that

14    insofar as you're requesting, as part of your work, that

15    he get various evaluations, I'm just saying, I've ordered

16    a forensic evaluation.

17        MS. DRUM:  Okay.  All right.  Just two more to go.

18    Vacating the restaining Orders, which I've advised him that

19    the ADA accommodations request will not seek to vacate

20    (inaudible) and the morning, -- number 9, we've already

21    discussed, so we don't need to discuss that any (inaudible).

22    I believe that's (inaudible)

23        THE COURT:  Okay.  I'm not accepting any more requests

24    from you, Miss Drum.  Enough.  And enough from him.  This

25    isn't a continuous 'oh I've thought of something else, let me

1    ask the Court.'.

2        This has been going on for over 6 months now, this

3    continuous onslaught of multiple accommodation requests,

4    by you and by Mr. Fishman.  And it has to stop.  So, no

5    more.  You understand that?

6        THE COURT:  I would think --

7        MS. DRUM:  I don't believe that I can be limited to do

8    that, and I don't believe that I am --

9        THE COURT:  Well then I will ask for additional medical

10   information, to explain why the request is being made, on a

11   future date --

12       MS. DRUM:  That's terrific.  I'll be happy to provide

13   that.

14       THE COURT:  Other than that, no more requests.  And you

15   must control Mr. Fishman.  He has sent continuous E-mails to

16   my Court Attorney, to my Court Part.  He has an advocate, he

17   has an attorney.  I've told him many, many times, he may not

18   communicate ex-parte with this Court, that it's inappropriate

19   to do so and he doesn't seem to understand.

20       MS. DRUM:  Judge, I have tried (inaudible) and I totally,

21   I'll do what I can to have him respect you, and to respect

22   your office and to respect your wishes.  What he does at 1:00

23   o'clock in the morning, I can't control.  But believe me, I

24   will continue to let him know how important it is that he not

25   communicate with you when you're (inaudible) doing it.  And he

1        only must do it through his attorney.

2             THE COURT:  Okay.

3        MS. DRUM:  I will continue to do so.

4             THE COURT:  Thank you.

5        MS. DRUM:  You're welcome.  And thank you for your time.

6             THE COURT:  I assume I'll see you next week.

7        MS. DRUM:  Yes, thank you.

8             THE COURT:  Good-bye.  Off the record.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

## C E R T I F I C A T E

I, Alan Kachalsky, certify that the foregoing transcript of proceedings in the Yonkers Family Court of FISHMAN AND SOLOMON, File no. 131794 was prepared using the required transcription equipment and is a true and accurate record of the proceedings.

Signature _____

**Al's Transcription Services**
**800 Westchester Avenue, Suite S-608**
**Rye Brook, New York 10573**
**Tel: (914) 220-5324**
**E-mail: catchsky@earthlink.net**