# Marc Fishman
## 3200 Netherland Avenue
## Apartment G
## Bronx, NY 10463
## (914) 837 – 3209
## Facsimile (347) 843 - 6894

Via Hand Delivery

May 6, 2018

Honorable Judge Kenneth M. Karas
United States District Judge
United States District Court
Southern District of New York
United States Courthouse
300 Quarropas Street, Chambers 533
White Plains, NY 10601-4150



Re: 7-18-CV-00282-KMK Civil Rights Case Fishman vs. "State" Office
Of Court Administration New York Courts
Response to opposing counsel opposition for preliminary injunctive relief

Dear Honorable Judge Karas:

Please be advised that the need for Federal injunctive relief is immediate, dire
and necessary as the defendant Office of Court Administration "State"(OCA,)
threatened me with Jail time and scheduled two "State" court contempt hearings
for June 12, 2018 and June 21, 2018 to have me jailed for making disability
accommodation requests and assisting my disabled son Jonah Fishman with his
disability of Langerhan Hystiocsytosis X (LCH) with an assistive device for his
unique communication and developmental disabilities.

Magistrate Carol Jordan ("State" OCA Administrator for New Rochelle Courts)
said May 3, 2018, I would be jailed and my proceeding terminated to lower my
support, if I did not bring a "qualified note taker/interpreter/scribe or note
takers/interpreters at my sole cost and expense" that she can choose from to
perform court note taking services on June 12, 2018 during her court proceeding.

Judge Michelle I. Schauer("State" OCA Administrator for Yonkers Family Court)
said May 1, 2018 I would be Jailed on June 21, 2018 for assisting my son with
his qualified ADA disabilities. Judge Schauer Scheduled a contempt court
hearing to have me jailed June 21, 2018, for having my insurance company
replace my disabled son's Smartphone with specialized educational programs to
help him with his cognitive , speech and other leaning disabilities associated with
his conditions. The smart phone was court ordered to be maintained by me by a

New York Supreme court Judge Paul Marx on May 5, 2014 as a disability accommodation for my ADA Qualified Disabled son, Jonah Fishman.

Both ("State") OCA Court Administrative Judges/Judicial Officers are violating ADA and 28 CFR Section 35.134 in its prohibition against retaliation and coercion.  Under 42 U.S, Code $12203, section (b) law states:

"It shall be unlawful to coerce, intimidate, threaten or interfere with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of any right granted or protected by this chapter."

Both the "State" Judicial officer and Judge are threatening me with immediate irreparable harm and are violating 28 CFR 35.134 (b) where the law states:

(b)'no private or public entity shall coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of or on account of his or her having exercised or enjoyed or on  account of his or her having aided or encouraged any other individual in the exercise or enjoyment of any right granted or protected by the act or this part"

The New York "State" Office of Court Administration must provide auxiliary aides and services for court services , programs, counseling including note takers, Large print court orders, aides, interpreters, translators, LEP, hearing disorders, and other disabilities to insure meaningful access to the court room. The "State" court must pay for these auxiliary aides at no charge to the litigant.

 Please see the below list of Federal US Department of Justices complaints and settlements against "State" court administrators (see Exhibit A) requiring providing no charge auxiliary aides to court participants in the field of communication in court AND COURT PROGRAMS(that are attached to this letter for court reference):

1. USDOJ v. Nineteenth Judicial Circuit Lake County, Illinois 204-23-150.
2. USDOJ v. Utah State Administrative Office of the Courts  01-07737
3. USDOJ v. Utah State Administrative Office of the Courts  01-07738
4. USDOJ v. Utah State Administrative Office of the Courts  01-07739
5. USDOJ v. Utah State Administrative Office of the Courts  01-07440
6. USDOJ v. Utah State Administrative Office of the Courts  01-07441
7. USDOJ v. Utah State Administrative Office of the Courts  01-07442
8. USDOJ v. North Carolina Admin Office of the Courts 171-54M-8
9. USDOJ v.  Superior Court of Arizona, Mohave County 171-8-23
10. USDOJ v.  Kentucky Administrative Office of the Court 171-30-21
11. USDOJ v.  Adelante, P.C. 202-23-56 Court Social Worker program to provide auxiliary aides for court services programs)
12. USDOJ v.  The Colorado Judicial Dept. 171-13-63
13. USDOJ v.  Admin Director of the Courts, The Judiciary Hawaii Complaint 171-21-5
14. USDOJ v. State of Maine Judicial Branch 171-34-8

15. USDOJ v. Rhode Island Judiciary 171-66-2
16. USDOJ v. New Jersey Admin of the Courts 171-48-38

As note takers for disabled court users with traumatic brain injury are the same as an interpreters/assistants for a disabled person with language or hearing problem, "State" Courts must provide them at no cost to the court users.  My disabilities of Occipital Neuralgia and Post Concussion Syndrome include the side effect of tinnitus that is ringing in my left ear.  This tinnitus condition is similar to hearing problems of deaf people.  So the need for note taker is similar to that of a deaf person or partial deaf/blind person needing communication assistance to insure meaningful access to the courtroom.  "Meaningful access" required under Tennessee versus lane. The note taking is needed because my severe obstructive Sleep apnea exacerbates my other disabilities by making me more tired.

New York "State" Courts continues to ignore its responsibilities to provide auxiliary aides to court users, jurors, participants, witnesses in court etc. New York State Entities are required to provide qualified note takers /scribes under their own ADA Rules

This Federal court needs to speak loud and clear that New York "State" OCA Must provide "meaningful access" to the disabled with appropriate no cost aides that fit the disabled person's unique disabilities.

The "State" OCA must have an ADA grievance procedure that is prompt and timely" per 28 cfr 35.107. Opposing counsel ignores this need for timely grievance of denial of ADA Accommodations in the "State" courts in her May 4, 2018 and any response to need for timely grievance is absent in the letter response entirely.

Per the attached (Exhibit "B") letter from  Assistant Attorney General Thomas E. Perez dated August 16, 2010,  on page three first paragraph, "DOJ expects courts to provide "meaningful access" for LEP persons to such court operated or managed point of contact in the judicial process, whether the contact occurs inside or outside the courtroom."

Declaratory Judgment needed  because these "State"  ADA Accommodation Denial cases cannot be appealed/grieved without permission of the "State." Under Federal Law 28 CFR 35.107, there can be no requirement of a "State" to obtain permission to file an ada grievance or appeal. No other state has a permission requirement to file a grievance like New York State "OCA" has. Thank you.

Very Truly Yours,

Marc Fishman
Qualified Ada Disabled Litigant, Pro se

C:   Lisa Evans,  Esq. OCA, Opposing Counsel



Exhib.t "A"

# SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE ADMINISTRATIVE OFFICE OF THE NINETEENTH JUDICIAL CIRCUIT LAKE COUNTY, ILLINOIS

DEPARTMENT OF JUSTICE COMPLAINT NUMBER 204-23-150

Background

1. This matter was initiated by a complaint filed under title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. ï½§ï½§ 12131 - 12134, with the United States Department of Justice ("Department") against the Administrative Office of the Nineteenth Judicial Circuit ("Court Services"). The complaint alleges that Court Services and its contractor Adelante, Inc. failed to provide effective communication to an individual probationer at Court-ordered counseling sessions.

2. The Department of Justice is authorized under 28 C.F.R. Part 35, Subpart F, to investigate fully the allegations of this complaint to determine Court Services' compliance with title II of the ADA and the Department's implementing regulation, issue findings, and, where appropriate, negotiate and secure voluntary compliance agreements. Furthermore, the Attorney General is authorized under 42 U.S.C. ï½§ 12133 to bring a civil action enforcing title II of the ADA should the Department fail to secure voluntary compliance pursuant to Subpart F. In consideration of the terms of this Agreement as set forth below, the Attorney General agrees to refrain from undertaking further investigation or from filing a civil suit in this matter.

3. The parties to this Agreement are the United States of America and the Administrative Office of the Nineteenth Judicial Circuit, Lake County, Illinois. In the interest of securing compliance by voluntary means, the parties hereby agree as follows:

Jurisdiction

4. The ADA applies to Court Services because it is a public entity as defined in the ADA, 42 U.S.C. ï½§ï½§ 12131-12134, and the Department's implementing regulation at 28 C.F.R. ï½§ 35.104.

5. Title II of the ADA prohibits discrimination against qualified individuals with disabilities on the basis of disability in the services, programs, or activities of a public entity, such as Court Services.

6. Under the ADA, Court Services is required to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others who participate in its services, programs and activities.

Remedial Action

7. The subject of this settlement is: Court Services' obligations to ensure nondiscrimination in contracts with outside agencies, such as Adelante, Inc.

8. Court Services will continue to adhere to the administrative order of the Supreme Court of Illinois pertaining to title II compliance. Court Services will provide a copy of the administrative order to members of the public upon request.

9. Court Services agrees that it will include the Equal Opportunity Provision contained on Exhibit A in all of its contracts with service providers entered into after the date of this Agreement and until June 1, 2001. Court Services further agrees that it will monitor its contractors' compliance with this provision. After June 1, 2001, Court Services' contracts will continue to ensure compliance with the applicable provisions of the ADA.

10. Within 20 days of the effective date of this Agreement, Court Services will compensate the complainant

5/7/18    Settlement Agreement Between The United States Of America And The Administrative Office Of The...

Case 7:18-cv-00282-KMK    Document 23    Filed 05/07/18    Page 5 of 83

in this matter by sending a certified check in the amount of $14,000.00 by certified mail to the address provided by the Department. Court Services will also send a copy of the check and transmittal letter to the Department.

Implementation and Enforcement

11. This Agreement is a public document. A copy of the document or any information contained in it may be made available to any person upon request.

12. The Department of Justice may review compliance with this Agreement at any time. If it determines that this Agreement or any requirement thereof has been violated, it may institute a civil action in Federal district court seeking specific performance of the provisions of this Agreement or the enforcement of the requirements of the ADA following written notice to Court Services of the possible violation and a period of ten days in which Court Services has the opportunity to cure the alleged violation.

13. Failure by the Department of Justice to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver of the Department's right to enforce other deadlines and provisions of this Agreement.

14. The effective date of this Agreement is the date of the last signature below.

15. This Agreement constitutes the entire agreement between the parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by either party or agents of either party, that is not contained in this written agreement, will be enforceable.

16. This Agreement is limited to the facts set forth in the first paragraph. This Agreement does not purport to remedy any other potential violations of the ADA or any other Federal law nor does it imply that any such violations exist. This Agreement does not affect Court Services' continuing responsibility to comply with all aspects of title II of the ADA.

17. The signer of this document for Court Services represents that he is authorized to bind Court Services to this Agreement.

For the Nineteenth Judicial Circuit:

By: _____    Date:_____
   Robert A. Zastany
   Court Administrator
   Nineteenth Judicial Circuit
   Lake County, Illinois

For the United States:

By: _____    Date:_____
   John L. Wodatch, Chief
   L. Irene Bowen, Deputy
   Susan Reilly, Attorney
   Thomas Esbrook, Investigator
   Disability Rights Section
   U.S. Department of Justice
   P.O. Box 66738
   Washington, D.C. 20035

Equal Opportunity:

The Provider will comply with all state and federal statutes and regulations ensuring equal opportunities for persons in any class protected by law, including but not limited to the federal Civil Rights Act of 1964, as amended, and the Illinois Human Rights Act as amended.

The Provider will accept referrals from Court Services and will under no circumstances reject an otherwise qualified client because of his or her disability, gender, racial or ethnic background or any other legally protected characteristic.

The Provider will comply with title III of the Americans with Disabilities Act of 1990 as amended by ensuring that qualified individuals with disabilities are not denied the benefits of Provider's services on the basis of disability. The Provider will provide appropriate auxiliary aids and services, including qualified interpreters, when necessary to ensure effective communication with a disabled client.

Court Services will assist the Provider in providing effective communication to clients who are deaf or hard of hearing in the following manner:

1. During the term of the Agreement, Court Services will loan the Provider an Audex SoundDirector SD-SYS-1 Amplifier System which many individuals who are hard of hearing find sufficient to allow for effective communication. In the event this Audex system is unavailable, an equivalent will be selected and made available to the Provider by Court Services. The Provider will return this system upon expiration of this Agreement.

2. Court Services maintains a listing of qualified sign language interpreters who provide services at the courthouse and upon request Court Services will make this listing available to the Provider

3. Court Services will reimburse the Provider for the provision of sign language interpreter services to a client referred by Court Services at the rate of $25/hr. The Provider will pay the remainder of the interpreter's fee. As a condition of reimbursement, the Provider will submit monthly invoices to the Court Administrator identifying the interpreter, his or her hourly fee, the number of hours of interpreter services provided and the client receiving such services.

The Provider will provide the type of auxiliary aid or service requested by a disabled client, except that the Provider is not required to provide a specific interpreter if another qualified interpreter is available to perform at a lesser fee. Any evidence of discrimination will result in immediate termination of this Agreement.

Nothing in this equal opportunity provision will be construed to create an agency or employment relationship between the Provider and Court Services, the Nineteenth Judicial Circuit Court, or the County of Lake.

EXHIBIT A

Esbrook's Directory - "reaagreementrevised"
Revised 6/15/99 per M. Marcouiller's comments dated 6/10. >

---

Was this page helpful?
Yes    No

```
            SETTLEMENT AGREEMENT BETWEEN
             THE UNITED STATES OF AMERICA
                        AND
     THE UTAH STATE ADMINISTRATIVE OFFICE OF THE COURTS
```

Department of Justice Complaint Number X

        This matter was initiated by a complaint filed under title
II of the Americans with Disabilities Act (ADA), 42 U.S.C.
SS 12131 -12134, with the United States Department of Justice
(Department of Justice) against the Second Judicial District
Court. The Second Judicial District Court is part of the Utah
state court system, and is administered by the Utah State
Administrative Office of the Courts (AOC). The complaint states
that a parent, who is deaf, attended, as an observer, court
proceedings involving her adult son. The parent alleges that the
Second Judicial District Court refused to provide interpreting
services or other auxiliary aids or services for the proceedings.
The complaint further alleges that the parent then secured her
own interpreter, and that the Second Judicial District Court
refused to pay the interpreter's fees.
        The Department of Justice is authorized under 28 C.F.R. Part
35, Subpart F, to investigate fully the allegations of the
complaint in this matter to determine AOC's compliance with title
II of the ADA and the Department's implementing regulation, issue
findings, and, where appropriate, negotiate and secure voluntary
compliance agreements. Furthermore, the Attorney General is
authorized under 42 U.S.C. S 12133, to bring civil action
enforcing title II of the ADA should the Department fail to
secure voluntary compliance pursuant to subpart F. The parties
to this Agreement are the United States of America and the Utah
State Administrative Office of the Courts. In consideration of
the terms of this Agreement as set forth below, the Attorney
General agrees to refrain from undertaking further investigation
or from filing civil suit in this matter. In the interest of
securing compliance by voluntary means, the parties hereby agree
as follows:
        1. The ADA applies to AOC because it is a public entity as
defined in the Department of Justice's regulation implementing
title II. 28 C.F.R. S 35.104.
        2. The subject of this Settlement Agreement is the
provision of auxiliary aids and services to afford individuals
who are deaf or hard of hearing an equal opportunity to observe
court proceedings.
        3. In order to ensure effective participation by any party,
witness, juror, or observer who is deaf or hard of hearing, AOC

agrees to provide, upon reasonable notice, appropriate auxiliary
01-07440

- 2 -

aids or services. Auxiliary aids and services include qualified
interpreters.

4. In order to ensure effective communication with any
observer who is deaf or hard of hearing, AOC agrees to amend,
during its regular course of policy amendments, its written
policies to require that appropriate auxiliary aids or services
be provided to observers who are deaf or hard of hearing. These
aids and services will be provided, at the expense of AOC, upon
reasonable notice to the clerk of the court in which the
proceedings are to occur. AOC also agrees to amend its policies
so that if an individual who is deaf or hard of hearing desires
to observe court proceedings but fails to provide reasonable
notice to the court clerk, the court may, but need not, continue
the court proceedings to accommodate the request for auxiliary
aid or service.

5. AOC agrees to instruct all of its employees, who are in
any way responsible for the conduct of any proceedings, to comply
with the provisions of this Agreement.

6. AOC has paid for the interpreter services incurred by
the complainant in this matter.

7. Within 30 days of the effective date of this Agreement,
AOC agrees to publish the following notice on two separate
occasions in a newspaper of general circulation in Weber County,
Utah:

   In accordance with the requirements of title II of the
   Americans with Disabilities Act, the Utah state court system
   will not discriminate against qualified individuals with
   disabilities on the basis of disability in its services,
   programs, or activities. In those proceedings where the
   provision of interpreter services is required to ensure that
   an observer who is deaf or hard of hearing can effectively
   observe judicial proceedings, the Utah state court system
   will, upon reasonable notice, secure the services of
   qualified interpreter(s).

8. AOC agrees to provide a copy of the notice to any person
upon request.

9. Within six months of the effective date of this
Agreement, AOC will submit a report to the Department of Justice
detailing the actions it has taken to comply with the preceding
provisions. This report will include copies of notices published
in the newspapers.

10. This Agreement is a public document. A copy of this
document or any information contained in it may be made available

01-07441

- 3 -

to any person. AOC will provide a copy of this Agreement to any person on request.

11. The Department of Justice may review compliance with this Agreement at any time. If it determines that this Agreement or any requirement thereof has been violated, it may institute civil action seeking specific performance of the provisions of this Agreement in an appropriate Federal court.

12. Failure by the Department of Justice to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver of the Department's right to enforce other deadlines and provisions of this Agreement.

13. The effective date of this Agreement is the date of the last signature below.

14. This Agreement constitutes the entire agreement between the parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by either party or agents of either party, that is not contained in this written agreement, will be enforceable. This Agreement is limited to the facts set forth in the first paragraph, and it does not purport to remedy any other potential violations of the ADA or any other Federal law. This Agreement does not affect AOC's continuing responsibility to comply with all aspects of title II of the ADA.

For the Utah State
Administrative Office of the
Courts:

For the United States:


(Signature)
RONALD W. GIBSON
State Court Administrator

(Signature)
MERRILY A. FRIEDLANDER
Acting Chief
ROBERT J. MATHER, Attorney

Date 12/9/94 (Handwritten)


(Signature)
COLIN R. WINCHESTER
General Counsel


Date 12/05/94
Administrative Office
  of the Courts
230 South 500 East #300
Salt Lake City, Utah 84102

Date 1/11/95
Coordination & Review Section
Civil Rights Division
U.S. Department of Justice
P.O. Box 66118

01-07442

Washington, D.C. 20035-6118

U.S. Department of Justice
Civil Rights Division
Coordination and Review Section
P.O. Box 66118
Washington, D.C. 20035-6118

Mr. Ronald W. Gibson
State Court Administrator
Administrative Office of the Courts
230 South 500 East #300
Salt Lake City, Utah 84102

      RE: Complaint Number X

Dear Mr. Gibson:

      This letter is to inform you that the Settlement Agreement
between the Utah State Administrative Office of the Courts and
Department of Justice concerning Title II of the Americans with
Disabilities Act of 1990 (ADA) becomes effective as of the date
of this letter. Enclosed is a copy of the fully-executed
Settlement Agreement that resolves a complaint alleging that the
Second Judicial District Court refused to provide interpreting
services for a parent who is deaf and who attended, as an
observer, court proceedings involving her adult son. The
Agreement states that the Administrative Office of the Courts
will provide auxiliary aids, including qualified interpreters, to
ensure effective communication with observers who are deaf.

      Based upon the assurances made by the Administrative Office
of the Courts in this Agreement, we are closing the file in this
complaint as of the date of this letter. Continued compliance is
contingent upon the Administrative Office's completion of the
actions required by the Agreement. Failure to implement the
requirements of the Agreement may result in a finding of
noncompliance with Title II of the ADA.

      The Coordination and Review Section will monitor the
Administrative Office's progress in implementing the requirements
of the Agreement. To begin the monitoring process, the
Administrative Office will submit a written report, as required
by paragraph 9 of the Agreement, July 11, 1994, six months after
the effective date of the Agreement.

      This letter and the enclosed Agreement are not intended, and

should not be construed, to cover any other issues regarding
compliance with Title II, which may exist and which are not
specifically discussed herein.
01-07443

- 2 -

Under the Freedom of Information Act, 5 U.S.C. S 522, we may
be required to release this letter and other correspondence and
records related to this complaint in response to a request from a
third party. Should we receive such a request, we will safe-
guard, to the extent permitted by the Freedom of Information
Act and the Privacy Act, the release of information which could
constitute an unwarranted invasion of privacy.

We appreciate the cooperation of the Administrative Office
and Mr. Colin R. Winchester during our investigation and
settlement negotiations. If you have any questions concerning
this letter, please feel free to call Robert Mather at (202) 307-
2236.

Sincerely,

Merrily A. Friedlander
Acting Chief
Coordination and Review Section
Civil Rights Division

Enclosure
01-07444

SETTLEMENT AGREEMENT BETWEEN
THE UNITED STATES OF AMERICA
AND
THE UTAH STATE ADMINISTRATIVE OFFICE OF THE COURTS

Department of Justice Complaint Number XXX

This matter was initiated by a complaint filed under title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12131 -12134, with the United States Department of Justice (Department of Justice) against The Third Judicial District Court, Salt Lake County, Utah. The complaint was investigated by the Coordination and Review Section of the Civil Rights Division of the Department of Justice, under the authority of 28 C.F.R. pt. 35, subpt F. The complaint alleges that The Third Judicial District Court disqualified or otherwise excused individuals who are deaf or hard of hearing from jury duty unless they provide their own interpreting services.

The Department of Justice is authorized under 28 C.F.R. pt. 35, subpt. F, to investigate fully the allegations of the complaint in this matter to determine the compliance of The Third Judicial District Court with title II of the ADA and the Department's implementing regulation, issue findings, and, where appropriate, negotiate and secure voluntary compliance agreements. Furthermore, the Attorney General is authorized under 42 U.S.C. 12133, to bring civil action enforcing title II of the ADA should the Department fail to secure voluntary compliance pursuant to subpart F. In consideration of the terms of this Agreement as set forth below, the Attorney General agrees to refrain from undertaking further investigation or from filing civil suit in this matter.

The parties to this Agreement are the United States of America and the Utah State Administrative Office of the Courts, a public entity as defined by title II of the ADA. Pursuant to the provision of the ADA entitled "Alternative Means of Dispute Resolution," 42 U.S.C. 12212, the parties have entered into this Agreement. In order to avoid the burdens and expenses of possible litigation, the parties hereby agree as follows: 01-07435

- 2 -

1. Title II of the ADA and its implementing regulation prohibit discrimination against qualified individuals with disabilities on the basis of disability in the services, programs, or activities of the district courts, such as jury service.

2. The district court must, upon notice, provide

appropriate auxiliary aids and services when necessary to afford
an individual with a disability an equal opportunity to
participate in, and enjoy the benefits of, the district court's
services, programs, or activities. Auxiliary aids and services
include qualified interpreters.

3. An individual who is deaf or hard of hearing may not be
excluded from jury service or otherwise treated differently
because of the disability or because of the requirement for
interpreting services.

4. The subject of this Settlement Agreement is the
development of a policy to ensure that no otherwise qualified
individual who is deaf or hard of hearing will be excluded from
jury service because of the disability or because of the
requirement for interpreting services.

5. The Utah State Administrative Office of the Courts has
developed a written policy (attached), which requires that
district courts provide qualified interpreters in those
proceedings involving a prospective juror who is deaf or hard of
hearing when necessary to ensure an equal opportunity to serve as
a juror.

6. Beginning on the effective date of this Agreement, the
Utah State Administrative Office of the Courts will inform and
instruct all appropriate district court officials responsible for
conducting proceedings to adhere to and comply with the
provisions of this Agreement.

7. The Administrative Office of the Courts will, no later
than January 31, 1994, conduct at least four regional training
seminars addressing the practical application of the ADA and this
Agreement in jury trials and other court proceedings.

8. Within thirty (30) days of the effective date of this
Agreement, the Utah State Administrative Office of the Courts
will publish the following notice or an equivalent on two
separate occasions in a newspaper of general circulation serving
Salt Lake County:
01-07436

- 3 -

In accordance with the requirements of title II of the
Americans with Disabilities Act, district courts of the
State of Utah will not discriminate against qualified
individuals with disabilities on the basis of disability in
jury service. In order to ensure that a prospective juror
who is deaf or hard or hearing is not denied an equal
opportunity to serve as a juror because of the requirement
for interpreting services, the district court will, upon
notice, ensure such an equal opportunity by providing, at
the court's expense, the services of qualified interpreters.

9. The Department of Justice may review compliance with this Agreement at any time. If it determines that this Agreement or any requirement thereof has been violated, it may institute civil action seeking specific performance of the provisions of this Agreement in an appropriate Federal court.

10. Failure by the Department of Justice to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver of the Department's right to enforce other deadlines and provisions of this Agreement.

11. This Agreement is a public document. A copy of this document or any information contained in it may be made available to any person. The Utah State Administrative Office of the Courts will provide a copy of this Agreement to any person upon request.

12. In the event that the Utah State Administrative Office of the Courts or the district court fails to comply in a timely manner with any requirement of this Agreement without obtaining sufficient advance written agreement with the Department as a temporary modification of the relevant terms of this Agreement, all terms of this Agreement will become enforceable in an appropriate Federal court.

13. The effective date of this Agreement is the date of the last signature below.

14. This Agreement constitutes the entire agreement between the parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by either party or agents of either party, that is not contained in this written agreement, will be enforceable. This Agreement does not purport to remedy any other potential violations of the ADA or 01-07437

- 4 -

any other Federal law. This Agreement does not affect the Utah State Administrative Office of the Courts' or the district courts' continuing responsibility to comply with all aspects of the ADA.

For the Utah State                    For the United States:
Administrative Office of the
Courts:



(Signature)                           (Signature)
Ronald W. Gibson                      Stewart B. Oneglia
State Court Administrator             Chief

(Signature)
Colin R. Winchester                    Robert J. Mather
General Counsel                        Attorney

Administrative Office                  Coordination & Review Section
of the Courts                          Civil Rights Division
230 South 500 East                     U.S. Department of Justice
Suite 300                              P.O. Box 66118
Salt Lake City, Utah 84102             Washington, D.C. 20035-6118

Date OCTOBER 5, 1993                   Date October 6, 1993
01-07438

THE UTAH STATE
ADMINISTRATIVE OFFICE OF THE COURTS
POLICY ON JURY DUTY AND THE PROVISION OF INTERPRETING SERVICES
          IT SHALL BE THE POLICY OF THE UTAH STATE ADMINISTRATIVE
OFFICE OF THE COURTS THAT WHEN THE DISTRICT COURT HAS NOTICE THAT
INTERPRETING SERVICES ARE REQUIRED TO ENSURE THAT A PROSPECTIVE
JUROR WHO IS DEAF OR HARD OF HEARING HAS AN EQUAL OPPORTUNITY TO
PARTICIPATE AS A JUROR, THE COURT WILL PROVIDE, AT THE COURT'S
EXPENSE, THE SERVICES OF A QUALIFIED INTERPRETER(S).
          BY ORDER OF THE UTAH STATE ADMINISTRATIVE OFFICE OF THE
COURT THIS          DAY OF          1993.
01-07439



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

MAR 0 8 2012

<u>BY EMAIL AND CERTIFIED MAIL</u>

Honorable John W. Smith
Director
North Carolina Administrative Office of the Courts
P.O. Box 2448
Raleigh, NC  27602

   Re:  Investigation of the North Carolina Administrative Office of the Courts
       Complaint No. 171-54M-8

Dear Judge Smith:

  We write to report the findings of the Civil Rights Division's investigation of the North Carolina Administrative Office of the Courts (AOC), an office within the North Carolina Judicial Department.  As the enclosed findings report explains, we have determined after a comprehensive investigation that the AOC's policies and practices discriminate on the basis of national origin, in violation of federal law, by failing to provide limited English proficient (LEP) individuals with meaningful access to state court proceedings and operations.

  The AOC's policies and practices have significant consequences for LEP individuals who are parties or witnesses to North Carolina state court proceedings.  Among the harms we identified in the course of our investigation are longer incarceration as a result of continuances caused by the failure to locate an interpreter; serious conflicts of interest caused by allowing state prosecutors to interpret for defendants in criminal proceedings; requiring pro se and indigent litigants to proceed with domestic violence, child custody, housing eviction, wage dispute, and other important proceedings without an interpreter; and other barriers to accessing court proceedings and other court operations.  These harms are the function of not only a state interpreter policy that is unduly restrictive, but also of the failure to implement even this limited policy according to its terms.  We further found that the AOC is aware of the harm caused by its court policies and practices on LEP individuals.

  The Civil Rights Division conducted this investigation after receiving complaints alleging national origin discrimination in the North Carolina state courts.  We investigated those complaints pursuant to our authority under Title VI of the Civil Rights Act of 1964 (Title VI), 42

2

U.S.C. §§ 2000d to 2000d-7, the Omnibus Crime Control and Safe Streets Act of 1968 (Safe Streets Act), 42 U.S.C. § 3789d(c), and their implementing regulations at 28 C.F.R. Part 42, Subparts C & D. Together, these statutes and regulations prohibit discrimination on the basis of race, color, national origin, sex, and religion by recipients of federal financial assistance. Such recipients must take reasonable steps to provide LEP individuals with meaningful access to their programs and activities. We notified the AOC of this investigation through several notice letters; requested and reviewed documentation regarding the AOC's practices and policies; and met with AOC staff and leadership on several occasions to discuss your policies and the requirements of federal law. We appreciate your cooperation with this investigation.

The AOC is subject to Title VI and the Safe Streets Act because it has accepted millions of dollars from the United States Department of Justice (DOJ) for its programs and activities, both as a direct recipient of DOJ grants, and as a recipient of subgrants made using DOJ funds provided to other North Carolina state recipients. The AOC also signed a contract for each grant of federal funds from DOJ, expressly agreeing that it would comply with Title VI, the Safe Streets Act, and their regulatory requirements.

The attached findings report explains in detail the nature of our investigation and the basis for our conclusion that the AOC has failed and refused to provide meaningful access for LEP individuals to the North Carolina state court system, and that this failure violates Title VI, its implementing regulations, and the related contractual agreements. The United States is deferring a formal determination of noncompliance with the Safe Streets Act and its regulations at this time to provide you an opportunity to voluntarily cooperate in resolving this matter so that your federal funding from DOJ is not immediately at risk. A formal determination of a Safe Streets Act violation initiates immediate administrative procedures to trigger recovery, suspension, or termination of federal funding from DOJ.

We would like to begin immediate negotiations to remedy the AOC's violations of federal law. We recognize that full compliance may take time, and for this reason a critical starting point for coming into compliance will be the AOC's commitment to a reasonable process for ensuring meaningful access to the court system for LEP individuals, through a comprehensive and enforceable agreement that involves the creation of a language access policy, implementation of that policy through a written plan, and effective oversight.

Adequate funding is a vital aspect of compliance, and we recognize that many state and local court systems around the country are struggling with budgetary constraints. The costs of services and the resources available to the court system are part of the determination of what language assistance is reasonably required in order to provide meaningful access. *See Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 67 Fed. Reg. 41,455, 41,460 (June 18, 2002). However, fiscal pressures are not a blanket exemption from civil rights requirements, and our investigation has determined that financial constraints do not preclude the AOC from taking further reasonable steps to comply with its federal non-discrimination obligations, for several reasons.

First, according to the AOC's Senior Deputy Director, the AOC has estimated the cost of expanding interpreter services to be approximately $1.4 million per year. A review of certified

3

budgets revealed that $1.4 million would have been 0.3% of the AOC's fiscal year 2011 certified budget of $463.8 million. *See* State of N.C., Office of State Budget and Mgmt., Post-Legis. Budget Summary 2009-2011, at 200 (2010). Second, as described in the attached findings report, our investigation found that the AOC has refused to provide interpreter services even when doing so would not involve *any* additional financial expenditure. Finally, any focus only on the financial costs of providing additional interpreter services ignores the significant fiscal and other costs of *non*-compliance with the AOC's obligation to take reasonable steps to ensure access to court operations for LEP individuals. It costs money and time to handle appeals and reversals based on the failure to ensure proper interpretation and effective communication. Similarly, delays in providing interpreters often result in multiple continuances, which needlessly waste the time and resources of court staff. And ineffective communication deprives judges and juries of the ability to make reliable decisions; renders victims, witnesses, and defendants effectively absent from proceedings that affect their rights; and causes other significant costs in terms of public safety, child welfare, and confidence in the judicial system.

Moreover, as we have discussed in the past, there are resources available to the AOC to improve access to court proceedings for LEP individuals. The Civil Rights Division has prepared and shared with you a table of federal funding resources that may be available to state court systems to provide language services to LEP individuals. The Division also provides technical assistance on the development of effective language access policies and the use of cost-saving practices, such as remote interpretation, and we have worked cooperatively with many other states to help implement these best practices. The AOC could also make more efficient use of infrastructures already in place in the North Carolina state court system, including broader use of staff interpreters and an already existing telephonic interpreter contract. Court systems in other states – including Colorado, Georgia, Maine, New York, and Pennsylvania – have taken advantage of these and other resources to provide greater access to their court operations for LEP individuals, despite facing similar financial constraints. Communication lies at the heart of the justice system, and language services must be considered part of the cost of doing business; a cost that can pale in comparison to the costs associated with appeals, reversals, delays, deprivations of liberty, and hazards to public safety, all of which are caused by the failure to ensure accurate and timely communication.

I am in receipt of your March 6 letter, in which you acknowledged your sensitivity to the need for interpreters in providing access to North Carolina courts. I also appreciate your willingness to work in good faith to resolve these issues. I respectfully disagree with your observation that "there appears to be a misunderstanding or failure of communication between the Judicial Branch of North Carolina and [our] office." In responding to our concerns regarding compliance with federal civil rights law, you have been consistent in asserting that state-law barriers and financial constraints prevent you from expanding interpreter services. We respectfully disagree with your assessment that a state law supersedes and eliminates your civil rights obligations under federal law as a recipient of federal financial assistance. We are quite willing to explain further our legal position that federal law preempts the state-law provisions that you have cited as a barrier to compliance.

Time is of the essence, and we would like to initiate a process at the earliest opportunity to determine whether a voluntary comprehensive resolution is feasible. As a result, we would appreciate if you would notify us by March 29, 2012, if you are interested in voluntarily

4

remedying the violations of federal law that our investigation identified. If the AOC is not interested in voluntary compliance, or if we determine that efforts to achieve compliance by voluntary means are unsuccessful, the United States will take appropriate enforcement action as authorized by Title VI and the Safe Streets Act. The United States may initiate civil litigation pursuant to Title VI, the related contractual agreements, and the pattern-or-practice provisions of the Safe Streets Act, which authorize both injunctive relief and the termination of federal financial assistance. In addition, the United States may initiate administrative procedures to trigger recovery, suspension, or termination of federal funding from DOJ by making a formal determination of a Safe Streets Act violation or by making a determination, under Title VI, that compliance cannot be secured by voluntary means. As we have noted, we would prefer to avoid both litigation and the termination of federal financial assistance, and therefore continue to prefer that we enter into a settlement agreement that will voluntarily secure the AOC's compliance with federal law. We have worked successfully and collaboratively with other state court systems to address these issues, and hope to do so here as well.

In addition, we are aware that the AOC receives federal financial assistance from federal agencies other than DOJ, including the United States Department of Health and Human Services. Each federal agency is responsible for enforcing Title VI as to the financial assistance it distributes. We are accordingly providing a copy of this notice letter and findings report to the HHS Office of Civil Rights for any further action that office may consider appropriate. *See* 28 C.F.R. §§ 42.412, 50.3; Executive Order 12250, § 1-201, 45 Fed. Reg. 72,995 (Nov. 4, 1980).

Please note that this letter is a public document and will be posted on the Civil Rights Division's website. We look forward to working with you to resolve this matter. If you have any questions, please contact Deeana Jang, Chief of the Federal Coordination and Compliance Section, at (202) 307-2222.

Sincerely,

Thomas E. Perez
Assistant Attorney General

cc:    Honorable Sarah Parker
          Chief Justice
          North Carolina Supreme Court
       Pamela Weaver Best
          Deputy Legal Counsel
          Administrative Office of the Courts


Enclosure

## REPORT OF FINDINGS

*Complaint No. 171-54M-8*

The Civil Rights Division of the U.S. Department of Justice (DOJ) has conducted an investigation of allegations of national origin discrimination by the North Carolina Administrative Office of the Courts (AOC), an office within the North Carolina Judicial Department. Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. §§ 2000d to 2000d-7, the Omnibus Crime Control and Safe Streets Act (Safe Streets Act), 42 U.S.C. § 3789d(c), and their implementing regulations, 28 C.F.R. Part 42, Subparts C & D, together provide that programs or activities receiving federal financial assistance may not discriminate on the basis of race, color, national origin, religion, or sex. In order to comply with Title VI, the Safe Streets Act, and their implementing regulations, recipients of federal financial assistance must provide meaningful access to limited English proficient (LEP) individuals. The AOC is a recipient of federal financial assistance from DOJ.

This report describes our investigation of the AOC's language services policies, procedures, and practices; summarizes relevant federal law; and outlines our factual findings in order to provide notice of the categories of violations. As described more fully below, our investigation establishes that the AOC discriminates against national origin minorities by failing to provide meaningful access for LEP individuals to the North Carolina state court system. More specifically, we found that the AOC's policies, practices, and procedures fail to provide Latino and other national origin minority LEP individuals with meaningful access to court proceedings and operations. We have concluded that these practices violate Title VI, its implementing regulations, and related contractual agreements. The United States will defer a formal determination of noncompliance with the Safe Streets Act and its implementing regulations at this time, to provide the AOC with an opportunity to cooperate in resolving this matter so that federal funding from DOJ is not immediately at risk.[1]

## I.    Summary of Findings

The AOC's language access policies, procedures, and practices affect a large segment of the population of North Carolina. Approximately 10% of North Carolina's residents speak a language other than English.[2] Over six hundred thousand people five years old and older in North Carolina speak Spanish, and more than half of these Spanish-speakers (308,429) speak English less than very well and are considered LEP.[3] Among other national origin minority groups in North Carolina with high incidence of limited English proficiency, 61% of the 19,945

---

[1] Unlike Title VI, the Safe Streets Act's processes for suspending, terminating, and seeking repayment of federal funds are automatically triggered once a formal determination of noncompliance is made. *See* 42 U.S.C. § 3789d(c)(2); 28 C.F.R. §§ 42.208, 42.210, 42.212, 42.213. In the interest of giving the AOC an opportunity to comply with its nondiscrimination obligations voluntarily before the process of fund termination begins, we are deferring this final determination.

[2] U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Table S1601; using American Factfinder, http://factfinder.census.gov.

[3] U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Table B16001; using American Factfinder, http://factfinder.census.gov.

Vietnamese speakers, 46% of the 25,412 speakers of Chinese languages (such as Mandarin and Cantonese), and 33% of the 15,061 Arabic speakers report speaking English less than very well.[4]

The AOC's policies and practices violate the nondiscrimination provisions of Title VI and its implementing regulations, as well as the contractual obligations that the AOC agreed to as a condition of receiving grant awards from DOJ. National origin minority LEP individuals have difficulty participating in proceedings, face barriers to court services and programs, and incur delays, costs, and other disadvantages because of their language ability. We found:

A. The AOC impermissibly restricts the types of proceedings in which the AOC will provide interpreters.[5] For instance, AOC policy does not provide interpreters in child custody hearings; child support hearings, civil no-contact order 50C proceedings, foreclosures, and divorce proceedings; in all small claims court matters, which can include wage disputes and eviction proceedings; to non-indigent defendants[6] for criminal and traffic matters, non-indigent respondents in domestic violence 50B proceedings and involuntary commitment proceedings, and non-indigent parents in juvenile proceedings; and in post-judgment services centers where a defendant's sentence is coordinated and monitored.

B. The AOC does not ensure that even the limited requirements of current AOC policy are met across the state.

C. AOC policy and practices result in numerous types of court proceedings moving forward without any language assistance for LEP individuals who therefore are unable to meaningfully participate in their case, causing harmful delays and outcomes.

D. The AOC does not adequately notify LEP individuals of their right to an interpreter, ensure effective scheduling of interpreters, or translate all vital documents.

E. Budget constraints do not excuse the AOC's failure to provide LEP individuals with meaningful access to court operations in this case.

F. Despite knowledge of the adverse impact of its policy on LEP individuals, the AOC has not remedied these harms.

The evidence uncovered during our investigation supports the legal finding that the AOC's denial of meaningful access to LEP individuals constitutes discrimination on the basis of national origin in violation of Title VI and the Title VI implementing regulations, and is also a breach of the AOC's contractual agreement to comply with these obligations.

---

[4] Id.

[5] For purposes of this letter, "provide" or "providing" an interpreter means appointing an interpreter free of charge to an LEP individual.

[6] North Carolina defines an indigent person as someone "who is financially unable to secure legal representation and to provide all other necessary expenses of representation in an action or proceeding[.]" N.C. Gen. Stat. § 7A-450(a). Judges have wide discretion in determining indigency. Factors for such a determination can include the severity of the crime, the cost of retainer for representation, the moving party's assets and liabilities, among others. We received reports in the course of our investigation that this standard is inconsistently applied.

3

## II.    Legal Discussion

### A.    Title VI, Safe Streets Act, and their Implementing Regulations

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The Safe Streets Act similarly prohibits discrimination on the basis of race, color, and national origin, as well as sex and religion, by recipients of federal financial assistance. 42 U.S.C. § 3789d(c). As implemented by DOJ regulations, these prohibitions include intentional discrimination as well as practices that have a discriminatory effect on the basis of protected grounds. *See* 28 C.F.R. §§ 42.104, 42.203.

The Supreme Court decided nearly four decades ago that the prohibition on national origin discrimination in Title VI and its implementing regulations can be violated by the denial of federally-funded program benefits on the basis of English proficiency. *Lau v. Nichols*, 414 U.S. 563, 568-69 (1974) ("It seems obvious that the Chinese-speaking minority receive fewer benefits than the English-speaking majority from respondents' school system which denies them a meaningful opportunity to participate in the educational program—all earmarks of the discrimination banned by" Title VI regulations.). Other courts have likewise held that the failure by a recipient to provide meaningful access to LEP persons can violate Title VI's prohibition of national origin discrimination. *See, e.g., Sandoval v. Hagan*, 197 F.3d 484, 510-11 (11th Cir. 1999) (holding that English-only policy for driver's license applications constituted national origin discrimination under Title VI), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001); *Almendares v. Palmer*, 284 F. Supp. 2d 799, 808 (N.D. Ohio 2003) (holding that allegations of failure to ensure bilingual services in a food stamp program could constitute a violation of Title VI); *Nat'l Multi Hous. Council v. Jackson*, 539 F. Supp. 2d 425, 430 (D.D.C. 2008) ("Longstanding Justice Department regulations also expressly require communication between funding recipients and program beneficiaries in languages other than English to ensure Title VI compliance." (citing 28 C.F.R. § 42.405(d)); *cf. Ling v. State*, 702 S.E. 2d 881, 884 (Ga. 2010) ("[A]s a recipient of federal funding, the court system in this State is obligated to provide persons who are 'limited English proficient' with meaningful access to the courts in order to comply with Title VI . . . [and the] Safe Streets Act . . . .").

DOJ guidance documents have also made clear that Title VI and the Safe Streets Act require meaningful access by LEP persons in all programs and activities that receive federal financial assistance from DOJ, including state court operations. Executive Order 13166 required each federal agency that extends financial assistance to issue guidance explaining the obligations of their recipients to ensure meaningful access by LEP persons to federally assisted programs and activities. *See* 65 Fed. Reg. 50,121 (Aug. 16, 2000). The DOJ guidance issued pursuant to this requirement states that recipients of financial assistance from DOJ should undertake "every effort . . . to ensure competent interpretation for LEP individuals during all hearings, trials, and motions." *Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 67 Fed. Reg. 41,455, 41,471 (June 18, 2002) (DOJ Guidance). And, the Assistant Attorney General for the Civil Rights Division issued a guidance letter in August 2010 to all Chief Justices and State Court Administrators describing the obligation of state courts under Title VI to provide LEP

4

individuals with meaningful access to court proceedings, notwithstanding any conflicting state or local laws or court rules. *See* Letter from Assistant Attorney General Thomas Perez to Chief Justices and State Court Administrators 2 (Aug. 16, 2010).

DOJ is authorized to investigate complaints to determine a recipient's compliance with Title VI, the Safe Streets Act, and their implementing regulations; to issue findings; and where appropriate, to negotiate and secure voluntary compliance. *See* 28 C.F.R. Part 42, Subparts C & D. When DOJ is unable to secure voluntary compliance by a recipient, DOJ has the authority to suspend or terminate financial assistance or to bring a civil suit to enforce the rights of the United States. *See* 42 U.S.C. § 2000d-1; 28 C.F.R. § 42.108. A formal determination of a Safe Streets Act violation automatically initiates administrative procedures to trigger recovery, suspension, or termination of federal funding from DOJ, and the United States may file a pattern or practice suit under the Safe Streets Act at any time. *See* 42 U.S.C. § 3789d(c); 28 C.F.R. §§ 42.208, 42.210, 42.212, 42.213, 42.215.

## B.    Contractual Obligations

Federal grant recipients are bound to comply with the nondiscrimination requirements of Title VI and the Safe Streets Act not only by statute, but also by contract. The Title VI regulations require that every application for federal financial assistance "shall, as a condition to its approval . . . , contain or be accompanied by an assurance that the program will be conducted . . . in compliance with all requirements imposed by or pursuant to this subpart." 28 C.F.R. § 42.105(a)(1); *see also* 28 C.F.R. 42.204(a) (Safe Streets Act) ("Every application for Federal financial assistance to which this subpart applies shall, as a condition of approval of such application and the extension of any Federal financial assistance pursuant to such application, contain or be accompanied by an assurance that the applicant will comply with all applicable nondiscrimination requirements . . . ."). DOJ has the authority to enforce the contractual obligations attendant to receipt of its federal financial assistance. *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 603 n.24 (1983) (noting that "the Federal Government can always sue any recipient who fails to comply with the terms of the grant agreement" under Title VI) (opinion of White, J.).

Since 2000, the AOC has received at least $19 million dollars in awards from DOJ alone.[7] Each application for federal financial assistance was accompanied by a contractual assurance that the program would be conducted in compliance with all of the requirements set forth in Title VI, the Safe Streets Act, and their implementing regulations. For example, as a recipient of several grants from the Office of Justice Programs and Office on Violence Against Women, the AOC assured DOJ that it will comply with Title VI and the Safe Streets Act. In connection with several current grant awards, the AOC was further notified of its obligation to

---

[7] This number is a low estimate of funding that the North Carolina Judicial Department has received from DOJ, in that this figure does not include all awards in which the AOC was a subgrantee; all awards in which the AOC Director signed the award assurance but another entity, such as a specific judicial district, actually applied for the award; or awards provided to other entities within the Judicial Department. Including these awards would increase the total amount of federal financial assistance the AOC receives. The AOC also receives funding from other federal agencies, including from the United States Department of Health and Human Services. In 2008, the AOC received $68 million in American Recovery and Reinvestment Act (ARRA) funds from various federal sources.

5

comply with civil rights requirements as set forth in a letter from the Office for Civil Rights in DOJ's Office of Justice Programs, which specifically identifies the Title VI obligation to provide meaningful access to LEP individuals. In addition, a recent grant from DOJ's Bureau of Justice Assistance to the AOC was approved subject to the AOC's certification that "Limited English Proficiency persons have meaningful access to the services under this program(s). National origin discrimination includes discrimination on the basis of limited English proficiency (LEP). To ensure compliance with Title VI and the Safe Streets Act, recipients are required to take reasonable steps to ensure that LEP persons have meaningful access to their programs. Meaningful access may entail providing language assistance services, including oral and written translation when necessary."

In addition, we have identified funds awarded to the North Carolina Department of Crime Control and Public Safety (NCDCCPS), such as STOP formula grants from DOJ's Office on Violence Against Women, that require NCDCCPS to provide at least five percent to the courts. Other awards, such as a Victim Assistance Formula Grant, were also awarded to NCDCCPS and sub-awarded to programs or activities of the North Carolina Judicial Department. As a sub-recipient of awards to NCDCCPS, the AOC is bound by the non-discrimination assurance agreements that the NCDCCPS signed as a condition of receiving its grants. 28 C.F.R. §§ 42.102(f), 42.105(b), 42.202(n), 42.204(a).

## III.    Investigative Background

The AOC is the state's administrative agency for the Judicial Department. The AOC assists courts statewide by providing personnel, financial, and information services. In 2006, the General Assembly authorized the AOC to prescribe mandatory policies to be uniformly implemented for appointing and paying for foreign language interpreters. In February 2007, the AOC published a guidance document to comply with the legislature's authorization. *See Policies and Best Practices for the Use of Foreign Language Interpreting and Translating Services in the North Carolina Court System* (February 2007).[8]

In April 2007, the Civil Rights Division initiated a Title VI investigation of the AOC based on a complaint alleging the AOC failed to provide LEP individuals with meaningful access to their programs and activities and treated Hispanics unequally as a result of the AOC's mandatory policies. The complainant specifically alleged that the AOC utilized an interpreter who provided incomplete and unprofessional interpretations, and who referred to Hispanic individuals in a derogatory manner on a white supremacist website. The interpreter resigned. The complainant also alleged that the AOC does not provide interpreters for LEP Spanish speakers facing eviction. The AOC provided a response to our request for data in September 2007 and we conducted an onsite visit in February 2008. This onsite visit included meetings with AOC officials, Alamance and Wake County judges, court staff, interpreters, advocates, and practitioners. We also observed proceedings in Alamance and Wake County courts.

During our meeting with AOC officials, and in a series of follow-up telephonic and e-mail communications, we explained that the AOC's denial of language access in many court

---

[8] This document is available online at www.nccourts.org/citizens/cprograms/foreign/documents/guidelines.pdf.

proceedings and operations raised significant Title VI compliance concerns. Since the 2007 complaint, the AOC has made some advancements in ensuring certification of more Spanish language contract interpreters and setting deadlines for non-certified Spanish interpreters to become certified or risk being unable to interpret in the courts.[9] As described further in this findings report, these efforts alone are not sufficient for the AOC to meet its non-discrimination obligations; but the Division undertook to secure the AOC's voluntary compliance by providing guidance and offering technical assistance.

A second complaint was filed with the Division on May 16, 2011, alleging that the North Carolina Judicial Branch, through the AOC, fails to provide LEP individuals with meaningful access to the courts, including intentional refusal to provide free interpreters to LEP individuals litigating or attempting to litigate civil claims. On June 22, 2011, we notified the AOC that we would expand our investigation to include this complaint and to review the AOC's compliance with Title VI and the Safe Streets Act. This letter also included a request for documents and responses to a number of questions.[10] Since that time, our investigation has included three onsite visits and more than 80 interviews. During these visits, we have spoken with the AOC Director, senior AOC staff, judges, court staff, contract and staff interpreters, complainants, practitioners, advocates, and litigants. AOC counsel was present for the majority of interviews conducted with court officials and staff. We also visited courthouses and observed proceedings in central, eastern, and western North Carolina.

## IV.   Factual Findings

As described in more detail below, the AOC's language access policy establishes that the AOC will only provide an LEP individual with a free interpreter in a limited subset of court proceedings. The AOC admits that it does not authorize courts to provide interpreters free of charge in many types of proceedings in the North Carolina state courts. We also found that the AOC routinely fails to meet its own standards even in the limited circumstances where free interpreters are authorized.

Our investigation has concluded that because of these policies and practices, the AOC – through the AOC staff, local court staff, contract interpreters, and judges[11] – is conducting court

---

[9] Our understanding is that there are no North Carolina state certified interpreters in any other language.

[10] The AOC sent us a response to our request for information; however, we found several of the responses to be incomplete. In particular, the AOC did not respond to our questions regarding policy, procedure, or practice differences among the various local courts. The AOC provided the number of non-Spanish interpreter assignments as requested but did not provide similar data regarding the number of Spanish-speaking individuals who requested language services, although we understand that staff and contract interpreters report this information to the AOC.

[11] The AOC has asserted that it has limited influence over judges because judges are independently elected constitutional officers. However, AOC has stated that per the General Assembly, the AOC's policies are mandatory and are to be applied uniformly throughout the state: "During the 2006 legislative session, the General Assembly authorized the Administrative Office of the Courts (AOC) to adopt mandatory policies and procedures for the appointment and payment of foreign language interpreters (G.S. 7A-314(f) and G.S. 7A-343(9c)). These policies and procedures are to be applied uniformly throughout the General Court of Justice." *Policies and Best Practices* 3. In addition, several judges told us in the course of our investigation that they consider AOC policies to be mandatory. For example, a Superior Court Judge stated that he considers the AOC "to be one of his bosses," and a District Court Judge told us that she and other judges follow the AOC language access policy and other policies and

proceedings and other court operations in a manner that results in an impermissible discriminatory impact on national origin minorities, and that fails to provide LEP individuals meaningful access to the courts. This failure to ensure meaningful access has resulted in severe consequences, including needlessly prolonging the amount of time one is incarcerated, and loss of custody rights, wages, and access to one's home. The AOC is aware that the limitations it places on language assistance services cause harm to national origin minorities and are inconsistent with DOJ's interpretation and guidance regarding Title VI and the implementing regulations.

### A. The AOC impermissibly restricts the types of proceedings in which the AOC will provide an interpreter to an LEP individual.

We found that AOC policy and practice limits the types of proceedings in which it provides interpreters. The AOC's policy only provides interpreters in the following, limited circumstances:

- for state witnesses, victims, indigent defendants, or indigent defendants' witnesses for criminal and traffic matters;
- for all petitioners and indigent respondents in domestic violence 50B proceedings;[12]
- for parents ordered to child custody mediation; indigent respondents in involuntary commitment proceedings; and juveniles and indigent parents for juvenile proceedings.[13]

Although North Carolina law and the AOC guidance state that the AOC will provide interpreters in all instances where the state bears the cost of representation, *see* N.C. Gen. Stat. § 7A-314(f) (2011); *Policies and Best Practices* § 7.2, there are a number of instances in which the state bears the cost of representation but the AOC does not affirmatively state that it will provide an interpreter.[14] In addition, there are many types of cases in which it is the AOC's policy *not* to provide an interpreter, including:

---

consequently spend a great deal of time trying to understand them. *See also Lopez-Solano v. Taylor*, No. 09-CVS-6903, Order Denying Plaintiffs' Motion to Appoint Translator (Superior Court for Gaston County, Jan. 21, 2011) (in denying plaintiffs' motion to appoint an interpreter, the court found that "Plaintiffs are indigent and Spanish is their native language," but held that the AOC's guidelines "prohibit the Court from providing foreign language interpreters at state expense in civil cases where the parties are required to bear their own costs of representation").

[12] A "50B proceeding" refers to a proceeding under Chapter 50B of the North Carolina General Statutes, which provides for civil remedies, including protective orders, in domestic violence matters. In a 50B proceeding, the court determines if a domestic violence protective order should be granted when there is a special relationship between the parties.

[13] The AOC policy also states that courts have the power to recoup interpreter fees from indigent defendants. *See Policies and Best Practices* § 7.4 (Assigning the Interpreter's Fee as Costs).

[14] These cases include certain proceedings to terminate parental rights pursuant to N.C. Gen. Stat. §§ 7B-1100 to 7B-1114 (2011), abuse cases involving incompetent indigent adults, and proceedings involving consent for an abortion on an unemancipated minor pursuant to N.C. Gen. Stat. §§ 90-21.6 to 21.10.

8

- Child custody hearings that are not mediations;[15]
- Child support hearings;
- Civil no-contact order 50C proceedings;[16]
- Non-indigent defendants for criminal and traffic matters;
- Non-indigent respondents in domestic violence 50B proceedings;
- Foreclosure proceedings;
- Divorce proceedings;
- All small claims court matters, which include wage disputes, eviction proceedings, and other proceedings where the claim is $5,000 or less;
- Non-indigent respondents in involuntary commitment proceedings;
- Non-indigent parents in juvenile proceedings; and
- Post-judgment services centers where a defendant's sentence is coordinated and monitored.[17]

In its September 2011 data response to DOJ, the AOC stated that it "acknowledges that interpreters are not provided at state expense in certain case types including civil cases and where the party is represented by private counsel."[18]

   In the course of our investigation, the AOC frequently stated its position that North Carolina state law directs interpreter coverage and limits its ability to expand its policy. The AOC interprets North Carolina General Statutes § 7A-314(f) to prohibit the provision of interpreters for any proceeding unless explicitly authorized. However, on its face, § 7A-314(f) does not expressly prohibit the appointment and payment of interpreters for all civil and criminal proceedings; the statute simply authorizes the AOC to provide interpreters for certain types of proceedings and is silent on whether other proceedings can be covered.[19]

---

[15] As noted above, it is the AOC's policy to provide an interpreter in child custody mediation. But if mediation fails and the parties must pursue the matter before a judge, the parties must do so *without* an AOC provided interpreter. We pointed out this inconsistency during our meeting with AOC staff on September 21, 2011, and the AOC's Senior Deputy Director agreed that this particular policy was inconsistent.

[16] In a proceeding under Chapter 50C of the North Carolina General Statutes, the court determines if a no-contact order should be granted. For a no-contact order to be granted, the individual must show that there is non-consensual sexual conduct or stalking from someone with whom they do not have an intimate or familial relationship.

[17] Some post-judgment programs and activities are coordinated by other North Carolina state agencies and are not subject to this investigation. However, if those programs receive federal financial assistance, they are subject to the same Title VI obligations.

[18] This statement reflects the AOC's inconsistent interpretation of its own policy regarding the provision of interpreters to indigent defendants represented by private counsel. AOC policy provides that a defendant who is represented by private counsel but can demonstrate indigency is entitled to an interpreter. *See Policies and Best Practices* § 7.2, at 22 (citing *State v. Boyd*, 332 N.C. 101, 107-09 (1992)). However, as discussed below, court staff and judges do not consistently allow criminal defendants represented by private counsel to obtain an interpreter by demonstrating indigency.

[19] *See* N.C. Gen. Stat. § 7A-314(f) ("In any case in which the Judicial Department is bearing the costs of representation for a party and that party or a witness for that party does not speak or understand the English language, and the court appoints a foreign language interpreter to assist that party or witness, the reasonable fee for the interpreter's services is payable from funds appropriated to the Administrative Office of the Courts. In order to

More importantly, and as the AOC has acknowledged in a similar context, it is a well-established doctrine that regulations under federal laws such as Title VI preempt any inconsistent state law obligations. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96 (1979) (agency regulations implementing federal statutes preempt state law under the Supremacy Clause); *Paul v. United States*, 371 U.S. 245, 253-55 (1963) (state must adhere to federal regulation when there is a conflict); *Free v. Bland*, 369 U.S. 663, 666 (1962) ("[A]ny state law, however clearly within a state's acknowledged power, which interferes with or is contrary to federal law, must yield.").

Indeed, the AOC has followed precisely this principle in reconciling the application of state law regarding sign language interpretation with the federal requirements under Title II of the Americans with Disabilities Act. In the "Legal Requirements" section of the AOC's interpreter use manuals for public defenders and assistant district attorneys, the AOC specifically notes that, although North Carolina state law regarding sign language interpreters provides for less coverage than Title II of the Americans with Disabilities Act, the ADA's greater obligations must be met. *See, e.g., District Attorneys' Use of Court Interpreters in the N.C. Court System*, North Carolina Admin. Office of the Courts, at 8-9 (April 2011). The manuals emphasize that "[t]he Judicial Branch bears the cost for the accommodation for the deaf or hard of hearing person **regardless** of whether the proceeding is civil or criminal, and **regardless** of whether the person is indigent." *Id.* at 9. Though the AOC claims that it cannot provide LEP individuals with interpreters for matters beyond those specifically identified in § 7A-314(f), the AOC does not hold such a limited interpretation when it comes to providing sign language interpreters for individuals who are deaf or hard of hearing.

### B.     The AOC does not ensure that even the limited requirements of current AOC policy are met across the state.

Even in circumstances clearly covered by the AOC's limited language access policy, North Carolina state courts are not consistently providing language services. Although the AOC's interpreter policy is mandatory, we found many inconsistencies among the judicial districts. We found instances of interpreters not being appointed in a timely manner; use of friends, family members, advocates, and other individuals to interpret even though their competency is not assessed;[20] and indigent defendants denied the opportunity to demonstrate

---

facilitate the disposition of criminal or Chapter 50B cases, the court may authorize the use of a court interpreter, paid from funds appropriated to the Administrative Office of the Courts, in cases in which an interpreter is necessary to assist the court in the efficient transaction of business. The appointment and payment shall be made in accordance with G.S. 7A-343(9c).").

[20] It is critically important to ensure that interpreters are competent and not merely bilingual. A bilingual person may inaccurately interpret or roughly interpret a summary of communications between the court and an LEP person, they may have a conflict of interest, or they may even be adverse. Under these circumstances, an LEP person is denied meaningful access to court operations in a way that a fluent English speaker is not. The DOJ Guidance emphasizes the importance of interpreter competency and states: "Competency requires more than self-identification as bilingual. Some bilingual staff and community volunteers, for instance, may be able to communicate effectively in a different language when communicating information directly in that language, but not be competent to interpret in and out of English." DOJ Guidance, 67 Fed. Reg. at 41,461. The AOC guidance acknowledges that interpreter competency is vital and that "simply being bilingual is not enough." The North Carolina Court System, http://www.nccourts.org/Citizens/CPrograms/Foreign/Interpreters/Certification/Default.asp (Nov. 8, 2011). In fact, the AOC's district attorney guidance states: "Using a properly trained court interpreter

10

their indigency so that an interpreter could be provided by the court. Specific examples of these problems include:

1. We have spoken with a defense attorney whose indigent client remained in jail for several weeks as a result of continuances caused by failure to locate a Spanish-speaking interpreter. Court documents show that some of these continuances were granted because an interpreter could not be located. According to defense counsel and the victim's counsel, the judge in this consolidated domestic violence and criminal matter asked the victim's advocate to interpret, but defense counsel and the victim's advocate objected because of the conflict of interest. We informed AOC counsel about the defendant's prolonged period of confinement due to the lack of an interpreter. Our office received a response from AOC counsel on this time sensitive matter approximately a week after our initial contact, and an interpreter was eventually appointed.[21]

2. Several criminal defense attorneys reported that assistant district attorneys have interpreted for LEP defendants, which raises serious conflict of interest concerns. One attorney stated that she has seen an assistant district attorney in eastern North Carolina approach multiple LEP defendants and, in seeking to ascertain a plea, ask "leave, yes?"[22] Based on the response to this question, the assistant district attorney has interpreted for defendants in court and has advised judges that the defendants were pleading guilty. A Wake County court staff member also stated that he has seen assistant district attorneys in Wake County interpret for defendants; a practitioner in Durham County stated that it happens there as well.

3. AOC staff, court officials, a judge, defense attorneys, and others reported that many magistrates throughout the state are not providing interpreters for LEP defendants although the AOC has indicated that a telephonic interpretation service is made available to the magistrates.[23] Failure to provide interpretation to LEP defendants can cause significant harm given the wide range of proceedings over which a magistrate presides. In North Carolina, magistrates in criminal cases issue warrants, set bail, and accept guilty pleas for minor misdemeanors and traffic violations. In some counties, they preside over worthless-check proceedings. Judicial districts appear not to have consistent practices for providing language services in matters overseen by a magistrate, although we have found that family and friends are often used to

---

ensures full and fair participation and improves access to justice for linguistic minorities in our courts. The court interpreter's purpose is to place the LEP party in a situation equivalent to that of an English-speaking party. Accordingly, the interpreter should interpret for the LEP party everything the party would hear if he or she was an English speaker." *District Attorneys' Use of Court Interpreters*, at 1.

[21] *See also* Bertrand M. Gutierrez, *Complaint says N.C. Courts Run Afoul of Civil-Rights Laws*, Winston-Salem J. (May 25, 2011), available at http://www2.journalnow.com/news/2011/may/25/wsmain01-complaint-says-nc-courts-run-afoul-of-civ-ar-1062273/.

[22] It is our understanding that in asking "leave, yes?," the assistant district attorney is seeking a guilty plea so that deportation proceedings can begin for a defendant not legally present in the United States.

[23] We acknowledge the AOC's efforts in providing language access through telephonic interpreting. In its September 2011 data response, the AOC states that "Magistrates' offices utilize a telephone interpreting service, which provides 24 hour access to interpreters for more than 150 languages."

11

interpret. The elected clerk in Duplin County informed us that magistrates may allow minors or jail inmates to interpret for LEP litigants in Duplin County.

4. According to criminal defense attorneys practicing in Wake County, indigent LEP defendants are routinely denied interpreters. For example, a practitioner who regularly appears in Wake County indicated that his clients have been denied AOC interpreters because the court refuses to allow requests for an indigency determination, although AOC policy provides for interpreters for indigent defendants with retained counsel. Other practitioners have indicated that certain Wake County courtrooms regularly impose such barriers to seeking an indigency determination.

5. It appears to be regular practice in Beaufort County court to proceed with domestic violence 50B hearings without an AOC certified or registered interpreter for either party. A Deputy Clerk in Beaufort County stated that she works with the local Legal Aid office to provide domestic violence petitioners with bilingual advocates in lieu of AOC certified or registered interpreters. The elected clerk in Duplin County, who the AOC lists as the Duplin County interpreter coordinator, stated that domestic violence petitioners are not provided with interpreters in Duplin because that would violate AOC policy. In addition, a victim's advocate reports that LEP litigants in Lenoir County court are not always provided with an AOC interpreter during domestic violence 50B proceedings. These litigants used friends, family members, advocates, and other individuals to interpret during court proceedings.

These examples demonstrate major gaps in access to competent interpreters, even when AOC policy provides for them.

**C.    AOC policy and practices result in numerous types of court proceedings moving forward without any language assistance for LEP individuals who therefore are unable to meaningfully participate in their case, causing harmful delays and outcomes.**

Judicial officials sometimes proceed with a hearing without an interpreter present. This leaves an LEP individual without any means to meaningfully participate in the court proceeding. Among the harmful consequences of this practice that we identified in the course of our investigation are the following:

1. AA lost permanent legal custody of her two children as a result of a hearing in which she was denied an interpreter despite being LEP. Prior to this October 2010 Wake County hearing, AA had custody of her two children. When she attended her trial without an attorney or interpreter, AA indicated that she is LEP. The court transcript shows that AA had great difficulty communicating with the court and understanding the judge, opposing counsel, and witnesses. According to the transcript, AA had difficulty understanding why she was not granted a continuance to secure an attorney and an interpreter, and clearly struggled to communicate basic facts because of her limited English proficiency. AA also had difficulty following testimony and evidence introduced by opposing counsel, including testimony that others sexually abused AA's child while under her supervision. At the end of the permanent custody hearing, AA lost custody of her children, though AA did not understand the result until after the hearing when she spoke with a child services employee.

12

**2.** BB, an LEP Arabic speaker appearing without counsel, was twice denied an interpreter in domestic violence proceedings. Court documents show she filed a domestic violence protective order against her ex-husband in Wake County in April 2009. The court did not provide BB with an interpreter although she was entitled to one under AOC policy. According to witnesses, BB had difficulty communicating with the court, and the judge did not grant BB's request for a protective order in part because the judge could not understand her. In June 2009, BB's ex-husband, an English speaker represented by counsel, filed for a restraining order against BB in Guilford County. The court eventually dismissed the action but only after conducting a hearing without an interpreter present. According to BB, and as a recording of the proceeding makes clear, BB had difficulty understanding the court. When the judge asked BB if she needed an interpreter, BB responded "What is an interpreter?" The hearing proceeded without a court-provided interpreter and BB put forward her defense, including testifying and cross-examining her ex-husband, without the assistance of an interpreter.

**3.** According to a court recording, when CC attempted to fight an annulment in Chatham County court, the judge used her husband, an adverse party, as the interpreter and translator. In July 2011, shortly after CC's counsel explained to the judge that CC is LEP, the judge allowed CC's husband to question CC in English. When CC had difficulty communicating in English, the judge allowed CC's husband to question CC in English, interpret those questions into Spanish for CC, and then roughly interpret her answers for the court. In addition, the judge allowed CC's husband to translate key evidence that CC submitted to the court, including documentary evidence that the court relied on in holding that CC's husband had met his burden to show grounds for an annulment.

**4.** DD had no attorney or interpreter for a child custody hearing in July 2011 in Chatham County. A court recording shows that the judge asked DD if he needed an interpreter and DD said yes. Despite this answer, the judge proceeded without an interpreter. During the proceeding, opposing counsel asked to speak with DD outside the courtroom. The judge agreed when opposing counsel indicated she spoke a little Spanish. After meeting with DD, opposing counsel presented the court with a consent decree. The judge asked both parties in English if they understood the decree, but did not ask for an interpreter or translator to assist DD. The judge signed the consent decree.

**5.** An interview with EE and her attorney revealed that EE was evicted without being able to communicate with the court. During her small claims court eviction hearing in November 2010, the Wake County court refused to provide EE with an interpreter. As a result, EE had great difficulty understanding the court. EE was evicted during the proceeding but did not know this until it was explained to her after the hearing.

**6.** An advocate informed us that failure to provide interpretation for FF may have resulted in denial of a domestic violence protective order and an unfavorable verdict in a missed rental payments case. After her husband allegedly attacked her, FF sought a domestic violence protective order at the Gaston County court in 2010. According to witnesses, the judge did not provide FF with an interpreter and dismissed her case because she was unable to communicate to the court the allegations against her husband. In a separate matter, after FF was unable to pay her rent and vacated her home, she became a defendant to a Mecklenburg County small claims court case because she allegedly owed outstanding rent payments for the apartment she and her

13

children vacated. Knowing that she could not afford an interpreter for the hearing, FF prepared a translated written statement of facts with assistance from a local advocacy organization, but the magistrate refused to read her statement. She lost her case.

7. According to GG, he did not have an interpreter during a February 2011 small claims court hearing for unpaid wages. At the hearing, GG asked the magistrate in Spanish for a continuance to get an interpreter. GG thought that the magistrate agreed to his request but the magistrate did not grant a continuance and went on with the proceeding. GG did not understand what occurred and had difficulty communicating with the court. GG lost the case. At the time of the hearing, GG's income was below the federal poverty level.

These examples are illustrative, but not exhaustive, of the consequences we identified in the course of our investigation of the AOC's failure to provide interpreters in court proceedings.

**D.    The AOC does not adequately notify LEP individuals of their right to an interpreter, ensure effective scheduling of interpreters, or translate all vital documents.**

The manner in which the AOC operates its language services program leads to additional denials of meaningful access to court proceedings. Our investigation identified systemic failures to provide notice to LEP individuals of their right to language services; inefficient scheduling policies that result in ineffective and inconsistent interpreter coverage; and an absence of translated forms that are necessary for many court proceedings.

**1.    Notice**

We found few formal efforts to provide LEP individuals with notice of their right to language services or their obligation, per AOC policy, to pay for their own interpreter. [24] In response to our June 22, 2011 request for information regarding how the AOC provides notice of language services to LEP individuals, the AOC's only response was to provide an excerpt of the instructions provided to a court official if he or she uses the telephonic interpreting service during a first appearance. It is not clear how these instructions provide notice to anyone other than court officials utilizing the telephonic interpretation system for first appearances.

We further found that because of the absence of regular notice procedures, LEP individuals incur delays and greater costs even beyond those associated with paying for an interpreter. For example, according to an interview with HH and a review of court documents, HH sought $2,000 in unpaid wages due to an allegedly bad check he received from his employer. HH did not know he had to bring a Spanish interpreter to his court hearing. HH had to pay a $98 fee to file the claim in Mecklenburg County small claims court. The presiding magistrate told HH that he needed an interpreter and dismissed his case, but HH did not understand that his case

---

[24] In Mecklenburg County, we obtained a notice given to LEP litigants at foreclosure hearings. The notice states that an interpreter will not be provided by the court, but a litigant can independently arrange for an interpreter to provide assistance at the next hearing. This informal notice is written in English and Spanish. In addition, as of May 2011, there was a sign outside a small claims courthouse in Wake County that reads in Spanish and English that if a litigant needs an interpreter, the litigant will need to bring one.

14

was dismissed. Subsequently, HH went to court again and paid another $98 filing fee, and an additional $160 for an interpreter. The magistrate at this hearing told him to go to arbitration. After this instance, HH went to an arbitrator, and paid an additional $50 in fees as well as the cost of an interpreter. The arbitrator ruled in favor of HH and awarded him court fees, but not interpreter fees.

### 2.     Inefficient practices in assignment of interpreters

We also found that county courthouses follow a wide range of practices, that are largely ad hoc, for identifying LEP Spanish speakers. The Buncombe County staff interpreter, for example, attempts to identify interpreter need based on the last names of defendants listed on the criminal docket. A contract interpreter in Henderson County stated that she also reviews the last names of parties on the criminal docket, and spends a fair amount of time trying to determine interpreter needs through other inefficient processes, with little support from the AOC. That interpreter has made several attempts to create a system in which jail staff identifies whether any LEP individuals need interpreting assistance for first appearances, but these efforts have been met with resistance. In Duplin County, a contract interpreter stated that if she is in a courtroom and a person answers in Spanish, she will interpret; or an assistant district attorney or court staff member will notify her when she is needed. Our investigation has determined that these ad hoc practices, and the failure to implement systemic methods for identifying the need for interpreter services, have caused both case delays and the failure to provide necessary language services.

### 3.     Forms

Furthermore, the AOC denies LEP individuals access to many basic court forms. The vast majority of the AOC's forms are only in English, including the affidavit of indigency, which a criminal LEP defendant represented by counsel or appearing pro se would need to provide in order to get an interpreter.[25] The AOC has translated a limited number of court forms into Spanish, and none have been translated into any other language. The AOC told us in the course of our investigation that it will translate forms by request, but it is not clear how an LEP individual would know about this service because neither the AOC Web site nor AOC policy discusses it. Also, while those AOC forms that have been translated into Spanish are available on the AOC website, accessing these translated forms online presents further difficulties for LEP individuals, because the instructions on how to search for court forms are provided only in English.

These practices further demonstrate the barriers that LEP individuals face when attempting to access court services in North Carolina.

---

[25] According to the AOC website as of March 2012, the Spanish translation of the indigency affidavit is "Unavailable – but under review." *See* North Carolina Court System, http://www.nccourts.org/Forms/FormSearchResults.asp.

15

### E.     Budget constraints do not excuse the AOC's failure to provide LEP individuals with meaningful access to court operations in this case.

As noted, throughout our investigation, the AOC has identified fiscal constraints as one reason for its failure to expand interpreter services to provide greater access to court proceedings for LEP individuals. Although fiscal circumstances can, in some instances, be one consideration in determining whether a recipient of federal funds has fulfilled its obligation to provide meaningful access to all of its programs and activities, our investigation concluded that financial constraints do not preclude the AOC from taking further reasonable steps to comply with its federal non-discrimination obligations.

We are aware of the budget strain many state court systems are under. The Division has accordingly provided, as guidance, a non-exhaustive list of factors DOJ considers in determining when a state court system is making a reasonable effort to provide meaningful access to court operations, in light of fiscal realities. *See* Letter from Assistant Attorney General Thomas Perez to Chief Justices and State Court Administrators (Aug. 16, 2010). Those factors include:

- The extent to which current language access deficiencies reflect the impact of the fiscal crisis as demonstrated by previous success in providing meaningful access;
- The extent to which other essential court operations are being restricted or defunded;
- The extent to which the court system has secured additional revenues from fees, fines, grants, or other sources, and has increased efficiency through collaboration, technology, or other means;
- Whether the court system has adopted an implementation plan to move promptly towards full compliance; and
- The nature and significance of the adverse impact on LEP persons affected by the existing language access deficiencies.

We recognize that the AOC has faced significant fiscal pressures, recently made large cuts to staff, and some local court positions have remained unfilled during this time. However, even in years when the AOC budget was growing, only minimal increases in language services occurred[26] and, as discussed below, the AOC even restricted services and declined to take steps that would improve coverage at no or minimal cost.

The AOC informed the Division of a fee increase, most of which went to the general fund and none of which increased language access services in courts. Further, although the AOC has contracted with a telephonic interpreter service for use by magistrates to increase efficiency and

---

[26] In 2007, the legislature added this language to § 7A-314(f): "In order to facilitate the disposition of criminal or Chapter 50B cases, the court may authorize the use of a court interpreter, paid from funds appropriated to the Administrative Office of the Courts, in cases in which an interpreter is necessary to assist the court in the efficient transaction of business." Previously, that statutory provision, which did not provide for domestic violence 50B litigants, read: "In a criminal case when a person who does not speak or understand the English language is an indigent defendant, a witness for an indigent defendant, or a witness for the state and the court appoints a language interpreter to assist that defendant or witness in the case, the reasonable fee for the interpreter's service, as set by the court are payable from funds appropriated to the Administrative Office of the Courts."

16

improve service, the AOC's Program Manager for Interpreting Services told us that many judicial districts have not even requested the pass code to access the service. As stated above, we found that magistrates are moving forward with criminal proceedings with no interpreter present and without using the telephonic interpreter line. We would expect the AOC would make greater efforts to ensure usage of the telephonic interpreter service, including actively providing the access code to all districts. We also found that the AOC has not pursued other possible means to increase efficiency through collaboration, technology, or other means.

In response to our June 2011 letter, the AOC stated that it is considering whether there is need for one or more staff interpreters,[27] and is exploring using existing interpreters to cover more proceedings than currently allowed under AOC policy. While this is welcome news, the AOC Director separately told us that the AOC has no specific plans to provide interpreters in more types of proceedings or expand other language services.[28] The AOC is responsible for preparing budget estimates, including such items as are deemed necessary for the proper functioning of the Judicial Department. N.C. Gen. Stat. § 7A-300 (2011).

Further, the AOC has not taken proactive steps to identify language needs among its population or fully assess its current usage. For example, the AOC explained that it does not analyze demographics or other relevant data to anticipate language access needs. The AOC's current practice is to respond to interpreter service requests rather than identify foreign language needs in a more proactive manner. Additionally, in the September 2011 data response, the AOC stated that it does not maintain information on the number of individuals requesting or needing Spanish-speaking interpreters,[29] and yet noted its view that districts without staff interpreters "appear to have less than full time interpreting needs." It is unclear from the information the AOC provided to the Division, including the lack of data collection on interpreter requests, how this determination could be reached. Our investigation therefore concluded that the use of straightforward analysis and data collection regarding interpreter needs, as other states have implemented, would allow the AOC to reduce costs by improving planning for language assistance needs.

In addition, we found evidence that the AOC prevents courts from providing interpreters even when there would be no financial cost to do so. Specifically, the AOC has directed staff and contract interpreters not to interpret for LEP individuals in cases not covered by the AOC's

---

[27] Court staff and AOC officials uniformly praised the efficiency and cost savings of staff interpreters. Since the AOC is authorized to "convert contractual foreign language interpreter positions to permanent State positions when the Director determines that it is more cost-effective to do so," N.C. Gen. Stat. § 7A-343(9)(c) (2011), it is unclear why the AOC has not taken these steps.

[28] The AOC's Senior Deputy Director informed us that the AOC drafted language in a General Assembly bill proposing to expand interpreter services to cover civil cases and included appropriations for approximately $1.4 million a year to cover the cost. See HB 1477, 2009-2010 Leg., 2009 Sess. (NC 2009). That bill has not passed and the AOC Deputy Director stated the AOC has not supported subsequent bills proposing expanded language services because no appropriations were included in those bills.

[29] In response to the same inquiry, the AOC did provide documentation for interpreter assignments for languages other than Spanish.

17

policy, even during an interpreter's working hours when he or she is not otherwise occupied.[30] The AOC Program Manager for Interpreting Services explained that the rationale for this denial of service is that if the AOC starts providing interpreter assistance beyond that required by the AOC policy, such assistance will become "expected rather than a favor." We find this approach to be inconsistent with the AOC's obligations under Title VI and the Safe Streets Act, and particularly troubling given that the AOC pays staff interpreters a fixed salary and assistance beyond what is in the limited AOC policy should not cost the AOC any additional funds.

The AOC's actions to limit language services prevent court personnel and officials from providing LEP individuals with meaningful access to court proceedings and operations. For example, we found that at least one judicial district, Judicial District 26 located in Mecklenburg County, previously provided language services for proceedings and court operations not approved in the AOC's policy. Recently, however, the AOC took specific steps to ensure that all judicial districts, including Mecklenburg, do not provide language services outside what is provided for in AOC policy.[31] Court staff in Mecklenburg County stated to us that the AOC's policy denies access to the court for LEP individuals.

Because the amount of funding that the AOC itself has estimated would be necessary to provide fuller interpreter coverage is relatively small; because the AOC has failed to take reasonable steps to ensure meaningful access to court operations and programs even where budget impact is nonexistent or limited; and because other states with similar fiscal challenges continue to take steps to provide LEP individuals with greater access to court operations,[32] we have concluded that the AOC's fiscal circumstances do not in this case justify its failure to take further reasonable steps to improve access to court proceedings for LEP individuals.

### F.     Despite knowledge of the adverse impact of its policy on LEP individuals, the AOC has not remedied these harms.

As set forth above, the AOC is aware of the requirements under federal law to ensure nondiscrimination against national origin minorities by providing meaningful language access. The AOC is equally aware that its policies and practices limit the types of proceedings and court operations in which interpretation and translation are provided for Latino and other national origin minority LEP individuals. The AOC has continued to pursue these policies and practices despite knowledge of the discriminatory effect on LEP individuals based on national origin.

---

[30] We recognize that breaks are critical for interpreters and our focus is on those times when an interpreter is neither on a break nor otherwise occupied.

[31] The AOC alleges in its September 2011 data response that Mecklenburg County court staff did not appropriately manage interpreters, resulting in unnecessary overcharges. We take no position on whether that allegation is true. Regardless of the accuracy of the allegation, until the AOC took over oversight of the staff interpreters in Mecklenburg on February 15, 2010, we understand that interpreters were provided free of charge in a broader number of situations.

[32] DOJ has reached agreements with the Colorado Judicial Department and Maine Judicial Branch that identify specific steps those court systems agreed to take to ensure LEP individuals have meaningful access to their courts. Other state court systems, such as in New York and Georgia, and some county courts in Washington State, have recently taken independent steps to increase their provision of language services.

18

## V.    Conclusion

As a recipient of federal funds from DOJ, the AOC is required to comply with civil rights obligations under Title VI, the Safe Streets Act, and their implementing regulations, and has signed contractual assurances specifically agreeing to comply with those obligations.  Yet, as set forth in this report, the AOC has implemented policies and practices that discriminate against national origin minorities in violation of these laws and agreements.

Based on our investigation, we have determined that the AOC has violated the nondiscrimination prohibitions of Title VI and its implementing regulations.  In addition, although the findings we have identified would support a Safe Streets Act violation, DOJ is deferring a formal finding under the Safe Streets Act in order to allow the AOC to voluntarily comply and avert litigation or immediate risk to federal funding.  DOJ finds that the AOC's policies and practices violate the nondiscrimination provisions of Title VI and its implementing regulations, and are in breach of the contractual obligations contained in its grant awards from DOJ.

U.S. Department of Justice

Civil Rights Division

*Federal Coordination and Compliance Section*
*950 Pennsylvania Ave, NW-NWB*
*Washington, DC  20530*

Mr. Kip Anderson
Court Administrator
Superior Court of Arizona, Mohave County
401 East Spring Street
P.O Box 7000
Kingman, AZ  86402

      Re:  Complaint No. 171-8-23
           Castaneda v. Superior Court of Arizona, Mohave County

Dear Mr. Anderson:

      This letter completes our formal engagement with the Mohave County Superior Court (MCSC) in which we addressed a complaint filed under Title VI of the Civil Rights Act of 1964 regarding the provision of language assistance services in Mohave County court proceedings. From the beginning, your office has been extremely cooperative and responsive to our inquiries and requests for commitments to compliance.  We appreciate your leadership and that of Presiding Judge Gurtler in resolving this matter.

Background

      On June 12, 2013, the Federal Coordination and Compliance Section in the Civil Rights Division of the United States Department of Justice (FCS) received a complaint from a nonprofit organization on behalf of a Spanish speaking limited English proficient (LEP) court user in Mohave County, Arizona.  The complaint alleged that MCSC was violating the prohibition against national origin discrimination in Title VI of the Civil Rights Act of 1964 by refusing to provide an interpreter free of charge in all cases.

      During our initial communications via telephone and e-mail, you and presiding Judge Gurtler assured FCS that MCSC would provide interpreters at no cost to all LEP court users, including the individual named in the complaint.  FCS memorialized our conversations in a September 10, 2013 letter proposing a framework for continued collaboration to achieve our common goal: providing meaningful access to all LEP individuals in MCSC proceedings and operations.

      On September 25, 2013, you accepted the proposals on behalf of MCSC and agreed to provide FCS with two written updates reporting on actions to improve outreach, planning, and implementation for court language services.  Consistent with our agreement, MCSC provided these reports on December 12, 2013 and November 24, 2014.  In addition MCSC agreed to amend the Superior Court Language Access Plan to reflect that court interpreters would be provided free of charge in all criminal and civil proceedings for all LEP parties, witnesses,

victims, or anyone with an interest in the matter. MCSC submitted the initial Language Access Plan update to FCS on December 12, 2013, and a subsequent update on November 24, 2014. Thank you for submitting the reports, updating your Language Access Plan, and working with my staff during this engagement. Below we summarize our collaboration and the work we accomplished together.

<u>Accomplishments</u>

During the agreement period, September 25, 2013 to present, MCSC accomplished the following:

1. **Provision of Interpreters in Court Proceedings and Services, Free of Charge to LEP Court Users**

In accordance with our agreement, MCSC took immediate steps to provide interpreter services in all court proceedings free of charge regardless of case type, court user income, or language to all LEP parties, witnesses, victims, and anyone with an interest in a matter. In addition to notifying judges of their obligation to provide interpreters free of charge in all court proceedings, MCSC also memorialized the policy in court documents, including the new Language Access Plan, which states:

Interpreters will be provided at no cost to all LEP court customers (including witnesses, victims and parents/guardians) who need assistance and any other person as determined by the judicial officer who needs such assistance in all courtroom proceedings. This includes all court services, probation services and all mandatory programs.

Superior and Limited Jurisdiction Court Policy, Mohave County, 4.03 Language Access Plan at Section III(A)(1).

2. **Court Interpreter Availability and Quality**

MCSC uses contract interpreters to provide interpretation. Arizona currently does not have a statewide testing and certification program for interpretation, but the Administrative Offices for the Courts (AOC) is considering options for developing one. In order to ensure quality and accuracy of interpretation, MCSC encourages all contract interpreters who have not yet obtained certification in another state to do so. In addition, MCSC has identified online training programs and explored opportunities to adopt in-house training from the New Mexico court system, and self-training and practice tools from the University of Arizona's National Center for Interpretation. MCSC plans to purchase and provide quality materials to further enhance interpreting skills in the coming year.

At the time of our agreement, MCSC was in the process of working with the Arizona AOC's video remote services for the court in an effort to take advantage of available certified interpreters in other parts of the state. In the year-and-a-half since, MCSC has made progress in establishing remote interpreting as a viable option when appropriate. On September 13, 2013, MCSC installed new video remote equipment in the Kingman courthouse, including a video system, sound system, high definition cameras, distribution amplifiers, video conference head

sets, courtroom desktop monitors, integration into existing systems. MCSC uses interpreters provided by the Arizona AOC as remote interpreters, and plans to consider additional options when an interpreter may not be available through the AOC. To cement the new procedures and protocols, MCSC developed a Video Remote Interpretation Policy that includes information about scheduling interpreters, appropriate times to use video remote interpreting, suggested consent language, and what to do the day of the hearing. MCSC trained new staff on these policies and procedures.

Ensuring that interpreters—including those who appear remotely—provide high quality, professional, and accurate interpretation will remain essential to ensuring meaningful access to LEP court users and the effective administration of justice.

### 3. Language Service Outside the Courtroom

MCSC's Language Access Plan recognizes its responsibility to ensure that LEP individuals have meaningful access to services outside the courtroom, including routine contact with court personnel, court-ordered mediation, and treatment or educational programs provided by the court or under contract with the court. Language Access Plan at Section III(B). To facilitate communication between LEP individuals and court staff, MCSC uses independent interpreter contractors, bilingual employees, "I Speak" cards to identify the individual's primary language, multilingual signage throughout courthouse locations, forms translated into Spanish on the Court's webpage, and telephonic or video interpreter services.

MCSC is also conducting video tests using a telephonic interpretation company via tablets at clerk counters. We look forward to hearing more about how this technology is working, and how it compares to the existing non-video, over-the-phone language services.

MCSC has enhanced its website to make it easier for the LEP community and the general public to access important information. For instance, shortly after our agreement, MCSC began the process of accurately translating its website. To date, MCSC has provided links to the Arizona Supreme Court's Spanish self-service center, translated law library information into Spanish, and made the limited jurisdiction courts e-payment system available in Spanish. MCSC continues to work with staff from the AOC to expand the number of available forms in both the general and limited jurisdiction courts. LEP court users should be able to find these forms not only online but also in courthouses where members of the public can easily access them.

FCS understands the need to prioritize the translation of additional forms and web information into Spanish because that it is the largest non-English language spoken in Mohave County and in the State of Arizona. However, we continue to encourage Mohave County and the State of Arizona to translate vital forms and web information into more languages. Across the State, there are significant numbers of Navajo, Chinese, Vietnamese, and Arabic LEP persons. In addition, in Mohave County, Punjabi ranks fourth in most frequently needed languages for court interpretation. Currently, court interpreters provide sight translations of court documents and correspondence associated with a case. To ensure consistency in translations and efficiency in the courts, the Mohave County courts should consider translating the most common forms into additional high frequency languages.

### 4. Training Staff on Language Access Plans, Policies, and Procedures

MCSC has taken significant steps to increase staff exposure to and understanding of language services for LEP court users. MCSC has implemented a number of trainings for all staff, including training at new staff orientation and at the semi-annual and annual all-staff trainings. The April 2014 and February 2015 annual staff trainings included a discussion of the fundamentals of language access, as well as tips and resources for staff working with LEP individuals. MCSC has committed to continue these trainings. In addition, MCSC highlights language access policies and procedures in judicial officer orientation on the use of court interpreters and language competency, a state language access DVD, diversity training, cultural competency training, and new employee orientation training.

### 5. Greater Outreach with Community Organizations

Regular communication with stakeholders in the community is key to determining the effectiveness of a language access program, both because it ensures that LEP individuals and their representatives understand and can access their rights to language services, and also to give stakeholders and opportunity to raise concerns, propose solutions, and engage constructively with the court. MCSC indicates that it has made outreach a priority and holds regular meetings with Legal Services to discuss issues encountered with the provision of language services in the courts.

Additionally, MCSC has begun including on the agenda of the Criminal Justice Coordinating Council, which you chair, a discussion about interpreter services and how best to serve the LEP community of Mohave County. These meetings include local law enforcement agencies and other justice partners.

The Language Access Plan states that the "court will solicit input from the LEP community and its representatives through outreach and will seek to inform community service organizations on how LEP individuals can access court services." Language Access Plan at Section VI. To the extent not already done, we encourage the Mohave County courts to include public defenders, the private bar, and additional community based organizations in its outreach.

Additionally, MCSC created a new complaint process that include a new form to make sure that LEP court users can raise concerns and have them formally addressed. MCSC translated the complaint form into Spanish and plans to translate it into additional languages. MCSC should make these forms readily available to all court users both online and in common areas of the courthouses.

### Conclusion

In light of the improvements that MCSC has made, we are prepared to formally close the Civil Rights Division's review of the above-referenced matter upon receipt of your acknowledgement, memorialized below, of your continuing commitment to compliance with Title VI, including the requirement to provide interpretation in court proceedings, free of charge

to LEP individuals, and to ensure meaningful access to court operations.

Please note that this letter addresses only the matters discussed in this correspondence and should not be construed to cover any other issue regarding the Mohave County Superior Court's compliance with Title VI, the Safe Streets Act, or any other law enforced by the Department of Justice. Nor does the closing of our review affect any rights that the complainants may have to file a private lawsuit in a court of law. Nothing in this letter prevents the Department of Justice from initiating an investigation or compliance review in the future, if such action is warranted.

In closing, thank you for your cooperation throughout this investigation. We would welcome continuing informal opportunities to discuss any future implementation success, concerns, and your annual language access plan updates. If you have any questions regarding this letter, please contact Ms. Andrea Plewes at (202) 353-4107 or Andrea.Plewes@usdoj.gov, or Principal Deputy Chief Christine Stoneman at (202)-616-6744 or Christine.Stoneman@usdoj.gov.

Sincerely,

Deeana Jang
Chief
Federal Coordination and Compliance Section
Civil Rights Division

As the Civil Rights Division, United States Department of Justice, closes its review of the Mohave County Superior Court's provision of language assistance services in state court proceedings and operations, Complaint Number 171-8-23, the Mohave County Superior Court agrees to continue its commitment to compliance with Title VI and implementing regulations, including the requirement to provide interpretation in court proceedings, free of charge to LEP individuals, and to ensure meaningful access to court operations.

Kip Anderson
Court Administrator
Mohave County Superior Court

cc: Ms. Diana L. Varela, Chief
    Civil Division, U.S. Attorney's Office
    District of Arizona



**U.S. Department of Justice**

Civil Rights Division

*Federal Coordination and Compliance Section*
*950 Pennsylvania Ave. NW-NWB*
*Washington, DC 20530*

June 17, 2016

CERTIFIED, RETURN-RECEIPT REQUESTED

```
┌──────────────────────┐
│     RECEIVED         │
│    JUN 20 2016       │
│   DIRECTORS OFFICE   │
└──────────────────────┘
```

Ms. Laurie K. Dudgeon
Director
Kentucky Administrative Office of the Court
1001 Vandalay Drive
Frankfort, KY 40601

Re: Complaint No. 171-30-21

Dear Ms. Dudgeon:

The purpose of this letter is to advise you of the manner in which the U.S. Department of Justice (DOJ), Civil Rights Division, will formally close the above-referenced file and complete its engagement with the Kentucky Administrative Office of the Court (KAOC). We initiated this engagement in response to complaints of alleged national origin discrimination under Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. §§ 2000d to 2000d-7, and its implementing regulations, 28 C.F.R. §§ 42.101 to 42.112, by a Kentucky State Court Judge who failed to provide interpreter services to limited English proficient (LEP) parties. Throughout this engagement, your office has been cooperative and we appreciate the collaborative working relationship we have had with your General Counsel.

Below we summarize the complaint allegations and the actions that KAOC has taken to ensure that LEP individuals appearing before the judge at issue receive appropriate and effecting language assistance services consistent with Title VI. Then, we explain the manner in which we hope to close this matter. Finally, we request that you sign the letter as indicated below and return a copy to us by email for our records in acknowledgement of the process for resolving this engagement.

**Background**

On September 29, 2014, the Federal Coordination and Compliance Section (FCS) informed you of the complaint received alleging that a judge did not provide interpreter services to LEP parties, even though LEP individuals requested interpreters and interpreters were available. In that letter, we invited you to contact our office to resolve this matter in order to avert the need for a full investigation. Between October 2014 and March 2016, KAOC staff worked to address the provision of language assistance services in the specific judge's courtroom and to ensure members of the Judicial Branch are aware of their obligations under Title VI.

## Actions Taken by KAOC to Address Complaint Allegations

In a data request response provided on December 18, 2015, the KAOC outlined actions taken to address concerns raised in the complaint. These actions included meetings with the judge in February and October 2015, in which the judge was reminded of obligations under Title VI, provided a copy of the Kentucky Court of Justice Language Access Plan, and given information on how to appropriately request and utilize interpreter services.[1] The KAOC further reported that the judge was very cooperative with the Court Interpreting Services and that since October 24, 2014, it has received no other complaints regarding the provision of language access services in his courtroom. FCS also has not received any additional complaints regarding language services in the judge's court during this time.

It also is our understanding that new court employees receive information about the Kentucky Court of Justice Language Access program during their Human Resources orientation day and that current circuit, family, and district judges receive information through the Bench Book, yearly training events, and the Judicial Branch Education Department. Court Interpreting Services has also worked with the Department of Public Advocacy and the Kentucky Bar Association to provide training to lawyers on language access, thereby improving access and quality of service to all LEP members of the public who interact with the courts. You have also stated that the KAOC will maintain a list of individuals certified or registered to provide interpreting services at all times, and that the list is available on the KAOC website at http://courts.ky.gov/courtprograms/CIS/Documents/DirectoryInterpreters.pdf.

The KAOC has worked with DOJ to develop a complaint form through which an LEP individual can file a grievance regarding provision or quality of language assistance services in the Kentucky State Court system. You have committed that this form will be available in Arabic, Bosnian, Burmese, Chinese, English, French, Kirundi, Nepali, Russian, Somali, Spanish, and Vietnamese. Additionally, the KAOC is currently identifying vital documents and the non-English languages into which they will be translated.

In order to resolve this matter, and as we discussed in a recent phone conversation with your office, we ask that your office send us periodic updates describing progress in implementing the activities described above. For example, these updates should include any staffing or structural developments in the Office of Court Interpreter Services, identification of vital documents, and progress in the translation of materials. Please also include in these letters copies of any new complaints received or filed alleging failure to provide appropriate language assistance services, and the manner in which those complaints have been resolved. We request that the KAOC send us these quarterly updates for a year beginning on October 3, 2016, concluding with the last update on July 3, 2017. Assuming that the KAOC provides the updates as requested and in the absence of any compliance concerns or complaints that have not been resolved satisfactorily, we will inform the KAOC of formal closure of this matter within 30 days of its final update.

Please note that this letter addresses only the matters discussed in this correspondence and should not be construed to cover any other issues regarding the Kentucky State Judiciary's compliance with Title VI. This letter does not constitute a finding that the KAOC is or will be in full

---

[1] In addition to obligations under Title VI, under Kentucky Revised Statute (KRS) 30A.415, the Court of Justice is required to provide qualified interpreters for all court appearances (civil and criminal), the qualifications for which are provided at KRS 30A.405.

3

compliance with Title VI and its implementing regulations or other federal laws, nor does it address other potential claims of discrimination on the basis of national origin that may arise from the activities of the KAOC. Likewise, this letter does not constitute an admission by KAOC with regard to any specific allegations reviewed in this matter.

Please note that this letter also does not affect any rights that individual complainant(s) may have to file private lawsuits regarding the concerns raised in their complaints to the DOJ. We will retain the complaints for our records and take the information provided into account if we receive similar future complaints against the KAOC.

We are obligated to inform you that recipients may not intimidate, threaten, coerce, or engage in other discriminatory conduct against anyone who has either taken action or participated in an action to secure rights protected by the civil rights laws DOJ enforces. The protection against retaliation extends to recipient employees who provide information or otherwise cooperate with DOJ's review. Any individual who alleges such harassment or intimidation may file a complaint with DOJ. We would investigate such a complaint if the situation warrants.

Under the Freedom of Information Act, it may be necessary to release information and related correspondence and records shared by recipients and complainants upon request. In the event that we receive such a request, we will seek to protect, to the extent provided by law, personal information which, if released, could constitute an unwarranted invasion of privacy

If you have any questions concerning this letter or any of its terms, please contact Deputy Chief Peter Gray at 202-305-0042 or peter.gray2@usdoj.gov, or staff attorney Dylan Nicole de Kervor at 202-616-2271 or dylan.dekervor@usdoj.gov.

Sincerely,

Christine Stoneman
Acting Chief
Federal Coordination and Compliance Section
Civil Rights Division

Agreed to on this _22nd_ day of June, 2016

Laurie K. Dudgeon
Director
Kentucky Administrative Office of the Court

cc: Kerry B. Harvey
United States Attorney
Eastern District of Kentucky

Case 7:18-cv-00282-KMK    Document 23    Filed 05/07/18    Page 46 of 83

5/7/18    Settlement Agreement Between The United States Of America And Adelante, P.C., | CRT | Department...

# SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND ADELANTE, P.C.,

D U 224-23-56 UNDER THE AMERICANS WITH DISABILITIES ACT

## BACKGROUND

1. This matter was initiated by a complaint filed under title III of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. ï½§ï½§ 12181-12189, with the United States Department of Justice (Department) against Adelante, P.C. (Adelante). The complaint alleged that Adelante failed to provide effective communication during counseling sessions led by its professional staff.

2. Adelante is a non-profit, social services agency in Chicago, Illinois. It is a public accommodation covered by title III of the ADA, 42 U.S.C. ï½§ 12182(7)(k).

3. The Department of Justice is authorized to investigate complaints under title III of the ADA and to bring suit in particular cases. 42 U.S.C. ï½§ 12188.

4. The parties have agreed to resolve this matter as set forth below, without adjudication of any factual and legal disputes.

## AGREEMENT

5. Adelante agrees to provide to participants in its programs and to members of the public appropriate auxiliary aids and services, including qualified sign language interpreters, upon reasonable notice and when necessary to ensure effective communication with deaf and hard of hearing individuals. Adelante will alert any public or private agency that referred the individual of the need for such aids or services and seek from it the funds to provide them. If that is unavailing, Adelante will provide aids or services at its own expense, unless to do so would constitute a fundamental alteration of its services or result in an undue financial or administrative burden.

6. Adelante will develop a written policy and set of procedures implementing ï½¶5 within 30 days of the effective date of this Agreement. The document will be integrated into any existing, written policies and procedures and copies will be distributed to all staff and provided to members of the public upon request. A copy of the policy and procedures will also be submitted to the Department of Justice within 40 days of the Agreement's effective date.

7. In consideration of the promises made in ï½¶ï½¶ 5 and 6, the Department agrees to close the investigation of complaint DJ# 224-23-56 and to refrain from bringing a civil action against Adelante.

## ENFORCEMENT

8. The Department of Justice may review compliance with this Agreement at any time. If the Department determines that this Agreement or any of its requirements has been violated, it may institute a civil action in federal district court to enforce this Agreement or the requirements of title III, following written notice to Adelante of the possible violation and a period of 10 days in which Adelante has the opportunity to cure the alleged violation.

9. The parties stipulate that, if the Department sues under ï½¶9 and prevails, Adelante will pay $10,000 as a civil penalty, as authorized by 42 U.S.C. ï½§ 12188(b)(2)(C), within 10 days of the entry of judgement.

10. Failure by the Department of Justice to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver of the Department's right to enforce other deadlines and provisions of this Agreement.

## IMPLEMENTATION

11. This Agreement is a public document. A copy of the document or any information contained in it may be made available to any person upon request.

12. The effective date of this Agreement is the date of the last signature below.

13. This Agreement constitutes the entire agreement between the parties on the matters raised here, and no other statement, promise, or agreement, either written or oral, made by either party or agents of either party, that is not contained in this written agreement, will be enforceable.

14. This Agreement is limited to the facts set forth above and does not purport to remedy any other potential violations of the ADA or any other Federal law. This Agreement does not affect Adelante's continuing responsibility to comply with all aspects of title III of the ADA.

15. The persons signing this document for Adelante represents that she is authorized to bind Adelante to this Agreement.

For Adelante, P.C.:

By: _____

    Karen Stanbary
    Director
    Adelante, P.C.
    Chicago, Illinois

For the United States:

By:_____

    John L. Wodatch, Chief
    L. Irene Bowen, Deputy
    Susan Reilly, Supervisory Attorney
    Thomas Esbrook, Investigator
    Disability Rights Section
    U.S. Department of Justice
    P.O. Box 66738
    Washington, D.C. 20035

>

Was this page helpful?
Yes    No

MEMORANDUM OF AGREEMENT
BETWEEN

THE UNITED STATES OF AMERICA
AND
THE COLORADO JUDICIAL DEPARTMENT

DEPARTMENT OF JUSTICE NUMBER 171-13-63

## A.  SCOPE OF THE INVESTIGATION

1.  The United States Department of Justice (DOJ) has conducted an investigation under Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d *et seq.*, (Title VI) and the Omnibus Crime Control and Safe Streets Act, as amended, 42 U.S.C. § 3789d(c), (Safe Streets Act) in response to an administrative complaint filed against the Colorado Judicial Department (CJD).  The complaint alleged that CJD failed to provide interpreters and other language access services in all court proceedings and operations to limited English proficient (LEP) individuals.

2.  CJD constitutes the judicial branch of government for the State of Colorado with the judicial power of the state being vested in a supreme court, a court of appeals, twenty-two district courts, a probate court in the city and county of Denver, a juvenile court in the city and county of Denver, sixty-three county courts, excluding Denver county court, and seven division water courts.  The Chief Justice of the Supreme Court is the executive head of CJD.

## B.  JURISDICTION

1.  DOJ has jurisdiction over this matter under Title VI and the Safe Streets Act.  Together, these statutes and their implementing regulations, codified at 28 C.F.R. §42.101, *et seq.*, and §42.201, *et seq.*, prohibit discrimination on the basis of race, color, national origin, sex, and religion in DOJ-funded programs or activities.

2.  DOJ is authorized under 28 C.F.R. Part 42, Subpart C and Subpart D to investigate the complaint in this matter to determine CJD's compliance with Title VI and the Safe Streets Act, to issue findings, and, where appropriate, to negotiate and secure voluntary compliance.  Furthermore, the Attorney General is authorized under 28 C.F.R. §42.108 and 28 C.F.R. §42.210 to suspend or terminate financial assistance to CJD provided by DOJ should DOJ fail to secure voluntary compliance pursuant to Subpart C or Subpart D, or to bring a civil suit or take other action to enforce the rights of the United States under applicable federal, state, or local law.

3.  This Memorandum of Agreement (MOA) does not constitute an admission with regard to any specific allegations investigated in this matter.  The purpose of the MOA is to

Page 1 of 6

memorialize CJD's commitment to devise and implement the policies, plans, and procedures needed to ensure compliance with the non-discrimination provisions of Title VI and the Safe Streets Act as they relate to access to court proceedings and operations by persons with limited English proficiency.

    4.  The parties to this MOA are the United States of America and CJD.  The persons signing for the CJD represent that they are authorized to bind CJD to this MOA.

    5.  In order to avoid the burdens and expenses of further investigation and possible litigation, the parties hereby agree as follows:

## C.  REMEDIAL ACTION

    1.  CJD agrees to comply with Title VI, the Safe Streets Act, and corresponding implementing regulations.  It shall provide meaningful access at no cost to LEP parties in interest in all court proceedings and operations.

    2.  The Chief Justice of the Colorado Supreme Court has issued the attached Chief Justice Directive 06-03, as amended, (Directive) on language access contemporaneously with this MOA. The Directive is effective July 1, 2011, and requires CJD to provide comprehensive, qualified language assistance to LEP parties in interest[1] in all court proceedings[2] and operations[3] at no charge.  CJD shall release the Directive to court personnel and to the public and post it on the CJD website promptly upon its issuance by the Chief Justice and before its effective date.  CJD agrees to take such actions as are necessary to implement the provisions of the Directive.

    3.  Within thirty days, the Chief Justice shall appoint at least eight additional consultative members to the CJD Court Interpreter Oversight Committee[4], none of whom shall be employed by CJD or working as court interpreters.  The appointees shall include a Colorado Legal Services attorney, a prosecutor, a public defender, an advocate representing the interests of the language minority populations in Colorado, and other members of the bar or community, all of whom shall have relevant experience in court language access issues.  Thereafter, the new committee members will be invited to participate in regular meetings of the Committee and to provide to the Chief Justice and Committee feedback on the state and district language access plans, efforts to implement the Directive, the advisability of conforming revisions to state and local rules and forms, and other issues relating to providing language access.

---

[1]  A party in interest is defined in the Directive as "A party to a case; a victim; a witness; the parent, legal guardian, or custodian of a minor party; and the legal guardian or custodian of an adult party."

[2]  A court proceeding is defined in the Directive as "Any hearing, trial or other appearance before any Colorado state court in an action, appeal, or other proceeding, including any matter conducted by a judicial officer."

[3]  Court operations are defined in the Directive as "Offices of the courts, services, and programs managed or conducted by the courts and probation, not including court proceedings, which involve contact with the public or parties in interest."

[4]  CJD is contemplating other changes to the name, mission, and composition of the Committee and may at any time present a proposal for review and approval to DOJ regarding such changes to the Committee.

4.   CJD shall submit to DOJ for review and approval a proposed state Language Access Plan (LAP) within ninety days.  The plan shall set forth the management actions needed to implement the Directive and ensure compliance with Title VI, including the translation of vital documents into languages as designated by highest need, and the tasks to be undertaken, assignment of responsibility, deadlines, and process.  CJD shall take such actions as are necessary to implement the LAP.

5.   CJD shall submit to DOJ for review and approval proposed District Language Access Plans (DLAPs) as they are completed within sixty days of DOJ's approval of the State LAP.  The DLAPs shall set forth the management actions needed at the district level to implement the Directive and ensure compliance with Title VI, including the translation of vital documents, and the tasks to be undertaken, assignment of responsibility, deadlines, and process.  CJD shall ensure that the districts take such actions as are necessary to implement their DLAPs and the state LAP.

6.   Within six months of the issuance of the Directive and the State LAP, whichever is later, CJD shall submit to DOJ for review and approval the other policies, forms, and procedures appropriate to implement the Directive and LAP.  CJD shall thereafter take such actions as are necessary to publish the forms and implement the policies and procedures.

7.   The parties shall discuss the extent to which CJD has succeeded in complying with the requirements of paragraph C.1 – C.6 above, the efficacy of the Directive, LAP, DLAPs, and other language access policies and procedures, and whether any modifications are needed.  These discussions shall occur following the submission of each report specified in D.1 below, and upon request of a party at any other time.  CJD shall submit to DOJ for review and approval any proposed modifications to the approved Directive, LAP, DLAPs, policies, and procedures and shall take such actions as are necessary to implement the changes.

## D.  MONITORING

1.   Every six months after the effective date of this MOA, and thirty days prior to its expiration, CJD will submit detailed written reports to DOJ documenting the efforts made to implement the Directive and to comply with the language access requirements of Title VI and the Safe Streets Act.

2.   The reports shall include, but not be limited to, the following categories of information:
   a.   The actions the CJD has taken or intends to take to comply with the MOA, implement the Directive, and execute the LAP;
      i.   Any further policies or procedures drafted or issued for these purposes; and
      ii.   Any language related notices, forms, and signs drafted or issued;

b. Data on services provided pursuant to the Directive and LAP, by court or court program, location, language, and the form and mode of language assistance, including data that indicates:
   i. Any delays resulting from unavailable language assistance;
   ii. Instances in which language assistance is not provided and the reasons therefor;

c. Data on the application of Section IV. C of the Directive, including number of interpreters and bilingual staff used, broken down by:
   i. Event, to include:
      a. Court or court program, including location; and
      b. Type of proceeding and case type;
   ii. Interpreter, to include:
      a. Language;
      b. Qualification level, as professionally certified, professionally qualified, or registered;
      c. Employment status as managing interpreter, staff interpreter, or contractor; and
      d. State of residence;
   iii. Event and interpreter, as set forth above, if CJD is able reasonably to enhance its case management software or devise other methods to collect such data;

d. Information regarding problems encountered in implementing the Directive and LAPs, including feedback gathered from the bench, bar, staff, and public; and
   i. The process established to receive and respond to language access complaints;
   ii. The number, nature, and disposition of any language access complaints;

e. The steps taken to notify the bench, bar, litigants, and public of the Directive and any other policies or procedures to implement the Directive and LAPs, and any responses thereto;

f. The trainings provided to judges, staff, and others regarding the Directive and any related language access matters, including the content of the trainings, training materials, dates held, trainers, and names and positions of attendees;

g. Steps taken to recruit, train, set standards for, qualify, and certify interpreters, translators, and bilingual staff;

h. Lists of authorized interpreters, translators, and bilingual staff specifying language, test results, and type of authorization;

i. Lists of documents, signage, forms, web content, and audio or video content that have been or will be translated, the languages completed or intended for each, and the means by which the items will be distributed internally and made available to litigants;

j. Additional steps taken to ensure quality communication when utilizing remote interpretation; and

k. Once a year, the report shall include figures on spending for language services.

## E.   GENERAL TERMS

1.    The term "review and approval" refers to the following process that the parties shall use to issue or modify a document other than a DLAP:

    a.    Upon receipt of the document from CJD, DOJ shall review it and provide comments to CJD within thirty days;

    b.    Within sixty days of the receipt of the comments, the parties may discuss them, and CJD shall respond and submit a revised version of the document to DOJ;

    c.    Within thirty days of the receipt of the revised document, DOJ shall return it to CJD with any changes DOJ requires; and

    d.    CJD shall publish the document with the required changes within thirty days of its receipt.

    e.    If the relevant document is a DLAP, the time periods in subparagraph a. and c. above shall be ninety days and sixty days, respectively.

2.    DOJ may review compliance with this MOA at any time.  If DOJ believes that CJD has failed to comply in a timely manner with any requirement of this MOA without obtaining advance written approval from DOJ for a modification of the relevant terms, DOJ will so notify CJD in writing and will attempt to resolve the issue or issues in good faith.  If DOJ concludes that the parties have been unable to reach a satisfactory resolution of the issue or issues raised within sixty days of the date it provided notice to CJD, DOJ may institute a civil action in federal district court to enforce the terms of this MOA or take other action as allowed by law.

3.    Failure by DOJ to enforce this entire MOA or any provision thereof with regard to any deadline or any other provision herein shall not be construed as a waiver of DOJ's right to enforce the deadlines and provisions of this MOA.

4.    This MOA is a public document.  CJD and DOJ shall make it available to any person upon request.

5.    This MOA constitutes the entire agreement between the parties on the matters raised herein, and no other statement or promise, either written or oral, made by either party or agents of either party regarding the matters raised herein that is not contained or referred to in this MOA shall be enforceable.  This MOA does not purport to remedy any other potential violations of Title VI and/or the Safe Streets Act or any other federal law.  This MOA does not affect CJD's continuing responsibility to comply with Title VI, the Safe Streets Act, or any other federal law.  Nor does it preclude DOJ from carrying out its duties under Title VI and the Safe Streets Act should a new complaint be filed with DOJ.

F.  EFFECTIVE DATE AND TERMINATION

1.  The effective date of this MOA is the date of the last signature below.

2.  Except as otherwise set forth, all deadlines for action are counted from the effective date.

3.  This MOA will remain in effect for three years following CJD's publication of the latter of the Directive and LAP approved in accordance with Paragraphs C.2 and C.4 above; provided, however, that CJD is in substantial compliance with the terms of this MOA at that time and has been in substantial compliance continuously during the preceding year.


For the Colorado Judicial Department:

*michael L Bender*
MICHAEL L. BENDER
Chief Justice
Colorado Supreme Court


*Gerald Marroney*
GERALD MARRONEY
State Court Administrator
Colorado Supreme Court

101 West Colfax Avenue, Suite 800
Denver, CO 80202

Dated: ___6/28/11___


For the United States:

THOMAS E. PEREZ
Assistant Attorney General

By: *Deeana Jang*
DEEANA JANG, Chief
CHRISTINE STONEMAN, Special Legal Counsel
PAUL M. UYEHARA, Attorney
ANNA MEDINA, Attorney

U.S. Department of Justice
Federal Coordination and Compliance Section
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dated: ___6/28/11___



U.S. Department of Justice

Civil Rights Division

*Federal Coordination and Compliance Section*
*950 Pennsylvania Ave, NW-NWB*
*Washington, DC  20530*

CERTIFIED, RETURN-RECEIPT REQUESTED

Mr. Rodney A. Maile
Administrative Director of the Courts
The Judiciary, State of Hawai'i
417 South King Street, Room 206A
Honolulu, HI  96813

      Re:  Complaint Number 171-21-5
          Language assistance services in Hawai'i state courts

Dear Mr. Maile:

      This letter completes our formal engagement with the Hawai'i state courts in which we addressed complaints regarding the provision of language assistance services in state court proceedings and operations.  From the beginning, your office has been extremely cooperative and responsive to our inquiries and in the fall of 2013, we agreed to move forward jointly to implement a number of action steps to resolve this matter.  We appreciate your leadership and that of Chief Justice Recktenwald.  In addition, my staff consistently remarks upon the excellent interactions they have had with Debi Tulang-DeSilva and Melody Kubo during this technical assistance and reporting period.

      Thank you for your final progress report, dated December 31, 2014, in which you described improvements to state court policies, procedures, and practices that enhance access to the courts for limited English proficient (LEP) individuals.  Below we summarize our collaboration and the work we accomplished together.

## Background

      From September 2012 through September 2013 staff from the Federal Coordination and Compliance Section (FCS) of the Civil Rights Division of the Department of Justice (DOJ) worked with staff from the Hawai'i State Judiciary Office on Equality and Access to the Courts (OEAC) to begin addressing complaints that FCS received regarding the provision of language assistance services in Hawai'i state court proceedings and operations.

      In September 2013, FCS sent a letter to your office summarizing our joint efforts and proposing a framework for continued collaboration to achieve our common goal: providing meaningful access to LEP individuals in Hawai'i state court proceedings and operations.  In October 2013, we reached a technical assistance agreement that required the Judiciary, through

the OEAC, to: (1) draft and issue a clear court policy regarding the provision of high quality, timely language assistance services free of charge to LEP individuals in all court proceedings and operations; (2) develop and implement consistent and widely publicized procedures describing how to access court language assistance services; (3) improve the Judiciary's complaint system for language assistance concerns; (4) revise the court's interpreter assignment system to ensure that first tier interpreters are called first with lesser qualified interpreters only called when first tier interpreters are not available; and (5) implement oversight measures to ensure that the court interpreter program is implemented in a way that complies with the requirements of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d to 2000d-7 and its implementing regulations, 28 C.F.R. Part 42, Subpart C.

Under the technical assistance agreement, the Judiciary agreed to submit documents for our review and comment and provide two progress reports. The Judiciary also agreed to participate in periodic technical assistance telephone conferences.

<u>Accomplishments</u>

During the technical assistance agreement period, the Judiciary accomplished the following:

1. Court Policy

In accordance with our agreement, the Judiciary improved its policy statement to make clear that court interpreters would be provided free of charge to LEP individuals in all case types during any contact with the Judiciary.

In March 2013, OEAC staff sent us a draft *Proposed Judiciary Policy Statement on Language Access Services*. The Judiciary subsequently adopted and published *Judiciary Policy 2013-1* stating that:

> "The Hawai'i State Judiciary is committed to providing meaningful access to court processes and services to persons with limited English proficiency. The Judiciary shall reasonably provide competent, timely, and free language assistance for Judiciary-related business. The Judiciary shall reasonably notify the public of the Judiciary's language assistance commitment."

While we recognized the progress represented by this policy statement, we asked the Judiciary to provide greater clarity so that courts and court staff would not inadvertently run afoul of federal law by refusing to provide competent and timely language assistance services free of charge in all case types, to all persons involved in a case, and in court operations outside of the courtroom. We provided examples of clearer policies from other states.

In May 2014, the Judiciary issued Hawai'i Policy Statement #12, which states:

> The Hawai'i State Judiciary is committed to providing meaningful access to court processes and services to persons with limited English proficiency. In all case

3

types, the Judiciary shall reasonably provide, free of charge and in a timely manner, competent court interpreters for parties, witnesses and individuals with a substantial interest in a case. It shall also provide language assistance services at points of contact with the Judiciary, including over-the-counter and over-the-telephone encounters for all Judiciary-related business. The Judiciary shall notify the public of the Judiciary's language assistance commitment.

Hawai'i Judiciary Policy #12 is prominently displayed on the Judiciary's new "Language Access" tab on the Judiciary's homepage.[1] As described below, the Judiciary then undertook additional outreach to ensure awareness of, and compliance with, the policy.

## 2. Accessing Court Language Assistance Services

The Judiciary agreed to implement an awareness campaign to increase the public's knowledge about how to access a court's language services program. When FCS initially spoke with your office in the fall of 2012, we discussed the need for the Judiciary to have multilingual information on its website and in hardcopy. In the spring of 2013, your office provided updates on the Judiciary's Language ID cards that an LEP person can print and show to Judiciary staff when he/she comes to court. The card asks the LEP person to write his/her name and language. The card also asks Judiciary staff to find someone who speaks the indicated language written on the card so the LEP person can communicate with the court. According to your staff, a review of data on the number of "hits" the ID cards receive on the Judiciary's website indicates a significant number of people have accessed this resource.

We then provided feedback on the language of the Judiciary's proposed multilingual court interpreter notification brochures entitled "How to Request an Interpreter" and "Tips on Going to Court" as well as on how the Judiciary should share these new resources with LEP populations and their representatives. The Judiciary made the brochures available on its website last spring. Judiciary trainers use information contained in the brochures in trainings for Judiciary staff, the Hawai'i State Bar Association, and the Legal Aid Society of Hawai'i, and the Judiciary collects and reports on the number of "hits" the brochure receives in order to assess its effectiveness.

In April 2014, the Judiciary launched enhancements to its website to make it easier for the LEP community and the general public to access important information about the Judiciary's language assistance services. Specifically, the Judiciary added a new Language Access tab located at the top of the Judiciary's main webpage that includes a drop down menu with links to the following information about the Judiciary's program in one location:

- Language Assistance Policy,
- Language Access Services,
- List of Interpreters
- Request a Court Interpreter,
- Sign Language Interpreters,

---

[1] http://www.courts.state.hi.us/services/language_assistance_services.html

4

- Use a Court Interpreter,
- Become a Court Interpreter, and
- Contact Information.

This information can also be found by clicking on "Services" then "Language Assistance" at the top of the Judiciary's main webpage. By clicking on either the Language Access tab or the Language Assistance link, an LEP person will be taken to the Language Assistance Services main webpage.

Importantly, the Judiciary has added links on its main webpage to a list of fourteen languages the Judiciary has identified as being most frequently encountered by court staff. In May 2014, the Judiciary launched fourteen language-specific webpages in: Cantonese, Chuukese, Ilokano, Japanese, Korean, Kosraean, Mandarin, Marshallese, Pohnpeian, Samoan, Spanish, Tagalog, Tongan and Vietnamese. By clicking on a language, an LEP user is taken to a language-specific webpage. These webpages compile all information that the Judiciary has translated in a particular language in one location. For instance, the Chuukese language webpage contains the statement, "You have the right to an interpreter at no cost to you" at the top of the webpage, a link to the Language ID card and instructions on what to do with the card, and links to the Judiciary's brochures (e.g., How to Request an Interpreter at the Hearing, How to Use a Court Interpreter, Tips on Going to Court, and Self-Help Centers). The Judiciary routinely monitors the number of "hits" of its language access services online resources to better understand the language needs of LEP court users, and to provide better services.

In July 2014, the Judiciary also made hard copies of its language access related brochures available through Self Help Centers, Access to Justice Rooms serving self-represented litigants, and several community partners (e.g., Inter-Agency Council on Refugee Immigrants, Hawai'i Immigrant Justice Center, and Legal Aid Society of Hawai'i). To further provide consistent and widely publicized information on how to request and work with an interpreter, the Judiciary regularly meets with the Hawai'i Access to Justice Commission, the Commission's Committee on Overcoming Barriers to Access to Justice, Hawai'i State Office of the Attorney General, Hawai'i State Office of Language Access, William S. Richardson School of Law, University of Hawai'i at Manoa, Hawai'i State Bar Association, and the Hawai'i Language Roadmap Initiative.

Throughout the review period, FCS welcomed the opportunity to discuss with your staff options for making the language program more visible and better understood. FCS also encouraged the Judiciary to include the expansion and updating of translations as a general budget item when the grants for translation of vital documents and development of Language ID cards and program brochures run out.

3. Language Assistance Complaint System

The Judiciary has made it easier for court users to raise concerns about the provision of

language services. For instance, last spring, the Judiciary improved its feedback link on the homepage of its website to directly link to a form that provides an option for submitting language access complaints. The website also includes contact information for OEAC on its Language Access main webpage and on the language-specific webpages. The Judiciary has also agreed to provide its own Judiciary-specific complaint form in the most commonly requested non-English languages online and in hard copy.

5

### 4. Court Interpreter Assignment System

In order to make the Judiciary's system of assigning interpreters more transparent and to ensure that LEP court users obtain language assistance from the highest qualified interpreters reasonably available, the Judiciary refined its court interpreter assignment policy and made a concerted effort to educate the public and train local court coordinators. During the technical assistance period, the Judiciary educated the public about the assignment process and conducted statewide mandatory language access trainings for judicial staff on the Judiciary's assignment process. In addition, the Judiciary has provided staff with step-by-step procedures and an easy- reference card. The Judiciary has committed to providing additional materials and training for judges in 2015.

Using a DOJ grant, OEAC provided Interpreter Skills Building workshops focused on developing skills and building competency of state court interpreters. Your staff has identified a continuing goal of elevating the competency level of all interpreters working in Hawai'i State courts and training judges on the court interpreter assignment system. We appreciate your awareness of these issues and your commitment to continue working to improve in this area; we are available to provide additional technical assistance as needed.

### 5. Title VI Accountability System

Lastly, as we agreed, the Judiciary added compliance and oversight duties to those of the Program Director of OEAC. The duties of the Language Access Coordinator include overseeing implementation and evaluation of the Language Access Plan (LAP); revising the LAP periodically; responding to inquiries, comments, and complaints about the LAP and the provision of language services; and training Judiciary staff on the LAP.

### Conclusion

In light of the improvements the state has made, we are prepared to formally close the Civil Rights Division's review of the above-referenced matter upon receipt of your acknowledgement, memorialized below, of your continuing commitment to compliance with Title VI, including the requirement to provide interpretation in court proceedings, free of charge to LEP individuals, and to ensure meaningful access to court operations. Please note that this letter addresses only the matters discussed in this correspondence and should not be construed to cover any other issue regarding the Hawai'i State Judiciary's compliance with Title VI, the Safe Streets Act, or any other law enforced by DOJ. Nor does the closing of our review affect any rights that complainants may have to file a private lawsuit in a court of law. Nothing in this letter prevents DOJ from initiating an investigation or compliance review in the future, if such action is warranted.

In closing, as expressed in your staff's email correspondence dated February 2, 2015 we are happy to continue to work with the Hawai'i State Judiciary in an informal manner to discuss future implementation issues in Hawai'i state courts.

.6

If you have any questions regarding this letter, please contact Ms. Kevonne Small, the Civil Rights Division attorney assigned to this matter at (202) 616-9692 or Kevonne.small@usdoj.gov, or Principal Deputy Chief Christine Stoneman, at (202) 616-6744 or Christine.Stoneman@usdoj.gov.

Sincerely,

*Deeana Jang*                                                          3/24/15
_____                              _____
                                                                              Date
Deeana Jang
Chief
Federal Coordination and Compliance Section
Civil Rights Division


As the Civil Rights Division, United States Department of Justice, closes its review of the Hawaiʻi state courts' provision of language assistance services in state court proceedings and operations, Complaint Number 171-21-5, the Hawaiʻi Judiciary agrees to continue its commitment to compliance with Title VI and implementing regulations, including the requirement to provide interpretation in court proceedings, free of charge to LEP individuals, and to ensure meaningful access to court operations.

*Rodney A. Maile*                                                   MAR 17 2015
_____                              _____
Rodney A. Maile                                                      Date
Administrative Director of the Courts
The Judiciary, State of Hawaiʻi


cc:    Ms. Florence T. Nakakuni
       United States Attorney
       District of Hawaiʻi

MEMORANDUM OF UNDERSTANDING

BETWEEN

THE UNITED STATES OF AMERICA

AND

THE STATE OF MAINE JUDICIAL BRANCH

DEPARTMENT OF JUSTICE NUMBER 171-34-8

A.   SUBJECT MATTER OF THE AGREEMENT

Entities receiving federal financial assistance from the Department of Justice must take reasonable steps to provide meaningful access to limited English proficient (LEP) individuals under Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000d, et seq., (Title VI); the Omnibus Crime Control and Safe Streets Act, as amended, 42 U.S.C. §3789(c) (Safe Streets Act); and their respective implementing regulations, 28 C.F.R. §42.101, et seq., and §42.201, et seq.  The United States Department of Justice (Department) Civil Rights Division has conducted an administrative review of the State of Maine Judicial Branch (Judicial Branch) in response to a complaint filed in March 2003 alleging that the Maine courts failed to provide interpreters and other language access services to LEP individuals.  As part of its review, Departmental personnel conducted an on-site visit to Maine from August 7 - 11, 2006.  During the on-site, Departmental personnel visited Maine courts, observed various judicial proceedings, and met with members of the Judicial Branch and various community organizations representing LEP individuals.

The Judicial Branch has voluntarily undertaken a number of steps designed to ensure meaningful access to the Courts.  The Chief Justice of the Maine Supreme Judicial Court ("SJC") established the Limited English Proficiency Task Force ("LEPTF") in May of 2005.  In February of 2007, the Task Force made recommendations to the SJC with regard to development of a Limited English Proficiency Program and for the promulgation of rules, orders, statutes or policies relating to LEP.  Effective October 11, 2006, the SJC promulgated Administrative Order JB-06-3, Guidelines for Determination of Eligibility for Court-Appointed Interpretation and Translation Services.  Administrative Order JB-06-03 is available on the Judicial Branch's website on the internet.

This Administrative Order extends qualified interpretation, at the State's expense, to all LEP individuals who are parties or witnesses in any type of court case, parents of minors involved in juvenile actions, or court customers seeking information or other

assistance from court clerks. The SJC has also issued a Policy Concerning Standards of Professional Conduct for Interpreters Providing Services in Judicial Proceedings, effective January 1, 2005. This policy is modeled on the National Center for State Courts ("NCSC") LEP Consortium model code of conduct for interpreters.

The SJC has also conducted the following training for interpreters: Advanced Training in Court Interpreting, November 3 and 10, 2004, and Introductory Workshop in Court Interpreting, April 26 and 27, 2005. In addition the SJC has assigned the Director of Court Services and Programs to administer LEP access within the Judicial Branch and to chair the LEPTF. The Judicial Branch has also translated a variety of forms into French, Spanish, Khmer, Vietnamese, Somali and Arabic, has made video arraignment tapes in French and Spanish, has posted language line charts at all clerk's office counters and has implemented a pilot project LCD screen in the lobby of the Lewiston District Court which explains how LEP individuals can access language services and includes the following message in English, French, Somali and Spanish: "Do you need an interpreter? If you do then please tell the clerk's office that you require assistance and they will help you." Clerk staffs throughout the Judicial Branch have been trained on the requirement to provide LEP assistance when requested or when they identify a need for such assistance.

The subject of this Agreement covers implementing measures designed to enforce the Judicial Branch's Administrative Order JB-06-3, including, but not limited to, publication of procedures and instructions for all court personnel on providing access to LEP individuals; maintenance of professional and assessment standards for interpreters and translators; publication and dissemination of translated versions of vital court documents; forging contractual agreements with telephonic and other interpretation and translation services to provide LEP individuals meaningful access to courtroom proceedings, clerk counters, and other Judicial Branch resources; identification of in-house bilingual employees who can assist in informal communications with LEP individuals; and development of periodic training for all court staff on LEP policies and procedures.

The parties to this Agreement are the United States of America and the Judicial Branch. In order to avoid the burdens and expenses of further investigation and possible litigation, the parties hereby agree as follows:

B.    **JURISDICTION**

The Department has determined that the Judicial Branch receives federal financial assistance from the Department of Justice. Therefore, the nondiscrimination provisions of Title VI and the Safe Streets Act apply. Together, these statutes and their implementing regulations, codified at 28 C.F.R. §42.101, et seq., and §42.201, et seq.,

2

prohibit discrimination on the basis of race, color, national origin, sex, and religion and provide jurisdiction for the Department to investigate the complainant's allegations.

The Department is authorized under 28 C.F.R. Part 42, Subpart C and Subpart D, to investigate the complaint in this matter to determine the Judicial Branch's compliance with Title VI and the Safe Streets Act, to issue findings, and, where appropriate, to negotiate and secure voluntary compliance. Furthermore, the Department is authorized under 28 C.F.R. §42.108 and 28 C.F.R. §42.210, to suspend or terminate financial assistance to the Judicial Branch provided by the Department should the Department fail to secure voluntary compliance pursuant to Subpart C or Subpart D, or to bring a civil suit to enforce the rights of the United States under applicable federal, state, or local law.

## C.     REMEDIAL ACTION

1.     The Judicial Branch acknowledges its obligation to comply with Title VI, the Safe Streets Act, and implementing regulations, and will provide meaningful access to all LEP parties and witnesses in all cases before the Maine courts, regardless of an LEP individual's national origin or limited ability to speak, read, write, or understand English.

2.     The Judicial Branch acknowledges its obligation to take reasonable steps to ensure effective communication with and meaningful access for LEP persons in the language(s) in which they are proficient, by providing competent language services at the state's expense, in order to comply with Administrative Order JB-06-03, in the manner contemplated by the Department of Justice Final Guidance to Federal Financial Assistance Recipients, 67 Fed. Reg. 41455-41472 (June 18, 2002) ("DOJ Guidance").

3.     In conjunction with the Department's review, the Judicial Branch has developed and implemented an Administrative Order extending qualified interpretation, at the State's expense, to all LEP individuals who are parties or witnesses in any type of court case, parents of minors involved in juvenile actions, or court customers seeking information or other assistance from court clerks.[1]  The Judicial Branch agrees to comply with the terms of Administrative Order JB-06-03.  The Department

---

[1]

It should be noted that, unlike the definition of limited English proficiency contained in the Department of Justice Final Guidance to Federal Financial Assistance Recipients, 67 Fed. Reg. 41455-41472 (June 18, 2002), which defines persons with LEP as "those individuals who have a limited ability to read, write, speak or understand English," based on principles of national origin discrimination, the Maine Judiciary definition of persons with LEP also includes individuals who are deaf or hard of hearing. Accordingly, the Department does not consider the Administrative Order provisions relating to deaf or hard of hearing individuals as part of this Memorandum of Agreement.

3

acknowledges that the Judicial Branch has posted Administrative Order JB-06-03 on the Judicial Branch's internet home page and has distributed Administrative Order JB-06-03 to all Judicial Branch employees.

4.    Within 180 days of the effective date of this Agreement, the Judicial Branch will draft, finalize, and distribute instructions and procedures to all court personnel on implementation of the Administrative Order. Such instructions and procedures will be developed using NCSC models and will provide detailed guidance to judges, clerks, marshals, and others charged with implementation of the Administrative Order. In addition, the instructions and procedures referenced herein will include specific information for judges on how to identify LEP witnesses and parties appearing before them.

5.    The Judicial Branch has developed and implemented professional ethics and language proficiency qualification standards for interpreters, and will require interpreters to comply with these standards. In conjunction with this effort, within 120 days, the Judicial Branch will develop an interpreter application form using the NCSC certification and registration process as a guide.

6.    Within 270 days of the effective date of this Agreement, the Judicial Branch will develop and distribute to all employees a list of interpreters who meet the qualification standards referenced in paragraph 5 above, as well as contact information for professional telephonic interpretation service providers, to include companies and qualified individuals who do telephonic as well as in-person interpreting.

7.    Within 120 days of the effective date of this Agreement, consistent with the provisions of any applicable collective bargaining agreement and any applicable guidance from NCSC, the Judicial Branch will develop an in-house mechanism for identifying qualified bilingual court employees who can assist LEP individuals with informal communications and distribute a list of such individuals and their contact information to all court employees.

8.    Within 180 days of the effective date of this Agreement, the Judicial Branch will develop and distribute to all employees a set of procedures to be utilized in the identification of LEP persons seeking to access court services inside and outside of the courtroom to include the use of language identification cards (or "I speak" cards), which invite LEP persons to identify their language needs to the Judicial Branch staff, and will post notices in commonly encountered languages notifying LEP persons of language assistance to encourage them to self-identify.

9.    The Director of Court Services or other administrator as assigned by the State Court Administrator is responsible for identifying qualified translators. The Judicial Branch has identified an initial set of vital documents and has translated them into

4

languages frequently encountered by the courts, and has distributed those documents to all courts. The Judicial Branch will periodically update the list of vital documents and translate them into frequently encountered languages. Translated versions of those documents that are commonly accessed by the public will be made available to the public both in hard copy at clerks' counters and on the Judicial Branch's intranet and internet sites. The Judicial Branch will ensure that all translated materials are checked for accuracy. The Judicial Branch will also review its pilot LCD screen project and determine whether the project should be expanded to include other languages and other courts.

10.    The Department acknowledges that the Judicial Branch has designated the Director of Court Services and Programs to oversee compliance with the Administrative Order and compliance with this Memorandum of Understanding.

11.    The Department acknowledges that the Judicial Branch has conducted training for judges and court personnel relating to language access policies and procedures. As of November of 2006, all new judges have received LEP training. The Judicial Branch agrees that all new employees will receive LEP training as part of new employee orientation, beginning 90 days from the effective date of this agreement. The Judicial Branch agrees to continue to provide training for court personnel relating to language access policies and procedures to include at least one additional training during the term of this Agreement. For the term of this Agreement, and at the Department's request, the Judicial Branch agrees to include Department of Justice personnel on the training agenda. The Judicial Branch further agrees to provide the Department with at least 60 days notice in advance of trainings. In addition, within 180 days and with input from the Department, the Judicial Branch will devise an intranet training program, concerning its Administrative Order and language access measures, which will be mandatory for all judges and court personnel to complete.

D.    IMPLEMENTATION AND ENFORCEMENT

1.    Except as otherwise specified in this Agreement, 240 days after the effective date of this Agreement, and 30 days prior to the expiration of this agreement, the Judicial Branch will submit detailed written reports to the Department summarizing the actions the Judicial Branch has taken to enter into compliance with this Agreement, and actions consistent with the attached Administrative Order.

2.    Prior to the expiration of this Agreement, the Department may review compliance with this Agreement. At the Department's written request, the Judicial Branch will furnish the Department with any additional information pertinent to the implementation of the attached Administrative Order on language access, or pertinent to

5

assessment of compliance with this agreement. For the term of this agreement, and at the Department's written request, the Judicial Branch will facilitate site visits for Department personnel.

3.    If the Department believes that the Judicial Branch has failed to comply in a timely manner with any requirement of this Agreement, the Department shall inform the Judicial Branch and attempt to reach an informal resolution. The Department and the Judicial Branch shall attempt to resolve the issue or issues in good faith. If the attempt at informal resolution fails, then the Department shall notify the Judicial Branch in writing that the Department believes that the Judicial Branch has failed to comply in a timely manner with the terms of this agreement.

The written notice shall include a statement of the basis for the Department's determination and will allow the Judicial Branch thirty (30) days to either:

a)    Explain in writing the reasons for its actions and describe the remedial actions that have been or will be taken to achieve compliance with this Agreement; or

b)    Provide information that would cause the Department to review or change its determination.

On notice to the Judicial Branch, the Department may shorten the time frame outlined above, if it determines that a delay would result in irreparable injury to the complainant or to other affected parties.

If the Judicial Branch does not respond to the notice or, if upon review of the Judicial Branch's response, the Department finds that the Judicial Branch has not complied with the terms of the Agreement, the Department may, upon notice to the Judicial Branch:

a)    Re-open the investigation;

b)    Issue a Letter of Findings documenting the area of non-compliance and the steps that must be taken to correct the non-compliance;

c)    Initiate the administrative process to suspend or terminate Federal financial assistance which proceedings must include an opportunity for an administrative hearing; or

d)    Refer the matter to the litigation section to seek injunctive relief or pursue other enforcement proceedings to enforce the terms of this Agreement, or it may initiate appropriate steps to enforce Title VI and/or the Safe Streets Act.

4.    Failure by the Department to enforce this entire Agreement or any provision thereof with regard to any deadline or any other provision herein shall not be construed as a waiver of the Department's right to enforce other deadlines and provisions of this Agreement.

5.    This Agreement is a public document.  Upon request, a copy of this document or any information contained in it may be made available to any person by the Judicial Branch or the Department.

6.    This Agreement, including the attached Administrative Order, constitutes the entire Agreement between the parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by either party or agents of either party, that is not contained in this written Agreement, shall be enforceable. This Agreement does not purport to remedy any other potential violations of Title VI and/or the Safe Streets Act or any other federal law.  This Agreement does not affect the Judicial Branch's continuing responsibility to comply with Title VI, the Safe Streets Act, or any other federal law.

7.    In its Administrative Order, the Maine Judiciary includes in its definition of LEP, persons who are deaf or hard of hearing, which is not the definition in the Department of Justice LEP Guidance.  This Agreement does not purport to remedy any potential violations under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12134, and its implementing regulations, 28 C.F.R. Part 35, as amended, which prohibit discrimination against qualified individuals with disabilities in services, programs, and activities of state and local governments, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended, which prohibits discrimination against qualified individuals with disabilities by recipients of federal financial assistance.

8.    Nothing in this Agreement shall be construed as an acknowledgment, admission, or evidence of liability on the part of the Judicial Branch or the State of Maine under Title VI, the Safe Streets Act, or the Constitution, or an acknowledgment, an admission, or evidence of liability of any Judicial Branch or State of Maine official under Federal or State law.  The Department has not issued any finding of non-compliance against the Judicial Branch.

9.    The effective date of this Agreement is the date of the last signature below.

10.    This Agreement will remain in effect for two years after the date of the final signature below.

7

11.     The person signing for the Judicial Branch represents that he or she is authorized to bind the Judicial Branch to this Agreement.

12.     This Agreement can only be enforced by the parties specified in this Agreement, their legal representatives and assigns.  This Agreement shall be unenforceable by third parties and shall not be construed to create third party beneficiary rights.  This Agreement shall not be used against the Judicial Branch in any proceeding other than a proceeding between the Department and the Judicial Branch.

For the Judicial Branch:

James T. Glessner
State Court Administrator
Maine Judicial Branch

_James T. Glessner_     9/23/08

For the United States:

Grace Chung Becker
Acting Assistant Attorney General

By: _Merrily A. Friedlander_
MERRILY A. FRIEDLANDER, Chief
PATRICK CHANG, Deputy Chief
ELIZABETH KEENAN, Deputy Chief
CHRISTINE STONEMAN, Special Legal
Counsel
BHARATHI VENKATRAMAN, Attorney
LINDA N. QUASH, Attorney
NANCY MCCLOSKEY, Investigator
U.S. Department of Justice
Coordination and Review Section
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

Date:_____9/29/08_____

8

VOLUNTARY RESOLUTION AGREEMENT
BETWEEN

THE UNITED STATES OF AMERICA
AND
THE RHODE ISLAND JUDICIARY

DEPARTMENT OF JUSTICE NUMBER 171-66-2

A.    BACKGROUND

1.    The United States Department of Justice (DOJ) initiated an investigation on August 15, 2005, under Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d *et seq.*, (Title VI) and the Omnibus Crime Control and Safe Streets Act, as amended, 42 U.S.C. § 3789d(c) (Safe Streets Act) and their implementing regulations, codified at 28 C.F.R. §42.101, *et seq.*, and §42.201, *et seq.*, which together prohibit discrimination on the basis of race, color, national origin, sex, and religion in DOJ-funded programs or activities.  DOJ acted in response to an administrative complaint filed in 2004 against the Rhode Island Judiciary (RIJ) by the Rhode Island affiliate of the American Civil Liberties Union.  The complaint alleged that RIJ failed to provide interpreters and other language assistance services to limited English proficient (LEP) individuals.

2.    RIJ is a unified judicial system comprised of the Supreme Court, Superior Court, Family Court, District Court, Workers' Compensation Court, and Traffic Tribunal, together with the Administrative Office of State Courts.  The Chief Justice of the Supreme Court is the executive head of RIJ.

3.    As part of its investigation, DOJ reviewed the policies and practices utilized by RIJ in providing language assistance services to LEP parties and witnesses in court proceedings and operations, observed proceedings and operations in several courthouses, interviewed witnesses, and gathered information from lawyers and advocates.  RIJ cooperated in the investigation.  During the investigation RIJ has been willing to discuss and implement significant improvements to its court interpreter program.

4.    RIJ and DOJ worked to resolve the complaint by informal means intended by DOJ to secure voluntary compliance.  RIJ has been working towards implementing enhancements recommended by DOJ to attain voluntary compliance.  DOJ has provided to RIJ technical assistance as needed throughout the process.

5.    Following extensive negotiations between representatives of RIJ and DOJ, the Chief Justice issued Executive Order No. 2012-05 on Language Services in the Courts (EO) on June 13, 2012 (incorporated into this Agreement as Attachment A).  The Executive Order required RIJ to provide appropriate, comprehensive, and free language assistance to limited English proficient persons in all court proceedings and operations effective July 1, 2012, and set forth a series of actions to enhance the courts' ability to provide and manage language services.

Page 2 of 5

DOJ determined that the EO set forth sufficient core policy and performance requirements to comply with Title VI and the Safe Streets Act when implemented.

6.    In September 2012, the Chief Justice appointed a Language Access Committee (LAC), consisting of RIJ staff and external members, to assist with the implementation of the Executive Order and provide feedback on the Language Access Plan (LAP). Since November 2012, DOJ has actively participated in most meetings of the LAC.

7.    DOJ and RIJ have had extensive discussions regarding the form and content of the Language Access Plan, which sets forth the management actions needed to implement the Executive Order. RIJ released the draft LAP for public comment and discussed it with LAC. The LAP was further modified, and will be effective on April 1, 2014 with the approval of DOJ. (Attachment B).

8.    RIJ has taken a number of other steps to implement the Executive Order, including, for example: conducted trainings for judges, staff, and interpreters; created a language access complaint process and form; posted interpreter signs in all court houses; released a six month monitoring report in January 2013; created an authorized interpreter roster; devised a notice of right to an interpreter; developed a language access bench card; translated additional court forms; inspected the audio recording system in another state; joined the Council of Language Access Coordinators; contracted with a vendor for a new case management system with language related modifications; distributed and incorporated the results of a language access survey to community groups, stakeholders and court users; promulgated certification and continuing education standards for authorized interpreters in court operations and proceedings; and sent staff to regional and national conferences on court language access.

9.    The purpose of this Voluntary Resolution Agreement (Agreement) is to resolve and close the DOJ investigation of the RIJ by: (a) memorializing RIJ's progress in devising and implementing the policies, plans, and procedures needed to ensure compliance with the non-discrimination provisions of Title VI and the Safe Streets Act as they relate to persons with limited English proficiency; (b) affirming RIJ's commitment to continue to enhance its delivery of language services; and (c) documenting further steps to be taken.

B.    GENERAL TERMS

1.    RIJ agrees to ensure compliance with Title VI, the Safe Streets Act, and their implementing regulations by ensuring that appropriate language services are provided at no cost to LEP parties and witnesses in all proceedings and court operations as set forth in Executive Order No. 2012-05 on Language Services in the Courts.

2.    RIJ will take such further actions as are reasonably necessary to implement the Executive Order in consultation with DOJ.

3.    RIJ will take such actions as are necessary to implement the LAP.

4.      RIJ will continue to convene the LAC periodically to evaluate the implementation of the Executive Order and the LAP, consider the need for conforming changes to court rules, suggest ongoing improvements to language access, assist in outreach and training efforts, and assist in other activities to improve language access in the courts.  RIJ will provide advance notice to DOJ of all meetings, allow DOJ representatives to participate in meetings in person or remotely, and provide copies of all documents distributed to the LAC.

5.      RIJ will notify DOJ of policies, forms, and procedures appropriate to implement the EO and LAP as they are amended or implemented and discuss them upon request of DOJ. RIJ maintains the sole discretion to amend the Executive Order and the LAP, or draft court rules relevant to either, but will seek prior agreement with DOJ.

6.      RIJ will provide to DOJ copies of all language services complaints it receives together with a report on the disposition of each complaint, in addition to periodically reporting complaint data as required by EO part H.d.ii.

7.      The parties will periodically discuss the extent to which RIJ has succeeded in complying with the requirements of this part B, the efficacy of the Executive Order, LAP, and language access policies and procedures, and whether any modifications are needed.  The State Court Administrator and DOJ will discuss implementation of the Agreement, LAP, and EO at least every two months in 2013 and at least quarterly thereafter for the period of the Agreement. RIJ leadership and counsel will make reasonable efforts to be available for discussions with DOJ and vice versa, as needed.  RIJ will make RIJ staff reasonably available for discussions regarding the provision of language assistance services.

9.      DOJ will monitor RIJ's performance of the provisions of this agreement, including the requirements of the EO and the LAP.  RIJ will continue to cooperate with DOJ and provide DOJ with access to its staff and facilities, and to provide specific data, records, or documents upon request.

C.    REMEDIES

1.      Good Faith Resolution of Disputes.  DOJ may review compliance with this Agreement at any time.  If DOJ believes that RIJ has failed to comply in a timely manner with any requirement of this Agreement without obtaining advance written approval from DOJ for a modification of the relevant terms, DOJ will so notify RIJ in writing and will attempt to resolve the issue or issues in good faith.  Nothing in this agreement shall prevent DOJ from pursuing any action as allowed by law.

2.      Mutual Communication.  The parties agree to continue to communicate and cooperate, to ensure full and continued compliance with this Agreement.  To this end, the parties agree to promptly respond, and give substantial consideration to the concerns and recommendations made by each party as to any matters within the scope of this Agreement.

Page 4 of 5

3.     Opportunity to Resolve.  Should DOJ determine that RIJ's acts or omissions, individually or cumulatively, may constitute a violation of Title VI or the Safe Streets Act, DOJ will provide written notice to RIJ of the potential violations, and give RIJ a reasonable time to respond.  Should the parties not reach a satisfactory resolution of the issue or issues raised within 60 days of the date DOJ provided notice to RIJ, DOJ may elect to open an - investigation of RIJ or take any other action as allowed by law.

## D.    ADDITIONAL TERMS

1.     Failure by DOJ to enforce this entire Agreement or any provision thereof with regard to any deadline or any other provision herein shall not be construed as a waiver of DOJ's right to enforce the deadlines and provisions of this Agreement.

2.     This Agreement is a public document.  RIJ and DOJ shall make it available to any person upon request.

3.     This Agreement constitutes the entire agreement between the parties on the matters raised herein, and no other statement or promise, either written or oral, made by either party or agents of either party regarding the matters raised herein that is not contained or referred to in this Agreement shall be enforceable.  The Agreement may be amended only in writing. This Agreement does not purport to remedy any other potential violations of Title VI and/or the Safe Streets Act or any other federal law.  This Agreement does not affect RIJ's continuing responsibility to comply with Title VI, the Safe Streets Act, or any other federal law, nor does it preclude DOJ from carrying out its duties under Title VI and the Safe Streets Act should a new complaint be filed with DOJ.

4.     The Agreement does not constitute an admission with regard to any specific allegations investigated in this matter, nor does it constitute a waiver of any rights the RIJ has or could have asserted.

5.     This Agreement shall be applicable to, and binding upon, the parties, their officers, agents, employees, assigns, and their successors in office.

## E.    EFFECTIVE DATE AND TERMINATION

1.     The effective date of this Agreement is the date of the last signature below.

2.     This Agreement will remain in effect for two years following RIJ's publication of the LAP; provided, however, that RIJ is in substantial compliance with the terms of this Agreement at that time and has been in substantial compliance continuously during the preceding year.

Page 5 of 5

For the Rhode Island Judiciary:

PAUL A. SUTTELL
Chief Justice
Rhode Island Supreme Court

J. JOSEPH BAXTER, JR.
State Court Administrator
Rhode Island Supreme Court

250 Benefit Street
Providence, RI 02903

Dated: 4-9-14

For the United States:

JOCELYN SAMUELS
Acting Assistant Attorney General

By: DEEANA JANG
DEEANA JANG, Chief
CHRISTINE STONEMAN, Special Legal
        Counsel
PAUL M. UYEHARA, Attorney
NDIDI N. MOSES, Assistant U.S. Attorney

U.S. Department of Justice
Federal Coordination and Compliance
        Section
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dated: March 28, 2014



U.S. Department of Justice

Civil Rights Division

*Federal Coordination and Compliance Section*
*950 Pennsylvania Ave, NW-NWB*
*Washington, DC 20530*

April 03, 2013

**CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Honorable Glenn A. Grant, J.A.D.
Acting Administrative Director of the Courts
New Jersey Administrative Office of the Courts
Richard J. Hughes Justice Complex
P.O. Box 037
Trenton, NJ  08625

   Re:  Complaint No. 171-48-38
     <u>Federal Coordination and Compliance Section</u>

Dear Judge Grant:

   As discussed during our most recent telephone conferences, on February 4, 2014 and March 4, 2014, the purpose of this letter is to notify you that upon your signature below and return of this letter to my office — the Department of Justice ("DOJ") Civil Rights Division is closing the above-referenced review.

   To first briefly summarize where we have been:  by letter dated February 4, 2013, the DOJ Civil Rights Division's Federal Coordination and Compliance Section informed your office that DOJ was reviewing allegations of failure to provide appropriate language assistance services by the Monmouth and Mercer Vicinages for possible discrimination on the basis of national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, ("Title VI").  While the Mercer Vicinage complaint was based on one allegation of a failure to provide interpreter services during a civil proceeding, the Monmouth Vicinage complaints alleged problems with the provision of interpreter and translation services in the Monmouth Vicinage.  As we advised in that correspondence, the DOJ is responsible for investigating complaints of violations of Title VI, as well as other federal laws, made against recipients of federal financial assistance from DOJ.  Rather than initiating a formal investigation at that time, we informed you of the allegations and offered to work with you to reach a productive and amicable resolution.

   Over the last year, as memorialized in the various letters exchanged, we have received information from you on behalf of the New Jersey Judiciary that has permitted us to complete our review.  Specifically, we learned that the Superior Court of New Jersey, Appellate Division, resolved the Mercer Vicinage complaint by remanding the underlying case to the trial court to address the failure to provide interpreter services.  With respect to the Monmouth Vicinage, the New Jersey Judiciary provided information regarding the Vicinage's actions, both in training and

2

practice, some of which were already underway, to supplement current New Jersey Judiciary policies with respect to interpreter services and to respond to concerns raised during the review. During our review, we discussed the following specific actions and initiatives in the Monmouth Vicinage:

1.  Signage: the Monmouth Vicinage continually assesses the need for bilingual signage and maintains all bilingual signage in the courthouse, including (1) the directional maps it currently has in the courthouse in English and Spanish, (2) the color copies of maps on the walls near the two LCD displays which are in English and Spanish, (3) the rotating presentations displayed on both of the LCD screens in English and Spanish, (4) English and Spanish signs in the Central Fee Office, (5) the English and Spanish signage informing customers that interpreters are available and encouraging litigants to request to speak with the Trial Court Administrator or the Operations Manager if they are dissatisfied.

2.  Emergency Exit Signage: the Monmouth Vicinage posted temporary emergency signs translated into Spanish near the emergency exit, which will remain in place, until the Vicinage is able to coordinate with the County to obtain permanent signs in accordance with N.J.S.A. 2B:6-1.b.

3.  Assistance to LEP Court Users: the Monmouth Vicinage provides assistance to court users transacting business and makes interpreters available when requested.

4.  Ombudsman Office: the Monmouth Vicinage maintains instructional signs in the Monmouth Vicinage Ombudsman's Office, on or near the touch-screen kiosk, to ensure that customers are aware that they can access information on the kiosk in English and in Spanish the Ombudsman's Office also maintains signs in Spanish informing customers that an interpreter can be called if needed.

5.  Customer Service Training: the Monmouth Vicinage provides training of staff to ensure staff is aware of how to provide the best customer service to LEP litigants.

6.  Tutorials in Spanish: the Monmouth Vicinage has revised its tutorial videos using the CAMTASIA software to ensure that the videos are accessible and in a format that will allow them to be more easily utilized by court users.

7.  Landlord/Tenant and Small Claims Calendar Calls: the Monmouth Vicinage provides instructions in Spanish and interpreters at the landlord/tenant and small claims calendar calls.

8.  Evacuation Procedures Pamphlet: the Monmouth Vicinage continues to provide its Evacuation Procedures Pamphlet for jurors and court users in English and Spanish, and is working with the County to display the procedures on the walls around the courthouse.

9.  Provision of Interpreting Services in Holding Cells: In response to questions regarding whether the Public Defender or the New Jersey Judiciary provides interpreting services when an individual is in a holding cell in New Jersey, the Judiciary advised that it is conducting a statewide review of this issue consistent with its commitment to ensure that all defendants, including LEP individuals, understand their criminal court proceedings

3

and have meaningful access to the courts. Such review and any resulting policy development must take into account the potential ethical and attorney client privilege issues that would be inherent in such provision of interpreter services outside of a public court proceeding with all parties present. Further, the New Jersey Judiciary must ensure that any policy is consistent with the Judiciary's core values and its unique role as an impartial arbiter of disputes. Should an official statewide Judiciary policy result from this review, the New Jersey Judiciary will provide a draft for comment to the DOJ Civil Rights Division's Federal Coordination and Compliance Section.

10. Publication in Community Newspapers: Where appropriate, the Monmouth Vicinage advertises its services, as well as job and volunteer opportunities, in publications utilized and widely read by the Latino community.

11. Translations of Court Forms and Pleadings: the New Jersey Judiciary has translated more than 340 statewide *pro se* forms, kits and brochures in Spanish, and about 60 additional documents are in the process of being translated. The Judiciary will continue its commitment to the translation of commonly used forms to address the needs of LEP court users.

12. Sight Translations and Emergent Matters: as noted above, the Monmouth Vicinage staff continues to instruct customers who experience difficulty in completing court business because of their limited English proficiency that they may speak with the Trial Court Administrator or the Operations Manager regarding their issues. In cases where customers request sight translation of forms, the Monmouth Vicinage continues to provide sight translations in cases where the matter has been deemed an emergency by the Trial Court Administrator or the Operations Manager. The Monmouth Vicinage will continue to inform the public that sight translation will be provided for forms in emergent eviction, child custody, and domestic violence cases, and other emergent matters that are time-sensitive as determined by the Trial Court Administrator or the Operations Manager. To ensure efficiency and the productive utilization of court services by all litigants, the Trial Court Administrator or Operations Manager will continue to provide customers with a prompt determination as to whether a matter is an emergency, and therefore eligible for sight translation of forms.

Please sign the last page below and return this document to my office. Once received, this office will close our investigative file in this matter. Although we do not expect this to occur, should there be a complaint that the New Jersey Judiciary is not continuing any of the above described initiatives, the DOJ has the discretion to reopen this matter and assess the need for additional review and/or a formal investigation.

4

In addition to resolving the particular issues as described above, we are pleased that the New Jersey Judiciary is developing a visitation program to, among other things, address courthouse access for LEP individuals across the state. As my staff has discussed with yours, other state courts have found it useful to invite suggestions from members of the community on their language access efforts. We are available to provide technical assistance to you as you prepare for, implement, and analyze the results of these visits.

This letter does not constitute a finding that New Jersey Judiciary is or will be in full compliance with Title VI or other federal laws, nor does it address other potential claims of discrimination on the basis of national origin that may arise from the activities of the New Jersey Judiciary. Likewise, this letter does not constitute an admission by New Jersey Judiciary with regard to any specific allegation reviewed in this matter, nor a finding that New Jersey Judiciary is not or has not been in full compliance with Title VI or other federal laws.

The purpose of this letter, instead, is to memorialize (a) New Jersey Judiciary's continued commitment to compliance with the non-discrimination provisions of Title VI language access obligations as they relate to access to court proceedings and operations by LEP individuals; and (b) the status of DOJ's review of those complaints and its intent to close its review of those complaints.

Please note that this letter does not affect any rights that the individual complainant(s) may have to file private lawsuits regarding the concerns raised in their complaints to the DOJ. We will retain the file for our records and take the information provided into account if we receive similar future allegations against the New Jersey Judiciary. While our file in this matter will be closed, we maintain the authority to contact the New Jersey Judiciary and ask for periodic updates as necessary, pursuant to Title VI and implementing regulations.

We are obligated to inform you that recipients may not intimidate, threaten, coerce, or engage in other discriminatory conduct against anyone who has either taken action or participated in an action to secure rights protected by the civil rights laws DOJ enforces. The protection against retaliation extends to recipient employees who provide information or otherwise cooperate with DOJ's review. Any individual who alleges such harassment or intimidation may file a complaint with DOJ. We would investigate such a complaint if the situation warrants. This is consistent with the New Jersey Judiciary's policy prohibiting retaliation against any person who complains about discrimination, files a discrimination complaint or who assists in the investigation of such complaints.

This letter, resolving alleged violations of Title VI, is a public document. Under the Freedom of Information Act, it may be necessary to release information and related correspondence and records shared by recipients and complainants upon request. In the event that we receive such a request, we will seek to protect, to the extent provided by law, personal information which, if released, could constitute an unwarranted invasion of privacy.

5

If you have any questions concerning this letter or any of its terms, please contact Special Legal Counsel Christine Stoneman, at (202) 616-6744 or Christine.Stoneman@usdoj.gov.

Sincerely,

*Deeana Jang*

Deeana Jang, Chief
Christine Stoneman, Special Legal Counsel
Ndidi Moses, Detail Attorney
Federal Coordination and Compliance Section
Department of Justice
Civil Rights Division

*Glenn A. Grant*

Honorable Glenn A. Grant, J.A.D.,
Acting Administrative Director of the Courts,
on behalf of the New Jersey Judiciary

Agreed to this 7th day of April, 2014

e xh.b.t  "B"

U. S. Department of Justice

Civil Rights Division

*Assistant Attorney General*                    *Washington, D.C. 20530*

August 16, 2010

Dear Chief Justice/State Court Administrator:

In the past decade, increasing numbers of state court systems have sought to improve their capacity to handle cases and other matters involving parties or witnesses who are limited English proficient (LEP). In some instances the progress has been laudable and reflects increased recognition that language access costs must be treated as essential to sound court management. However, the Department of Justice (DOJ) continues to encounter state court language access policies or practices that are inconsistent with federal civil rights requirements. Through this letter, DOJ intends to provide greater clarity regarding the requirement that courts receiving federal financial assistance provide meaningful access for LEP individuals.

Dispensing justice fairly, efficiently, and accurately is a cornerstone of the judiciary. Policies and practices that deny LEP persons meaningful access to the courts undermine that cornerstone. They may also place state courts in violation of long-standing civil rights requirements. Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d *et seq.* (Title VI), and the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 42 U.S.C. § 3789d(c) (Safe Streets Act), both prohibit national origin discrimination by recipients of federal financial assistance. Title VI and Safe Streets Act regulations further prohibit recipients from administering programs in a manner that has the effect of subjecting individuals to discrimination based on their national origin. *See* 28 C.F.R. §§ 42.104(b)(2), 42.203(e).

The Supreme Court has held that failing to take reasonable steps to ensure meaningful access for LEP persons is a form of national origin discrimination prohibited by Title VI regulations. *See Lau v. Nichols*, 414 U.S. 563 (1974). Executive Order 13166, which was issued in 2000, further emphasized the point by directing federal agencies to publish LEP guidance for their financial assistance recipients, consistent with initial general guidance from DOJ. *See* 65 Fed. Reg. 50,121 (Aug. 16, 2000). In 2002, DOJ issued final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons. 67 Fed. Reg. 41,455 (June 18, 2002) (DOJ Guidance). The DOJ Guidance and subsequent technical assistance letters from the Civil Rights Division explained that court systems receiving federal financial assistance, either directly or indirectly, must provide meaningful access to LEP persons in order to comply with Title VI, the Safe Streets Act, and their implementing regulations. The federal requirement to provide language assistance to LEP individuals applies notwithstanding conflicting state or local laws or court rules.

- 2 -

Despite efforts to bring courts into compliance, some state court system policies and practices significantly and unreasonably impede, hinder, or restrict participation in court proceedings and access to court operations based upon a person's English language ability. Examples of particular concern include the following:

1. <u>Limiting the types of proceedings for which qualified interpreter services are provided by the court.</u>  Some courts only provide competent interpreter assistance in limited categories of cases, such as in criminal, termination of parental rights, or domestic violence proceedings. DOJ, however, views access to *all* court proceedings as critical. The DOJ Guidance refers to the importance of meaningful access to courts and courtrooms, without distinguishing among civil, criminal, or administrative matters. *See* DOJ Guidance, 67 Fed. Reg. at 41,462. It states that "every effort should be taken to ensure competent interpretation for LEP individuals during *all* hearings, trials, and motions," *id.* at 41,471 (emphasis added), including administrative court proceedings. *Id.* at 41,459, n.5.

Courts should also provide language assistance to non-party LEP individuals whose presence or participation in a court matter is necessary or appropriate, including parents and guardians of minor victims of crime or of juveniles and family members involved in delinquency proceedings.  Proceedings handled by officials such as magistrates, masters, commissioners, hearing officers, arbitrators, mediators, and other decision-makers should also include professional interpreter coverage.  DOJ expects that meaningful access will be provided to LEP persons in all court and court-annexed proceedings, whether civil, criminal, or administrative including those presided over by non-judges.

2. <u>Charging interpreter costs to one or more parties.</u>  Many courts that ostensibly provide qualified interpreters for covered court proceedings require or authorize one or more of the persons involved in the case to be charged with the cost of the interpreter. Although the rules or practices vary, and may exempt indigent parties, their common impact is either to subject some individuals to a surcharge based upon a party's or witness' English language proficiency, or to discourage parties from requesting or using a competent interpreter.  Title VI and its regulations prohibit practices that have the effect of charging parties, impairing their participation in proceedings, or limiting presentation of witnesses based upon national origin.  As such, the DOJ Guidance makes clear that court proceedings are among the most important activities conducted by recipients of federal funds, and emphasizes the need to provide interpretation free of cost.  Courts that charge interpreter costs to the parties may be arranging for an interpreter's presence, but they are not "providing" the interpreter.  DOJ expects that, when meaningful access requires interpretation, courts will provide interpreters at no cost to the persons involved.

- 3 -

3. <u>Restricting language services to courtrooms</u>. Some states provide language assistance only for courtroom proceedings, but the meaningful access requirement extends to court functions that are conducted outside the courtroom as well. Examples of such court-managed offices, operations, and programs can include information counters; intake or filing offices; cashiers; records rooms; sheriff's offices; probation and parole offices; alternative dispute resolution programs; *pro se* clinics; criminal diversion programs; anger management classes; detention facilities; and other similar offices, operations, and programs. Access to these points of public contact is essential to the fair administration of justice, especially for unrepresented LEP persons. DOJ expects courts to provide meaningful access for LEP persons to such court operated or managed points of public contact in the judicial process, whether the contact at issue occurs inside or outside the courtroom.

4. <u>Failing to ensure effective communication with court-appointed or supervised personnel</u>. Some recipient court systems have failed to ensure that LEP persons are able to communicate effectively with a variety of individuals involved in a case under a court appointment or order. Criminal defense counsel, child advocates or guardians *ad litem*, court psychologists, probation officers, doctors, trustees, and other such individuals who are employed, paid, or supervised by the courts, and who are required to communicate with LEP parties or other individuals as part of their case-related functions, must possess demonstrated bilingual skills or have support from professional interpreters. In order for a court to provide meaningful access to LEP persons, it must ensure language access in all such operations and encounters with professionals.

DOJ continues to interpret Title VI and the Title VI regulations to prohibit, in most circumstances, the practices described above. Nevertheless, DOJ has observed that some court systems continue to operate in apparent violation of federal law. Most court systems have long accepted their legal duty under the Americans with Disabilities Act (ADA) to provide auxiliary aids and services to persons with disabilities, and would not consciously engage in the practices highlighted in this letter in providing an accommodation to a person with a disability. While ADA and Title VI requirements are not the same, existing ADA plans and policy for sign language interpreting may provide an effective template for managing interpreting and translating needs for some state courts.

Language services expenses should be treated as a basic and essential operating expense, not as an ancillary cost. Court systems have many operating expenses – judges and staff, buildings, utilities, security, filing, data and records systems, insurance, research, and printing costs, to name a few. Court systems in every part of the country serve populations of LEP individuals and most jurisdictions, if not all, have encountered substantial increases in the number of LEP parties and witnesses and the diversity of languages they speak. Budgeting adequate funds to ensure language access is fundamental to the business of the courts.

- 4 -

We recognize that most state and local courts are struggling with unusual budgetary constraints that have slowed the pace of progress in this area. The DOJ Guidance acknowledges that recipients can consider the costs of the services and the resources available to the court as part of the determination of what language assistance is reasonably required in order to provide meaningful LEP access. *See id.* at 41,460. Fiscal pressures, however, do not provide an exemption from civil rights requirements. In considering a system's compliance with language access standards in light of limited resources, DOJ will consider all of the facts and circumstances of a particular court system. Factors to review may include, but are not limited to, the following:

- The extent to which current language access deficiencies reflect the impact of the fiscal crisis as demonstrated by previous success in providing meaningful access;
- The extent to which other essential court operations are being restricted or defunded;
- The extent to which the court system has secured additional revenues from fees, fines, grants, or other sources, and has increased efficiency through collaboration, technology, or other means;
- Whether the court system has adopted an implementation plan to move promptly towards full compliance; and
- The nature and significance of the adverse impact on LEP persons affected by the existing language access deficiencies.

DOJ acknowledges that it takes time to create systems that ensure competent interpretation in all court proceedings and to build a qualified interpreter corps. Yet nearly a decade has passed since the issuance of Executive Order 13166 and publication of initial general guidance clarifying language access requirements for recipients. Reasonable efforts by now should have resulted in significant and continuing improvements for all recipients. With this passage of time, the need to show progress in providing all LEP persons with meaningful access has increased. DOJ expects that courts that have done well will continue to make progress toward full compliance in policy and practice. At the same time, we expect that court recipients that are furthest behind will take significant steps in order to move promptly toward compliance.

The DOJ guidance encourages recipients to develop and maintain a periodically-updated written plan on language assistance for LEP persons as an appropriate and cost-effective means of documenting compliance and providing a framework for the provision of timely and reasonable language assistance. Such written plans can provide additional benefits to recipients' managers in the areas of training, administering, planning, and budgeting. The DOJ Guidance goes on to note that these benefits should lead most recipients to document in a written LEP plan their language assistance services, and how staff and LEP persons can access those services. In court systems, we have found that meaningful access inside the courtroom is most effectively implemented in states that have adopted a court rule, statute, or administrative order providing for universal, free, and qualified court interpreting. In addition, state court systems that have strong leadership and a designated coordinator of language services in the office of the court administrator, and that have identified personnel in charge of ensuring language access in each courthouse, will more likely be able to provide effective and consistent language access for LEP

- 5 -

individuals. Enclosed, for illustrative purposes only, are copies of Administrative Order JB-06-3 of the Supreme Judicial Court of Maine, together with the September 2008 Memorandum of Understanding between that court and DOJ. Also enclosed for your information is a copy of "Chapter 5: Tips and Tools Specific to Courts" from DOJ, *Executive Order 13166 Limited English Proficiency Document: Tips and Tools from the Field* (2004).

The Office of Justice Programs provides Justice Assistance Grant funds to the states to be used for state and local initiatives, technical assistance, training, personnel, equipment, supplies, contractual support, and criminal justice information systems that will improve or enhance criminal justice programs including prosecution and court programs. Funding language services in the courts is a permissible use of these funds.

DOJ has an abiding interest in securing state and local court system compliance with the language access requirements of Title VI and the Safe Streets Act and will continue to review courts for compliance and to investigate complaints. The Civil Rights Division also welcomes requests for technical assistance from state courts and can provide training for court personnel. Should you have any questions, please contact Mark J. Kappelhoff, Acting Chief, Federal Coordination and Compliance Section (formally known as Coordination and Review Section) at (202) 307-2222.

Sincerely,

Thomas E. Perez
Assistant Attorney General

Enclosures