# Marc Fishman
## 3200 Netherland Avenue
## Apartment G
## Bronx, NY 10463
## (914) 837 – 3209
## Facsimile (347) 843 - 6894



Via Hand Delivery

October 11, 2018

Honorable Judge Kenneth M. Karas
United States District Judge
United States District Court
Southern District of New York
United States Courthouse
300 Quarropas Street, Chambers 533
White Plains, NY 10601-4150

Re:  7-18-CV-00282-KMK Civil Rights Case Fishman vs. "State" Office
Of Court Administration New York Courts Request for Injunctive Relief
To Order New York state to use the Auxiliary aide OF CART REAL TIME
Transcription in all of my "State" Court proceedings

Dear Honorable Judge Karas:

I implore the court to reject the discriminatory arguments against providing the CART REAL time
transcription Service and REAL Time closed Captioned services in the "State" courtroom.

I beg the court to order the CART Service be used in the "STATE" Courtroom to comply with 28
CFR 35.160.  Under attorney general regulation 28 CFR 35.160, " A State entity shall take
appropriate steps to ensure that communications with applicants, members of the public with
disabilities are AS EFFECTIVE AS COMMUNICATIONS WITH OTHERS."  Under 28 CFR 35.160
it states, " A state entity shall furnish appropriate auxiliary aids (including real-time computer-
aided transcription services, open and closed captioning, including real time captioning) and
services where necessary to afford individuals with disabilities, including applicants, participants,
and members of the public an equal opportunity to participate in and enjoy the benefits of a
service, program, or activity of a state entity." (see page 10 of enclosure entitled " Procedures for
Implementing Reasonable Accommodation in Programs and Services for Individuals with
Disabilities Dept of State New York State.) attached exhibit one and two

Numerous Studies show that closed captioned helps those with learning disabilities like traumatic
brain injury and post concussion syndrome.  CART Real time transcripts and Closed captioning
aide the disabled like me and assist to provide meaningful communication in the court room.  The
Supreme Court mandated "Meaningful access and Communication" for the disabled in the
decision in Tennessee versus Lane 504 US 509 in 2004.

No where has NEW YORK STATE OFFICE OF COURT ADMINISTRATION shown that providing
CART would be a hardship to them or effect the normal operation of the courtroom under 28 CFR
35.164.  Auxiliary AIDS including CART must be provided  to the hearing impaired with tinnitus
and Occipital Neuralgia FOR PROGRAM ACCESSIBILITY PER ATTORNEY GENERAL
MANADTATE UNDER 28 CFR 35.149-150.  No where in New York State's papers does it
dispute that I have a hearing disability called tinnitus and occipital neuralgia.  My neurostimulator

stimulation cord implant runs within inches of the ear and sometimes effects my hearing. The ringing in my ear from tinnitus affects my hearing and communication.

As the Federal Court is aware I have numerous qualified ADA disabilities including Tinnitus, Traumatic Brain Injury, Occipital Neuralgia, TMJ, Peripheral Neuropathy, Severe Obstructive Sleep apnea, Cubital Tunnel Syndrome and Post Concussion Syndrome. These "qualified disabilities" effect the major bodily functions of but not limited to hearing, learning, sleeping, remembering, eating, breathing, use of arm, organizing and writing.

I therefore kindly request that you sign the injunction relief and Declaratory judgment motion/application submitted to your Federal court. The "State" public entity court will not abide by title two of the ADA and provide the CART REAL Time Transcription services(that they already have in the court room) without Federal court order. The simple truth is that NY State does not want a real time transcript produced for the Qualified ADA Disabled. That is the only reason I am being denied the CART use with the hearing disability of tinnitus and Occipital Neuralgia that I have. Without a Federal Court telling NY State to use the CART in my proceedings, New York State will not turn on the system that Governor Cuomo mandated in the 2015 State law be used in the courtroom for the disabled like me with hearing issues. Tinnitus is a" hard of hearing disability." (See attached exhibit 3)

New York State was provided with certified medical records of both my tinnitus and occipital neuralgia disability. The "State" Magistrate Carol Jordan even signed the subpoena to my EAR, Nose and Throat doctor to obtain certified copies of the Tinnitus and post concussion syndrome diagnosis disability because she did not want or believe medical records that were not certified.

Under title two of the ADA, the State Entity must "give primary consideration to the requests of the individuals with disabilities." Under Title two of the ada II-7.1100, "Primary consideration means that the public entity must honor the choice" of the disabled individual requesting the auxiliary aid. No where in New York State's papers does it dispute this clause in the ADA title two technical manual In addition under Title Two of the ADA, "auxiliary aides must be provided in a timely manner." The "State" offer of alternate auxiliary aides of ordering a digital recorded transcript is not timely. It has taken as long as five months to obtain a transcript in New York of the proceedings because there is no stenographer in family court and the digital recording system transcription process takes way to long to provide meaningful communications. Have never obtained a transcript that did not have multiple inaudible words in it or one that took less than 30 days to obtain. A real time transcript records all words and is provided the same day in real time. Ordering digital recorded transcripts is not the same accommodation or same auxiliary aid as real time transcripts. Digital recorded transcripts do not provide closed/open captioning in the courtroom so it is not the same auxiliary aide. In addition under the ADA, the disabled court participant MAY NOT BE CHARGED FOR THE AUXILLIARY AID see 28 CFR 35.130. New York State has illegally forced me to order transcripts as my auxiliary aide at a cost of over $30,000 to date. Under the USDOJ correspondence (DJ #192-06-00006) the USDOJ specifically states that the state and local courts ARE PROHIBITED FROM CHARGING INDIVIDUALS FOR THE COSTS OF AUXILLIARY AIDS AND SERVICES. On page three of the correspondence from USDOJ to state of Indiana it states, "If a court transcript is used as an auxiliary aid for you to understand the proceeding, then the court may not charge the cost to you." (attached exhibit) four

By denying use of the CART Real Time Transcription service already installed in all New York courts, New York "State" is disallowing required needed reasonable accommodations for my meaningful participation in "State" Family court under 28 CFR 35.160. These denials effect me for me as well as hundreds of other disabled New Yorkers violate the ADA, Section 504 of the Rehabilitation Act of 1973 and ADAAA by denying us the Communication we require in the "State" court.

It is not sufficient for New York State to say in its press releases that it has real time transcription when it never implements the auxiliary aid of CART for all those with hearing and learning impairments. The State must turn on and use the CART System to really have meaningful access for the hearing impaired in "State" Court.

Please sign the injunctive relief order directing the State of New York to implement the CART System for others and me with hearing and cognitive disabilities.

Thank you for your assistance.


Very Truly Yours,

Marc Fishman
Qualified Ada Disabled Litigant, Pro se

C:   USDOJ, Disability Rights Section
     Kathy Davidson, Chief Administrative Court Supervising Judge 9th district.
     Ian Spier, Esq.
     Donna Drumm, Ada Advocate
     V. Casale, Esq.
     Eve Bunting smith, Esq.
     NYS Human Rights Commission
     Nancy Barry, OCA
     Omar Cumberbach, OCA
     V. Clingan, Brain Injury Assoc of NY
     S. Liss, DRNY
     James Garfein, OCA
     Judge Egetto, Chief Administrative Judge Family Court
     Dan Weisz, OCA
     Lisa Evans, OCA, opposing Counsel
     Judge Hal Greenwald, Family Court Judge
     Magistrate Jordan, Family Court Magistrate
     Dean Solomon, Esq.


Enclosures

Exhibit "one"



# Procedures for Implementing Reasonable Accommodation in Programs and Services for Individuals with Disabilities

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 3
    Americans with Disabilities Act ..................................................................................... 3
    New York State Human Rights Law .............................................................................. 3

SECTION I: UNIFORM STATE POLICY ...................................................................... 4
    Policy Statement ................................................................................................................ 4
    Public Access to Information on Reasonable Accommodation ................................ 4

SECTION II:  AMERICANS WITH DISABILITIES ACT PROVISIONS, AND ACCOMPANYING
REGULATIONS .................................................................................................................... 5

SECTION III: DEFINITIONS AND LEGAL STANDARDS FOR REASONABLE
ACCOMMODATION IN STATE PROGRAMS AND SERVICES ............................ 6
    1. State Entities ............................................................................................................ 6
    2. Qualified Individual with a Disability ................................................................ 6
    3. Disability ................................................................................................................... 6
    4. Prohibitions Against Unlawful Discrimination ................................................ 6
    5. Program Accessibility ............................................................................................ 8
    6. Undue Burden ......................................................................................................... 9
    7. Direct Threat ........................................................................................................... 9
    8. Notice ........................................................................................................................ 9
    9. Information & Signage .......................................................................................... 10
    10. Communications .................................................................................................. 10

SECTION IV:  UNIFORM PROCEDURES FOR REASONABLE ACCOMMODATION IN STATE
PROGRAMS AND SERVICES. ........................................................................................ 12
    ADA Coordinator (Designee for Reasonable Accommodation) ......................... 12
    Requests for Accommodation ..................................................................................... 12
    Grievance Procedures .................................................................................................... 12

Appendix A: ........................................................................................................................ 14

Sample NOTICE UNDER THE AMERICANS WITH DISABILITIES ACT ........... 14

Appendix B: ........................................................................................................................ 16

Sample GRIEVANCE PROCEDURE UNDER THE AMERICANS WITH DISABILITIES ACT ...... 16

Appendix C: ........................................................................................................................ 17

Sample AMERICANS WITH DISABILITIES ACT COMPLAINT FORM ............. 17

# INTRODUCTION

New York State has long been committed to the proposition that every individual in the State has an equal opportunity to enjoy a full and productive life. This commitment to equal opportunity extends to providing reasonable accommodation for persons with disabilities in all state-owned or operated programs and services.

## Americans with Disabilities Act

All State agencies and authorities must comply with the provisions of the Americans with Disabilities Act (ADA), Title II.  Title II (42 USCA §§ 12131-12134) applies to State and local government entities. State entities are covered by Title II regardless of whether they receive federal funding.

Access to civic life by people with disabilities is a fundamental goal of the ADA. To ensure that this goal is met, Title II of the ADA requires State and local governments to make their programs and services accessible to persons with disabilities. This requirement extends not only to physical access at government facilities, programs, and events – but also to policy changes that governmental entities must make to ensure that all people with disabilities can take part in, and benefit from, the programs and services of State and local governments. In addition, governmental entities must ensure effective communication – including the provision of necessary auxiliary aids and services (as defined in Section III (10) herein) – so that individuals with disabilities can participate in civic life.

## New York State Human Rights Law

The New York State Human Rights Law (Executive Law, article 15) requires non-discrimination on the basis of disability in public accommodations, including those owned by state and local governmental entities. Therefore, public buildings, parks, libraries, museums, etc., and any attendant services that constitute public accommodations, such as food service, camp grounds, and other accommodations open to the public, must not deny service to an individual because of disability, pursuant to Human Rights Law § 296.2, and must provide accommodation and accessibility as set forth in § 296.2, subsections (c), (d) and (e). Complaints may be filed with the New York State Division of Human Rights for claims falling within the scope of § 296.2.

Governmental programs and services, which do not constitute public accommodations, are **not** subject to the provisions of the Human Rights Law, though they are fully covered by the federal Americans with Disabilities Act, Title II.

# SECTION I: UNIFORM STATE POLICY

**Policy Statement**

Each agency, department, office and facility shall follow the Statewide Reasonable Accommodation Policy and Procedures, as set forth below, and communicate its commitment to provide reasonable accommodation to members of the public with disabilities.

The State of New York is committed to assuring equal opportunity for persons with disabilities. To this end, it is the State's policy to provide reasonable accommodation in all its accommodations, programs and services. This policy is based on the federal Americans with Disabilities Act, Title II, and all applicable federal regulations thereunder.  This duty of reasonable accommodation applies to:

- physical accessibility at government facilities, programs, and events;
- policy changes necessary to ensure that all people with disabilities can take part in, and benefit from, all state-owned or operated programs and services ;
- the provision of necessary auxiliary aids and services to ensure effective communication with persons with disabilities.

**Public Access to Information on Reasonable Accommodation**

The names and office phone numbers of key personnel involved in providing reasonable accommodation, including the agency's Designee for Reasonable Accommodation (DRA) – also known as the ADA Coordinator – shall be posted and the listing maintained by the agency's DRA.

The state entity's "Notice Under the Americans with Disabilities Act" (see sample notice in Appendix A) shall be made readily available, such as by posting it to the state entity's website and posting in public areas of the state entity's offices or facilities.

The state entity's "Grievance Procedures Under the Americans with Disabilities Act" (see sample in Appendix B) shall be made readily available, such as by posting it to the state entity's website and by providing a copy to anyone inquiring or complaining informally about accommodation of disability in the state entity's programs or services.

4

## SECTION II:  AMERICANS WITH DISABILITIES ACT PROVISIONS, AND ACCOMPANYING REGULATIONS

The Americans with Disabilities Act, Title II, contains the following provisions regarding the reasonable accommodation of members of the public with disabilities:

SUBCHAPTER II - PUBLIC SERVICES
Part A - Prohibition Against Discrimination and Other Generally Applicable Provisions
    *Sec. 12131. Definitions*
        As used in this subchapter:
            (1) State entity
            The term "state entity" means
                (A) any State or local government;
                (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and
                (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of title 49).
            (2) Qualified individual with a disability
            The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a state entity.
    *Sec. 12132. Discrimination*
    Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a state entity, or be subjected to discrimination by any such entity.

The accompanying regulations (28 C.F.R. Part 35–Nondiscrimination on the Basis of Disability in State and Local Government Services) provide details as to agency obligations. They are available at <u>www.ada.gov/ada title II.htm</u>. Use this link also to access ***Title II Regulations: 2010 Guidance and Section-by-Section Analysis***, or click on <u>www.ada.gov/ regs2010/titleII 2010/titleII 2010 regulations.htm#a2010guidance</u>.

See also ***ADA Best Practices Tool Kit for State and Local Governments***, at <u>**http://www.ada.gov/pcatoolkit/toolkitmain.htm**</u>.

# SECTION III: DEFINITIONS AND LEGAL STANDARDS FOR REASONABLE ACCOMMODATION IN STATE PROGRAMS AND SERVICES

## 1. State Entities

"State entities" include State government, and any department, agency, special purpose district, or other instrumentality of a State or States government. (28 CFR 35.104)

## 2. Qualified Individual with a Disability

A "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a state entity (28 CFR 35.104).

## 3. Disability

"Disability" is defined as a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment. (28 CFR 35.104)

## 4. Prohibitions Against Unlawful Discrimination (28 CFR 35.130)

A state entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability:

(1) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(2) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(3) provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

(4) otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

More specifically, a state entity:

- may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that has the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

6

- may not, in determining the site or location of a facility, make selections that have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination;

- may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a state entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability;

- shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered;

- shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities;

- may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part;

- shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association;

- may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the state entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities;

- shall permit the use of a service animal, consistent with ADA regulation 28 CFR 35.136, and where applicable, Human Rights Law § 296.14. See 28 CFR 35.136 and related guidance at www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.htm#a2010guidance.

- shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the state entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

### 5.  Program Accessibility (28 CFR 35.149-150)

Except as otherwise provided below, no qualified individual with a disability shall, because a state entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a state entity, or be subjected to discrimination by any state entity.

A state entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This does not:

> (1) Necessarily require a state entity to make each of its existing facilities accessible to and usable by individuals with disabilities;

> (2) Require a state entity to take any action that would threaten or destroy the historic significance of a historic property; or

> (3) Require a state entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.

In those circumstances where personnel of the state entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a state entity has the burden of proving that compliance would result in such alteration or burdens.

The decision that compliance would result in such alteration or burdens must be made by the head of a state entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a state entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the state entity.

A state entity may comply with the requirements of this section through such means as:

- redesign or acquisition of equipment;

- reassignment of services to accessible buildings;

- assignment of aides to beneficiaries;

- delivery of services at alternate accessible sites.

A state entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance.  In choosing among available methods for meeting the requirements of this section, a state entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

**6.   Undue Burden (28 CFR 35.164)**

A state entity is not required to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.  In those circumstances where personnel of the state entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a state entity has the burden of proving that compliance would result in such alteration or burdens.

The decision that compliance would result in such alteration or burdens must be made by the head of the state entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion.

If an action required to comply would result in such an alteration or such burdens, a state entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the state entity.

**7.   Direct Threat (28 CFR 35.139)**

A state entity is not required to permit an individual to participate in or benefit from the services, programs, or activities of that state entity when that individual poses a direct threat to the health or safety of others.

Direct threat means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services. (28 CFR 35.104)

In determining whether an individual poses a direct threat to the health or safety of others, a state entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

**8.   Notice**

A state entity shall make available to applicants, participants, beneficiaries, and other interested persons information regarding the applicability of Title II of the ADA to the services, programs, or activities of the state entity, and make such information available to them in such manner as the head of the state entity finds necessary to apprise such persons of the protections against discrimination assured them by the Act. (28 CFR 35.106)

For more information on notice requirements, see ***ADA Best Practices Tool Kit for State and Local Governments***, Chapter 2: ADA Coordinator, Notice & Grievance Procedure, at http://www.ada.gov/pcatoolkit/chap2toolkit.htm.
A sample written Notice is found in Appendix A.

**9.   Information & Signage (28 CFR 35.163)**

A state entity shall ensure that interested persons, including persons with impaired vision or hearing, can obtain information as to the existence and location of accessible services, activities, and facilities.

A state entity shall provide signage at all inaccessible entrances to each of its facilities, directing users to an accessible entrance or to a location at which they can obtain information about accessible facilities. The international symbol for accessibility shall be used at each accessible entrance of a facility.

**10.  Communications (28 CFR 35.160)**

A state entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public with disabilities are as effective as communications with others.

A state entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a state entity.

Auxiliary aids and services include:

(1) Qualified interpreters on-site or through video remote interpreting (VRI) services; note takers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing;

(2) Qualified readers; taped texts; audio recordings; Brailed materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision. (28 CFR 35.104)

The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a state entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

A state entity shall not require an individual with a disability to bring another individual to interpret for him or her.

## SECTION IV:  UNIFORM PROCEDURES FOR REASONABLE ACCOMMODATION IN STATE PROGRAMS AND SERVICES

This section describes the procedures for handling reasonable accommodation requests from individuals with disabilities.

### ADA Coordinator (Designee for Reasonable Accommodation)

Pursuant to 28 CFR 35.107, a state entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part. The state entity shall make available to all interested individuals the name, office address, and telephone number of the employee or employees designated pursuant to this paragraph.

A state entity that employs 50 or more persons shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part.

As stated above, the ADA Coordinator shall be the agency's Designee for Reasonable Accommodation (DRA).

### Requests for Accommodation

Whenever an individual with a disability requests reasonable accommodation with regard to state programs or services, the accommodation should be provided whenever there is no issue of undue burden or direct threat, as those concepts are described above.  Whenever a requested accommodation cannot be immediately granted, the matter should be referred to the DRA.

The DRA shall contact the individual requesting accommodation, and shall make a bona fide effort to reach a solution consistent with this policy and applicable legal standards.  The DRA shall consult, as needed, with the agency's Counsel and Fiscal Officer.  Where a reasonable accommodation cannot be offered as requested, the DRA shall assure that the individual requesting accommodation is aware of the agency's formal grievance procedures.

### Grievance Procedures

Any individual who is unsatisfied with the state entity's response to his or her needs as a person with a disability, or who is unsatisfied with the accommodation provided by the state entity, or who has been informally denied a requested accommodation, is entitled to file a formal written complaint with the agency. (28 C.F.R. § 35.107(b))

The formal written complaint shall be filed with the agency's DRA, whose name, title and address shall be readily available to the public, and provided to anyone who wishes to file a complaint.

Alternative means of filing the complaint must be available where necessary to afford the individual with a disability the ability to file the complaint. These include such alternatives as a verbal interview conducted by the DRA (or his or her designee for this purpose), or acceptance of a tape recording of the complaint. The DRA will assure that the complaint taken by alternate means is reduced to written form for recordkeeping purposes.

Within 15 calendar days after receipt of the complaint, **the** DRA or **his or her** designee will meet with the complainant to discuss the complaint and the possible resolutions. Within 15 calendar days of the meeting, **the** DRA or **his or her** designee will respond in writing, and where appropriate, in a format accessible to the complainant, such as large print, Braille, or audio tape. The response will explain the position of the agency and offer options for substantive resolution of the complaint. The response will also contain information on how to appeal any adverse decision.

Adverse decisions are appealable to the agency head or his or her designee by the individual, or the individual's designee. An appeal must be filed with the agency head or his or her designee within 15 days of the written response from the DRA.

The agency head or his or her designee shall, within 15 days of receipt of the appeal, respond in writing, and, where appropriate, in a format accessible to the complainant, with the agency's final resolution of the complaint, or indicating that the matter has been returned to the DRA for further action. If further action is indicated, the complainant will be contacted by the DRA within 15 days from the agency head or his or her designee written response, and further prompt action will be taken to resolve the complaint in accordance with the agency head or his or her designee instructions.

For more information on ADA requirement for grievance procedures, see ***ADA Best Practices Tool Kit for State and Local Governments***, Chapter 2: ADA Coordinator, Notice & Grievance Procedure, at http://www.ada.gov/pcatoolkit/chap2toolkit.htm.

A sample Grievance Procedure is found in Appendix B.

## Appendix A:

## NOTICE UNDER THE AMERICANS
## WITH DISABILITIES ACT

In accordance with the requirements of title II of the Americans with Disabilities Act of 1990 ("ADA"), the **New York State Department of State** will not discriminate against qualified individuals with disabilities on the basis of disability in its services, programs, or activities.

*Employment:* **New York State Department of State** does not discriminate on the basis of disability in its hiring or employment practices and complies with all regulations promulgated by the U.S. Equal Employment Opportunity Commission under title I of the ADA.

*Effective Communication:* **New York State Department of State** will generally, upon request, provide appropriate aids and services leading to effective communication for qualified persons with disabilities so they can participate equally in **New York State Department of State's** programs, services, and activities, including qualified sign language interpreters, documents in Braille, and other ways of making information and communications accessible to people who have speech, hearing, or vision impairments.

*Modifications to Policies and Procedures:* **New York State Department of State** will make all reasonable modifications to policies and programs to ensure that people with disabilities have an equal opportunity to enjoy all of its programs, services, and activities. For example, individuals with service animals are welcomed in **New York State Department of State** offices, even where pets are generally prohibited.

Anyone who requires an auxiliary aid or service for effective communication, or a modification of policies or procedures to participate in a program, service, or activity of **New York State Department of State,** should contact the office of  **Maria C. Herman, Director of Affirmative Action Programs/ADA Coordinator, One Commerce Plaza, 99 Washington Ave., Suite 1150, Albany, NY 12231, Phone (518) 473-3401** as soon as possible but no later than 48 hours before the scheduled event.

The ADA does not require the **New York State Department of State** to take any action that would fundamentally alter the nature of its programs or services, or impose an undue financial or administrative burden.

Complaints that a program, service, or activity of **New York State Department of State** is not accessible to persons with disabilities should be directed to **Maria C. Herman, Director of Affirmative Action Programs/ADA Coordinator, One Commerce Plaza, 99 Washington Ave., Suite 1150, Albany, NY 12231, Phone (518) 473-3401.**

**New York State Department of State** will not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the cost of providing

auxiliary aids/services or reasonable modifications of policy, such as retrieving items from locations that are open to the public but are not accessible to persons who use wheelchairs.

## Appendix B:

## GRIEVANCE PROCEDURE UNDER THE AMERICANS WITH DISABILITIES ACT

This Grievance Procedure is established to meet the requirements of the Americans with Disabilities Act of 1990 ("ADA"). It may be used by anyone who wishes to file a complaint alleging discrimination on the basis of disability in the provision of services, activities, programs, or benefits by the **New York State Department of State**. Employment-related complaints of disability discrimination are covered elsewhere, in policies available from the human resources office of the **New York State Department of State**.

The complaint should be in writing and contain information about the alleged discrimination such as name, address, phone number of complainant and location, date, and description of the problem. No particular format of the complaint is required. Alternative means of filing complaints, such as personal interviews or a tape recording of the complaint, will be made available for persons with disabilities upon request.

The complaint should be submitted by the grievant and/or his or her designee as soon as possible but no later than 60 calendar days after the alleged violation to:

> **Maria C. Herman, Director of Affirmative Action Programs, Designee for Reasonable Accommodation / ADA Coordinator**
> **One Commerce Plaza, 99 Washington Ave., Suite 1150, Albany, NY 12231, Phone (518) 473-3401**

Within 15 calendar days after receipt of the complaint, the ADA Coordinator or his or her designee will meet with the complainant to discuss the complaint and the possible resolutions. Within 15 calendar days of the meeting, the ADA Coordinator or his or her designee will respond in writing, and where appropriate, in a format accessible to the complainant, such as large print, Braille, or audio tape. The response will explain the position of the **New York State Department of State** and offer options for substantive resolution of the complaint.

If the response by the ADA Coordinator or his or her designee does not satisfactorily resolve the issue, the complainant and/or his or her designee may appeal the decision within 15 calendar days after receipt of the response to the agency head or his or her designee or his or her designee.

Within 15 calendar days after receipt of the appeal, the agency head or his or her designee or his or her designee will respond in writing, and, where appropriate, in a format accessible to the complainant, with the agency's final resolution of the complaint, or indicating that the matter has been returned to the ADA Coordinator for further action. If further action is indicated, the complainant will be contacted within 15 days from the written response.

All written complaints received by the ADA Coordinator or his or her designee, appeals to the agency head or his or her designee or his or her designee, and responses from these two offices will be retained by the **New York State Department of State** for at least three years.

16

**Appendix C:**

**AMERICANS WITH DISABILITIES ACT COMPLAINT FORM**

Please use this form to file a complaint based on disability in the provision of services, activities, programs or benefits.

Please submit this form to the ADA Coordinator, **Maria C. Herman, New York State Department of State**; you may find contact information for **Maria C. Herman** at http:www.dos.ny.gov/forms/Language_Access_Contact_Info.pdf.

**COMPLAINANT INFORMATION**

Name:                                          Home Phone:

Home Address:                                  Email:

1. Your claim is made against:

   State Agency:

   Name:

   Title:

   Address:

   Phone:

2. Location(s) and date(s) of the circumstances giving rise to your complaint:

   Are the circumstances of your complaint continuing?
   ☐ Yes   ☐ No

17

3. Please describe the alleged denial of services, activities, programs or benefits and your reason(s) for concluding that the conduct was discriminatory.  Please include the name(s) of witnesses, if any, and attach supporting data, if available.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

4. A.  Have you filed a claim regarding this complaint with a federal, state or local government agency?
   ☐ Yes    ☐ No

   B.  Have you hired an attorney with respect to the allegations in the complaint?
   ☐ Yes    ☐ No

   C.  Have you instituted a legal suit or court action regarding this complaint?
   ☐ Yes    ☐ No

5. This complaint form was completed by:
   ☐ ADA Coordinator    ☐ Complainant

SIGNATURE: _____    DATE: _____

18

*Exh. bit "two"*

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*





# Effective Communication

The Department of Justice published revised final regulations implementing the Americans with Disabilities Act (ADA) for title II (State and local government services) and title III (public accommodations and commercial facilities) on September 15, 2010, in the Federal Register. These requirements, or rules, clarify and refine issues that have arisen over the past 20 years and contain new, and updated, requirements, including the 2010 Standards for Accessible Design (2010 Standards).

## Overview

**People who have vision, hearing, or speech disabilities ("communication disabilities") use different ways to communicate. For example, people who are blind may give and receive information audibly rather than in writing and people who are deaf may give and receive information through writing or sign language rather than through speech.**

The ADA requires that title II entities (State and local governments) and title III entities (businesses and nonprofit organizations that serve the public) communicate effectively with people who have communication disabilities. The goal is to ensure that communication with people with these disabilities is equally effective as communication with people without disabilities.

This publication is designed to help title II and title III entities ("covered entities") understand how the rules for effective communication, including rules that went into effect on March 15, 2011, apply to them.

- The purpose of the effective communication rules is to ensure that the person with a vision, hearing, or speech disability can communicate with, receive information from, and convey information to, the covered entity.

- Covered entities must provide auxiliary aids and services when needed to communicate effectively with people who have communication disabilities.

- The key to communicating effectively is to consider the nature, length, complexity, and context of the communication and the person's normal method(s) of communication.

- The rules apply to communicating with the person who is receiving the covered entity's goods or services as well as with that person's parent, spouse, or companion in appropriate circumstances.

## Auxiliary Aids and Services

The ADA uses the term "auxiliary aids and services" ("aids and services") to refer to the ways to communicate with people who have communication disabilities.

- For people who are blind, have vision loss, or are deaf-blind, this includes providing a qualified reader; information in large print, Braille, or electronically for use with a computer screen-reading program; or an audio recording of printed information. A "qualified" reader means someone who is able to read effectively, accurately, and impartially, using any necessary specialized vocabulary.

- For people who are deaf, have hearing loss, or are deaf-blind, this includes providing a qualified notetaker; a qualified sign language interpreter, oral interpreter, cued-speech interpreter, or tactile interpreter; real-time captioning; written materials; or a printed script of a stock speech (such as given on a museum or historic house tour). A "qualified" interpreter means someone who is able to interpret effectively, accurately, and impartially, both receptively (i.e.,

understanding what the person with the disability is saying) and expressively (i.e., having the skill needed to convey information back to that person) using any necessary specialized vocabulary.

- For people who have speech disabilities, this may include providing a qualified speech-to-speech transliterator (a person trained to recognize unclear speech and repeat it clearly) , especially if the person will be speaking at length, such as giving testimony in court, or just taking more time to communicate with someone who uses a communication board. In some situations, keeping paper and pencil on hand so the person can write out words that staff cannot understand or simply allowing more time to communicate with someone who uses a communication board or device may provide effective communication. Staff should always listen attentively and not be afraid or embarrassed to ask the person to repeat a word or phrase they do not understand.

In addition, aids and services include a wide variety of technologies including 1) assistive listening systems and devices; 2) open captioning, closed captioning, real-time captioning, and closed caption decoders and devices; 3) telephone handset amplifiers, hearing-aid compatible telephones, text telephones (TTYs) , videophones, captioned telephones, and other voice, text, and video-based telecommunications products; 4) videotext displays; 5) screen reader software, magnification software, and optical readers; 6) video description and secondary auditory programming (SAP) devices that pick up video-described audio feeds for television programs; 7) accessibility features in electronic documents and other electronic and information technology that is accessible (either independently or through assistive technology such as screen readers) .

**Real-time captioning** (also known as computer-assisted real-time transcription, or CART) is a service similar to court reporting in which a transcriber types what is being said at a meeting or event into a computer that projects the words onto a screen. This service, which can be provided on-site or remotely, is particularly useful for people who are deaf or have hearing loss but do not use sign language.

The free nationwide **telecommunications relay service** (TRS), reached by calling 7-1-1, uses communications assistants (also called CAs or relay operators) who serve as intermediaries between people who have hearing or speech disabilities who use a text telephone (TTY) or text messaging and people who use standard voice telephones. The communications assistant tells the telephone user what the other party is typing and types to tell the other party what the telephone user is saying. TRS also provides speech-to-speech transliteration for callers who have speech disabilities.

**Video relay service** (VRS) is a free, subscriber-based service for people who use sign language and have videophones, smart phones, or computers with video communication capabilities. For outgoing calls, the subscriber contacts the VRS interpreter, who places the call and serves as an intermediary between the subscriber and a person who uses a standard voice telephone. The interpreter tells the telephone user what the subscriber is signing and signs to the subscriber what the telephone user is saying.

**Video remote interpreting** (VRI) is a fee-based service that uses video conferencing technology to access an off-site interpreter to provide real-time sign language or oral interpreting services for conversations between hearing people and people who are deaf or have hearing loss. The new regulations give covered entities the choice of using VRI or on-site interpreters in situations where either would be effective. VRI can be especially useful in rural areas where on-site interpreters may be difficult to obtain. Additionally, there may be some cost advantages in using VRI in certain circumstances. However, VRI will not be effective in all circumstances. For example, it will not be effective if the person who needs the interpreter has difficulty seeing the screen (either because of vision loss or because he or she cannot be properly positioned to see the screen, because of an injury or other condition). In these circumstances, an on-site interpreter may be required.

If VRI is chosen, *all* of the following specific performance standards must be met:

- real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;

- a sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the face, arms, hands, and fingers of the person using sign language, regardless of his or her body position;

- a clear, audible transmission of voices; and

- adequate staff training to ensure quick set-up and proper operation.

**Many deaf-blind individuals use support service providers (SSPs) to assist them in accessing the world around them. SSPs are not "aids and services" under the ADA. However, they provide mobility, orientation, and informal communication services for deaf-blind individuals and are a critically important link enabling them to independently access the community at large.**

## Effective Communication Provisions

Covered entities must provide aids and services when needed to communicate effectively with people who have communication disabilities.

The key to deciding what aid or service is needed to communicate **effectively** is to consider the nature, length, complexity, and context of the communication as well as the person's normal method(s) of communication.

Some easy solutions work in relatively simple and straightforward situations. For example:

- In a lunchroom or restaurant, reading the menu to a person who is blind allows that person to decide what dish to order.

- In a retail setting, pointing to product information or writing notes back and forth to answer simple questions about a product may allow a person who is deaf to decide whether to purchase the product.

Other solutions may be needed where the information being communicated is more extensive or complex. For example:

- In a law firm, providing an accessible electronic copy of a legal document that is being drafted for a client who is blind allows the client to read the draft at home using a computer screen-reading program.

- In a doctor's office, an interpreter generally will be needed for taking the medical history of a patient who uses sign language or for discussing a serious diagnosis and its treatment options.

A person's method(s) of communication are also key. For example, sign language interpreters are effective only for people who use sign language. Other methods of communication, such as those described above, are needed for people who may have lost their hearing later in life and do not use sign language. Similarly, Braille is effective only for people who read Braille. Other methods are needed for people with vision disabilities who do not read Braille, such as providing accessible electronic text documents, forms, etc., that can be accessed by the person's screen reader program.

Covered entities are also required to accept telephone calls placed through TRS and VRS, and staff who answer the telephone must treat relay calls just like other calls. The communications assistant will explain how the system works if necessary.

Remember, the purpose of the effective communication rules is to ensure that the person with a communication disability can receive information from, and convey information to, the covered entity.

## Companions

In many situations, covered entities communicate with someone other than the person who is receiving their goods or services. For example, school staff usually talk to a parent about a child's progress; hospital staff often talk to a patient's spouse, other relative, or friend about the patient's condition or prognosis. The rules refer to such people as "companions" and require covered entities to provide effective communication for companions who have communication disabilities.

The term "companion" includes any family member, friend, or associate of a person seeking or receiving an entity's goods or services who is an appropriate person with whom the entity should communicate.

## Use of Accompanying Adults or Children as Interpreters

Historically, many covered entities have expected a person who uses sign language to bring a family member or friend to interpret for him or her. These people often lacked the impartiality and specialized vocabulary needed to interpret effectively and accurately. It was particularly problematic to use people's children as interpreters.

The ADA places responsibility for providing effective communication, including the use of interpreters, directly on covered entities. They cannot require a person to bring someone to interpret for him or her. A covered entity can rely on a companion to interpret in only two situations.

(1) In an emergency involving an imminent threat to the safety or welfare of an individual or the public, an adult or minor child accompanying a person who uses sign language may be relied upon to interpret or facilitate communication only when a qualified interpreter is not available.

(2) In situations **not** involving an imminent threat, an adult accompanying someone who uses sign language may be relied upon to interpret or facilitate communication when a) the individual requests this, b) the accompanying adult agrees, and c) reliance on the accompanying adult is appropriate under the circumstances. This exception does **not** apply to minor children.

Even under exception (2) , covered entities may **not** rely on an accompanying adult to interpret when there is reason to doubt the person's impartiality or effectiveness. For example:

- It would be inappropriate to rely on a companion to interpret who feels conflicted about communicating bad news to the person or has a personal stake in the outcome of a situation.

- When responding to a call alleging spousal abuse, police should never rely on one spouse to interpret for the other spouse.

## Who Decides Which Aid or Service Is Needed?



When choosing an aid or service, title II entities are **required** to give primary consideration to the choice of aid or service requested by the person who has a communication disability. The state or local government must honor the person's choice, unless it can demonstrate that another equally effective means of communication is available, or that the use of the means chosen would result in a fundamental alteration or in an undue burden (see limitations below). If the choice expressed by the person with a disability would result in an undue burden or a fundamental alteration, the public entity still has an obligation to provide an alternative aid or service that provides effective communication if one is available.

Title III entities are **encouraged** to consult with the person with a disability to discuss what aid or service is appropriate. The goal is to provide an aid or service that will be effective, given the nature of what is being communicated and the person's method of communicating.

**Covered entities may require reasonable advance notice from people requesting aids or services, based on the length of time needed to acquire the aid or service, but may not impose excessive advance notice requirements. "Walk-in" requests for aids and services must also be honored to the extent possible.**

## Limitations

Covered entities are required to provide aids and services unless doing so would result in an "undue burden," which is defined as significant difficulty or expense. If a particular aid or service would result in an undue burden, the entity must provide another effective aid or service, if possible, that would not result in an undue burden. Determining what constitutes an undue burden will vary from entity to entity and sometimes from one year to the next. The impact of changing economic conditions on the resources available to an entity may also be taken into consideration in making this determination.

**State and local governments**: in determining whether a particular aid or service would result in undue financial and administrative burdens, a title II entity should take into consideration the cost of the particular aid or service in light of all resources available to fund the program, service, or activity and the effect on other expenses or operations. The decision that a particular aid or service would result in an undue burden must be made by a high level official, no lower than a Department head, and must include a written statement of the reasons for reaching that conclusion.

**Businesses and nonprofits**: in determining whether a particular aid or service would result in an undue burden, a title III entity should take into consideration the nature and cost of the aid or service relative to their size, overall financial resources, and

overall expenses. In general, a business or nonprofit with greater resources is expected to do more to ensure effective communication than one with fewer resources. If the entity has a parent company, the administrative and financial relationship, as well as the size, resources, and expenses of the parent company, would also be considered.

In addition, covered entities are not required to provide any particular aid or service in those rare circumstances where it would fundamentally alter the nature of the goods or services they provide to the public. In the performing arts, for example, slowing down the action on stage in order to describe the action for patrons who are blind or have vision loss may fundamentally alter the nature of a play or dance performance.

## Staff Training

A critical and often overlooked component of ensuring success is comprehensive and ongoing staff training. Covered entities may have established good policies, but if front line staff are not aware of them or do not know how to implement them, problems can arise. Covered entities should teach staff about the ADA's requirements for communicating effectively with people who have communication disabilities. Many local disability organizations, including Centers for Independent Living, conduct ADA trainings in their communities. The Department's ADA Information Line can provide local contact information for these organizations.

**For more information about the ADA, please visit our website or call our toll-free number.**

**ADA Website**

**www.ADA.gov**

To receive e-mail notifications when new ADA information is available,

visit the ADA Website's home page and click the **link** near the top of the middle column.

**ADA Information Line**

800-514-0301 (Voice) and 800-514-0383 (TTY)

24 hours a day to order publications by mail.

M-W, F 9:30 a.m. – 5:30 p.m. , Th 12:30 p.m. – 5:30 p.m. (Eastern Time) to speak with an ADA Specialist.

All calls are confidential.

For persons with disabilities, this publication is available in alternate formats.

Duplication of this document is encouraged. January 2014

**PDF Version of this Document**

January 31, 2014

BY JONATHAN R. BROWN, PhD, CCC-A, CED

*exhibit three*

patient education



# Tinnitus:
# An Auditory Processing Disorder

he sensation of ringing, buzzing or roaring sounds in the ear(s) or head when no external sounds are being made is called tinnitus. This condition may range from a temporary experience of a few seconds to being chronic. It may be intermittent or sustained. It may be in one ear, both ears, or the origin may not be understood by the patient. It may be loud or soft. It may bother the patient more during some times of the day, such as nighttime, more than others.[1,2]

## Testing for Tinnitus

Tinnitus often is a symptom caused by some underlying physiological problem. Therefore, the first initiative in helping a patient is to perform tests that will help determine the cause of the tinnitus. An examination is helpful to find possible underlying physical causes. There are many causes of tinnitus. Wax in a person's ear, blood pressure, medications, allergies, noise exposure, disease of the auditory system, and cardiovascular abnormalities are a few possible reasons why tinnitus may be experienced. It is common for the patient's physician and audiologist to collaborate testing and managing a patient with tinnitus.[1,2]

An audiologist is an important part of the testing process. The audiologist administers a set of basic and advanced ear and hearing tests to determine if the auditory system

is functioning normally. Additionally, the audiologist typically asks a series of questions about ear involvement, type of sounds heard, when the sounds are most prevalent, sound pitch, sound volume, consistency of the sound, etc.

## Treating Tinnitus

Following medical and audiological examinations, tinnitus treatment may take one of several forms. Physical abnormalities are treated medically or surgically; sometimes effective treatment may require both. Unfortunately, many of the causes of tinnitus are not resolved medically or surgically because the reason for the tinnitus is not known. Abnormalities that are not medically or surgically treatable typically are managed by an audiologist.[1,2]

A variety of therapies have been used to treat tinnitus, including drug therapy, counseling and tinnitus maskers. Combinations of treatments are sometimes used. What works for one patient may not necessarily work for another patient.

Tinnitus maskers have had reasonable success with many patients. These devices look like hearing aids, but they work by emitting sound into the ear. The purpose of the tinnitus masker is to help cover up the patient's perception of tinnitus or to distract attention from it. For tinnitus patients who also have hearing loss, a hearing aid and tinnitus masker are sometimes combined into one unit that provides both amplification and masking to help cover up the patient's tinnitus.

Because tinnitus frequently is reported as more annoying at night when there are fewer surrounding noises and patients may be trying to sleep, audiologists sometimes may recommend sound-producing systems that are placed beside a patient's bed. The sounds from the device help to cover up or distract the patient's perception of the annoying tinnitus.

Some patients also benefit from counseling therapy, auditory rehabilitation therapy or a combination of both. Counseling therapy frequently focuses on treatment of emotional distress that may be the result of the effects of experiencing tinnitus. Auditory rehabilitation therapy focuses on how to maximize listening techniques in the presence of tinnitus to optimize what the patient hears.

## Team Approach

Tinnitus can be a disabling condition. The purpose of recognizing, diagnosing and treating tinnitus is to improve the quality of a patient's life. Effective treatment frequently involves the patient, a physician and an audiologist. Fortunately, a systematic team approach can often improve the quality of life for patients who seek and receive professional help. $

REFERENCES:
1. American Speech Language Hearing Association, accessed online at *www.asha.org/public/hearing/treatment/tinnitus_manage.htm*
2. Oregon Health and Science University, accessed online at *www.ohsu.edu/ohrc/tinnitus-clinic.*

*Jonathan R. Brown, PhD, CCC-A, CED, is a professor at Clarion University, Clarion, PA.*

FOR MORE INFORMATION:

- **American Academy of Audiology**
  *www.howsyourhearing.org/tinnitus.html*
- **American Tinnitus Association**
  *www.ata.org*
- **Better Hearing Institute**
  *www.betterhearing.org/tinnitus/index.cfm*
- **National Institute on Deafness and Other Communications Disorders**
  *www.nidcd.nih.gov/health/hearing/noiseinear.asp*
- **Tinnitus Practitioners Association**
  *www.tinnituspractitioners.com/understanding_tinnitus.html*

MEDIOIMAGES/PHOTODISC/THINKSTOCK

Exhibit four

```
                        tal073.txt
                U.S. Department of Justice

                Civil Rights Division
```

DJ# 192-06-00006


                        Coordination and Review Section
                        P.O. Box 66118
                        Washington, D.C. 20035-6118

                        MAY 21 1992

Mr. (b)(6)
XX
Indianapolis, Indiana 46219

Dear Mr. (b)(6)xx

        This is in response to your inquiry about the Americans with
Disabilities Act (ADA) covering payment for certain court costs
and provision of auxiliary aids and services necessary to
understand court proceedings.

        The ADA authorizes the Department to provide technical
assistance to entities that are subject to the Act. This letter
provides informal guidance to assist you in understanding how the
ADA may apply to your case. This technical assistance, however,
does not constitute a determination by the Department of Justice
of your rights or responsibilities under the ADA and does not
constitute a binding determination by the Department of Justice.

        There are two Federal laws that require the provision of
auxiliary aids and services in court proceedings. If the court
receives Federal financial assistance from the Department of
Justice, section 504 of the Rehabilitation Act of 1973, as
amended, may apply. Section 504 prohibits discrimination on the
basis of handicap in federally assisted programs. The
Department's regulation implementing section 504, which has been
in effect since 1980, requires that State and local courts
receiving Federal funding provide auxiliary aids and services
where necessary to ensure effective communication with members of
the public (28 C.F.R. SS 42.503(e) and (f)). A copy of the
Department's section 504 rule is enclosed.

        Title II of the ADA, which was effective on January 26,
1992, prohibits discrimination on the basis of disability in all
programs, activities, and services provided or made available by
State and local governments, instrumentalities, or agencies--

                        Page 1

tal073.txt

regardless of the receipt of Federal funds. The title II
regulation is based on regulations implementing section 504.
Copies of the title II regulation and a manual explaining the
regulation are enclosed. Like the section 504 rule, the title II

01-00804


- 2 -


rule requires the provision of auxiliary aids and services by
courts where necessary to ensure effective communication with an
individual who is deaf or hard of hearing (S35.160 of our title
II rule).

     Title II also prohibits State and local courts from charging
an individual with a disability for the costs of auxiliary aids
and services (S35.130(f) of our title II rule). If a court
transcript is used as an auxiliary aid for you to understand the
proceeding, then the court may not charge the cost to you.

     For individuals with hearing impairments, auxiliary aids and
services include, but are not limited to, qualified interpreters,
notetakers, assistive listening devices, assistive listening
systems, and transcription services such as computer aided real-
time transcription (CART) (S35.104). Public entities must
provide the auxiliary aid requested by an individual, unless the
public entity can demonstrate that another effective means of
communication exists or that providing the requested aid would
result in a fundamental alteration in the program or in undue
financial and administrative burdens (SS 35.160(b)(2) and 35.164).

     The title II rule also requires that a State or local court
make reasonable modifications in practices, policies and
procedures, if necessary, to avoid discrimination on the basis of
disability, unless the court can demonstrate that making those
modifications would fundamentally alter the nature of the
service, program, or activity (S35.130(b)(7)).

     If you believe that you have been subjected to
discrimination on the basis of disability by the court under
section 504 or title II, you may, within 180 days of the alleged
discrimination, file either-

     1) An administrative complaint by writing a letter to:
Coordination and Review Section, Civil Rights Division, U.S.
Department of Justice, P.O. Box 66118, Washington, D.C. 20045-

                            Page 2

tal073.txt

6118; or

    2)  A private lawsuit in Federal district court.
    If you file an administrative complaint that is timely and
to which section 504 and/or title II apply, the Department of
Justice will investigate the allegations of discrimination.
Should we conclude that the public entity violated the Federal
law, we will attempt to negotiate settlement to remedy the


01-00805


                    - 3 -


violations. If settlement efforts fail, termination of funds or
court litigation may be instituted. Please note that to be
covered under title II, your complaint must allege discriminatory
actions that took place after January 26, 1992.


    I hope this information has been helpful to you.

                Sincerely,




                Stewart B. Oneglia
                      Chief
         Coordination and Review Section
           Civil Rights Division

Enclosures (3)

tal073.txt

01-00806